# EXHIBIT A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:** CHEVRON CORP.; CHEVRON U.S.A. INC.;
*(AVISO AL DEMANDADO):* EXXONMOBIL CORP.; BP P.L.C.; BP AMERICA,
INC.; ROYAL DUTCH SHELL PLC; SHELL OIL PRODUCTS COMPANY
LLC; CITGO PETROLEUM CORP.; CONOCOPHILLIPS; CONOCOPHILLIPS
Additional Parties Attachment form is attached.
**YOU ARE BEING SUED BY PLAINTIFF:** THE CITY OF IMPERIAL BEACH, a
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* municipal corporation,
individually and on behalf of THE PEOPLE OF THE STATE OF CALIFORNIA

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

F I L E D

JUL 17 2017

STEPHEN H. NASH CLERK OF THE COURT
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA
By_____, Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California, County of Contra Costa
725 Court Street
Martinez, California  94553

CASE NUMBER:
*(Número del Caso):*

**C17-01227**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: Victor M. Sher
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
SHER EDLING LLP
425 California St., Ste. 810, SAN FRANCISCO, CA 94104

DATE:                                    Clerk, by            **S. OZUNA**            (628) 231-2500
*(Fecha)* JUL 17 2017                    *(Secretario)* _____, Deputy *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

   Chevron Corp.
3. ☒ on behalf of *(specify):*

   under: ☒ CCP 416.10 (corporation)            ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
           ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*
Westlaw Doc & Form Builder™

SUM-200(A)

| SHORT TITLE: The City of Imperial Beach vs. Chevron Corp., et al. | CASE NUMBER: |
|---|---|

## INSTRUCTIONS FOR USE

➤ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
➤ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

COMPANY; PHILLIPS 66; PEABODY ENERGY CORP.; TOTAL E&P USA INC.; TOTAL SPECIALTIES USA INC.; ARCH COAL, INC.; ENI S.p.A.; ENI OIL & GAS INC.; RIO TINTO PLC; RIO TINTO LTD.; RIO TINTO ENERGY AMERICA INC.; RIO TINTO MINERALS, INC.; RIO TINTO SERVICES INC.; STATOIL ASA; ANADARKO PETROLEUM CORP.; OCCIDENTAL PETROLEUM CORP.; OCCIDENTAL CHEMICAL CORP.; REPSOL S.A.; REPSOL ENERGY NORTH AMERICA CORP.; REPSOL TRADING USA CORP.; MARATHON OIL COMPANY; MARATHON OIL CORPORATION; MARATHON PETROLEUM CORP.; HESS CORP.; DEVON ENERGY CORP.; DEVON ENERGY PRODUCTION COMPANY, L.P.; ENCANA CORP.; APACHE CORP.; and DOES 1 through 100, inclusive,

Page ___1___ of ___1___

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Westlaw Doc & Form Builder™

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td>

**NOTICE TO DEFENDANT:** CHEVRON CORP.; CHEVRON U.S.A. INC.;
**(AVISO AL DEMANDADO):** EXXONMOBIL CORP.; BP P.L.C.; BP AMERICA,
INC.; ROYAL DUTCH SHELL PLC; SHELL OIL PRODUCTS COMPANY
LLC; CITGO PETROLEUM CORP.; CONOCOPHILLIPS; CONOCOPHILLIPS
Additional Parties Attachment form is attached.
**YOU ARE BEING SUED BY PLAINTIFF:** THE CITY OF IMPERIAL BEACH, a
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):** municipal corporation,
individually and on behalf of THE PEOPLE OF THE STATE OF CALIFORNIA

</td><td>

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

F I L E D

JUL 17 2017

STEPHEN H. NASH CLERK OF THE COURT
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA
By_____, Deputy Clerk

</td></tr>
</table>

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

<table>
<tr><td>

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California, County of Contra Costa
725 Court Street
Martinez, California 94553

</td><td>

CASE NUMBER:
*(Número del Caso):*
**C 17 - 0 1 2 2 7**

</td></tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: Victor M. Sher
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
SHER EDLING LLP
425 California St., Ste. 810, SAN FRANCISCO, CA 94104                                (628) 231-2500

<table>
<tr><td>

DATE:
*(Fecha)* JUL 17 2017

</td><td>Clerk, by
*(Secretario)* **S. OZUNA**</td><td>, Deputy
*(Adjunto)*</td></tr>
</table>

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. [   ] as an individual defendant.
2. [   ] as the person sued under the fictitious name of *(specify):*

[SEAL]

Chevron U.S.A. Inc.

3. [X] on behalf of *(specify):*

under: [X] CCP 416.10 (corporation)          [   ] CCP 416.60 (minor)
      [   ] CCP 416.20 (defunct corporation)     [   ] CCP 416.70 (conservatee)
      [   ] CCP 416.40 (association or partnership) [   ] CCP 416.90 (authorized person)
      [   ] other *(specify):*

4. [   ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*
Westlaw Doc & Form Builder™

SUM-200(A)

| | |
|---|---|
| SHORT TITLE: The City of Imperial Beach vs. Chevron Corp., et al. | CASE NUMBER: |

## INSTRUCTIONS FOR USE

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

COMPANY; PHILLIPS 66; PEABODY ENERGY CORP.; TOTAL E&P USA INC.; TOTAL SPECIALTIES USA INC.; ARCH COAL, INC.; ENI S.p.A.; ENI OIL & GAS INC.; RIO TINTO PLC; RIO TINTO LTD.; RIO TINTO ENERGY AMERICA INC.; RIO TINTO MINERALS, INC.; RIO TINTO SERVICES INC.; STATOIL ASA; ANADARKO PETROLEUM CORP.; OCCIDENTAL PETROLEUM CORP.; OCCIDENTAL CHEMICAL CORP.; REPSOL S.A.; REPSOL ENERGY NORTH AMERICA CORP.; REPSOL TRADING USA CORP.; MARATHON OIL COMPANY; MARATHON OIL CORPORATION; MARATHON PETROLEUM CORP.; HESS CORP.; DEVON ENERGY CORP.; DEVON ENERGY PRODUCTION COMPANY, L.P.; ENCANA CORP.; APACHE CORP.; and DOES 1 through 100, inclusive,

Page <u>  1  </u> of <u>  1  </u>

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Westlaw Doc & Form Builder™

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Victor M. Sher  SBN: 96197 | |
| SHER EDLING LLP | **F I L E D** |
| 425 California St., Ste. 810, SAN FRANCISCO, CA 94104 | |
| TELEPHONE NO.: (628) 231-2500  FAX NO.: (628) 231-2929 | **JUL 17 2017** |
| ATTORNEY FOR *(Name)*: City of Imperial Beach | STEPHEN H. NASH CLERK OF THE COURT  SUPERIOR COURT OF THE STATE OF CALIFORNIA  COUNTY OF CONTRA COSTA |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA
STREET ADDRESS: 725 Court Street
MAILING ADDRESS: 725 Court Street
CITY AND ZIP CODE: Martinez, 94553
BRANCH NAME: Wakefield Taylor Courthouse

By_____, Deputy Clerk

CASE NAME: The City of Imperial Beach, a municipal corporation, individually and
on behalf of the People of the State of California vs. Chevron Corp., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited  [ ] Limited | [ ] Counter  [ ] Joinder | **C 17 - 0 1 2 2 7** |
| (Amount  (Amount demanded is demanded $25,000 or less) exceeds $25,000) | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:  DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[X] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [X] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [X] Substantial amount of documentary evidence
   d. [X] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [X] punitive
4. Number of causes of action *(specify)*: Public Nuisance, Strict Liability, Private Nuisance, Negligence, Trespass
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: July 17, 2017

Victor M. Sher
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use  Judicial Council of California  CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;  Cal. Standards of Judicial Administration, std. 3.10  www.courtinfo.ca.gov  Westlaw Doc & Form Builder |

1  | JENNIFER LYON (SBN 215905)
jlyon@mcdougallove.com
2  | STEVEN E. BOEHMER (SBN 144817)
sboehmer@mcdougallove.com
3  | **McDOUGAL, LOVE, BOEHMER, FOLEY, LYON & CANLAS**
CITY ATTORNEY FOR CITY OF IMPERIAL BEACH
4  | 8100 La Mesa Boulevard, Ste. 200
La Mesa, CA 91942
5  | Tel: (619) 440-4444
Fax: (619) 440-4907
6  |
7  | VICTOR M. SHER (SBN 96197)
vic@sheredling.com
8  | MATTHEW K. EDLING (SBN 250940)
matt@sheredling.com
TIMOTHY R. SLOANE (SBN 292864)
9  | tim@sheredling.com
MARTIN D. QUIÑONES (SBN 293318)
10 | marty@sheredling.com
**SHER EDLING LLP**
11 | 425 California Street, Ste. 810
San Francisco, CA 94104
12 | Tel: (628) 231-2500
Fax: (628) 231-2929
13 |
14 | *Attorneys for Plaintiff*
*The City of Imperial Beach, a municipal corporation*
15 | *and on behalf of the People of the State of California*

**FILED**

JUL 17 2017

STEPHEN H. NASH CLERK OF THE COURT
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN DIEGO
By OZUNA
Deputy Clerk

PER LOCAL RULES 5 THIS
CASE IS ASSIGNED TO
DEPT. 17

SUMMONS ISSUED

16 |                 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                      **IN AND FOR THE COUNTY OF CONTRA COSTA**

17 | THE CITY OF IMPERIAL BEACH, a            | Case No. **C 17 - 0 1 2 2 7**
18 | municipal corporation, individually and on |
     behalf of THE PEOPLE OF THE STATE OF   | COMPLAINT FOR:
19 | CALIFORNIA,                               |
20 |                                           | 1. PUBLIC NUISANCE ON BEHALF
                     Plaintiff,                |    OF THE PEOPLE OF THE STATE
21 |        vs.                                |    OF CALIFORNIA;
                                               | 2. PUBLIC NUISANCE;
22 | CHEVRON CORP.; CHEVRON U.S.A. INC.;       | 3. STRICT LIABILITY – FAILURE TO
     EXXONMOBIL CORP.; BP P.L.C.; BP          |    WARN;
23 | AMERICA, INC.; ROYAL DUTCH SHELL          | 4. STRICT LIABILITY – DESIGN
     PLC; SHELL OIL PRODUCTS COMPANY          |    DEFECT;
24 | LLC; CITGO PETROLEUM CORP.;               | 5. PRIVATE NUISANCE;
     CONOCOPHILLIPS; CONOCOPHILLIPS           | 6. NEGLIGENCE;
25 | COMPANY; PHILLIPS 66; PEABODY             | 7. NEGLIGENCE – FAILURE TO
     ENERGY CORP.; TOTAL E&P USA INC.;        |    WARN; and
26 | TOTAL SPECIALTIES USA INC.; ARCH          | 8. TRESPASS.
27 | COAL, INC.; ENI S.p.A.; ENI OIL & GAS     |
     INC.; RIO TINTO PLC; RIO TINTO LTD.;     | JURY TRIAL DEMANDED
28 |

SHER
EDLING LLP

**COMPLAINT**

1  RIO TINTO ENERGY AMERICA INC.; RIO
   TINTO MINERALS, INC.; RIO TINTO
2  SERVICES INC.; STATOIL ASA;
   ANADARKO PETROLEUM CORP.;
3  OCCIDENTAL PETROLEUM CORP.;
   OCCIDENTAL CHEMICAL CORP.; REPSOL
4  S.A.; REPSOL ENERGY NORTH AMERICA
   CORP.; REPSOL TRADING USA CORP.;
5  MARATHON OIL COMPANY; MARATHON
   OIL CORPORATION; MARATHON
6  PETROLEUM CORP.; HESS CORP.; DEVON
   ENERGY CORP.; DEVON ENERGY
7  PRODUCTION COMPANY, L.P.; ENCANA
   CORP.; APACHE CORP.; and DOES 1
8  through 100, inclusive,
9
                    Defendants.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHER
EDLING LLP

COMPLAINT

## **TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................ 1

II.  PARTIES ...................................................................................................... 4

    A.   Plaintiffs ............................................................................................... 4

    B.   Defendants ............................................................................................ 5

III. AGENCY ..................................................................................................... 22

IV.  JURISDICTION AND VENUE .................................................................. 22

V.   FACTUAL BACKGROUND ...................................................................... 23

    A.   Global Warming—Observed Effects and Known Cause......................... 23

    B.   Sea Level Rise—Known Causes and Observed Effects .......................... 28

    C.   Attribution........................................................................................... 32

    D.   Defendants Went to Great Lengths to Understand the Hazards Associated with and Knew or Should Have Known of the Dangers Associated with the Extraction, Promotion and Sale of Their Fossil Fuel Products. ................................... 34

    E.   Defendants Did Not Disclose Known Harms Associated with the Extraction, Promotion and Consumption of Their Fossil Fuel Products and Instead Affirmatively Acted to Obscure Those Harms and Engaged in a Concerted Campaign to Evade Regulation. ............................................................. 46

    F.   In Contrast to their Public Statements, Defendants' Internal Actions Demonstrate their Awareness of and Intent to Profit from the Unabated Use of Fossil Fuel Products.............................................................................................. 62

    G.   Defendants' Actions Prevented the Development of Alternatives That Would Have Eased the Transition to a Less Fossil Fuel Dependent Economy. ........................... 64

    H.   Defendants Caused Plaintiffs' Injuries ................................................. 71

VI.  CAUSES OF ACTION ............................................................................... 75

    FIRST CAUSE OF ACTION
    (Public Nuisance on Behalf of the People of the State of California) ................................. 75

    SECOND CAUSE OF ACTION
    (Public Nuisance on Behalf of City of Imperial Beach).................................................. 78

THIRD CAUSE OF ACTION
(Strict Liability—Failure to Warn on behalf of City of Imperial Beach) ........................... 81

FOURTH CAUSE OF ACTION
(Strict Liability—Design Defect on behalf of City of Imperial Beach) ............................. 83

FIFTH CAUSE OF ACTION
(Private Nuisance on behalf of City of Imperial Beach) ..................................................... 87

SIXTH CAUSE OF ACTION
(Negligence on Behalf of City of Imperial Beach) ............................................................. 90

SEVENTH CAUSE OF ACTION ........................................................................................ 92
(Negligence - Failure to Warn on Behalf of City of Imperial Beach) ................................. 92

EIGHTH CAUSE OF ACTION
(Trespass on Behalf of City of Imperial Beach) ................................................................. 93

VII. PRAYER FOR RELIEF ............................................................................................... 95

VIII. JURY DEMAND .......................................................................................................... 96

# I.   **INTRODUCTION**

1.      Defendants, major corporate members of the fossil fuel industry, have known for nearly a half century that unrestricted production and use of their fossil fuel products create greenhouse gas pollution that warms the planet and changes our climate. They have known for decades that those impacts could be catastrophic and that only a narrow window existed to take action before the consequences would not be reversible. They have nevertheless engaged in a coordinated, multi-front effort to conceal and deny their own knowledge of those threats, discredit the growing body of publicly available scientific evidence, and persistently create doubt in the minds of customers, consumers, regulators, the media, journalists, teachers, and the public about the reality and consequences of the impacts of their fossil fuel pollution. At the same time, Defendants have promoted and profited from a massive increase in the extraction and consumption of oil, coal, and natural gas, which has in turn caused an enormous, foreseeable, and avoidable increase in global greenhouse gas pollution and a concordant increase in the concentration of greenhouse gases,[1] particularly carbon dioxide ("$CO_2$") and methane, in the Earth's atmosphere. Those disruptions of the Earth's otherwise balanced carbon cycle have substantially contributed to a wide range of dire climate-related effects, including global warming, rising atmospheric and ocean temperatures, ocean acidification, melting polar ice caps and glaciers, more extreme and volatile weather, and sea level rise.[2] Plaintiffs, the People of the State of California and City of Imperial Beach,[3] along with the City's residents, taxpayers, and infrastructure, suffer the consequences.

2.      Defendants are vertically integrated extractors, producers, refiners, manufacturers, distributors, promoters, marketers, and sellers of fossil fuel products. Decades of scientific research show that pollution from the production and use of Defendants' fossil fuel products plays

---

[1] As used in this Complaint, "greenhouse gases" refers collectively to carbon dioxide, methane, and nitrous oxide. Where a source refers to a specific gas or gases, or when a process relates only to a specific gas or gases, this Complaint refers to them by name.

[2] Exhibit A, attached to this Complaint, is a timeline highlighting information alleged in the paragraphs below. The timeline illustrates what the fossil fuel companies knew, when they knew it, and what they failed to do to prevent the environmental effects that are now imposing real costs on people and communities around the country. The information comes from key industry documents and other sources.

[3] As used in this Complaint, "Imperial Beach" refers to all areas within the geographic boundaries of the City.

a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution and increased atmospheric $CO_2$ concentrations since the mid-20th century. This dramatic increase in atmospheric $CO_2$ and other greenhouse gases is the main driver of the gravely dangerous changes occurring to the global climate.

3.       Anthropogenic (human-caused) greenhouse gas pollution, primarily in the form of $CO_2$, is far and away the dominant cause of global warming and sea level rise.[4] The primary source of this pollution is the extraction, production and consumption of coal, oil, and natural gas, referred to collectively in this Complaint as "fossil fuel products."[5]

4.       The rate at which Defendants have extracted and sold fossil fuel products has exploded since the Second World War, as have emissions from those products. The substantial majority of all greenhouse gas emissions in history has occurred since the 1950s, a period known as the "Great Acceleration."[6] About three quarters of all industrial $CO_2$ emissions in history have occurred since the 1960s,[7] and more than half have occurred since the late 1980s.[8] The annual rate of $CO_2$ emissions from production, consumption and use of fossil fuels has increased by more than 60% since 1990.[9]

5.       Defendants have known for nearly 50 years that greenhouse gas pollution from their fossil fuel products has a significant impact on the Earth's climate and sea levels. Defendants' awareness of the negative implications of their own behavior corresponds almost exactly with the Great Acceleration, and with skyrocketing greenhouse gas emissions. With that knowledge,

---

[4] See IPCC, 2014: Climate Change 2014: Synthesis Report. Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Core Writing Team, R.K. Pachauri and L.A. Meyer (eds.)]. IPCC, Geneva, Switzerland. Page 6, Figure SMP.3, https://www.ipcc.ch/report/ar5/syr/.
[5] See C. Le Quéré et al., Global Carbon Budget 2016, Earth Syst. Sci. Data 8, 632 (2016), http://www.earth-syst-sci-data.net/8/605/2016/. Cumulative emissions since the beginning of the industrial revolution to 2015 were 413 GtC attributable to fossil fuels, and 190 GtC attributable to land use change. Id. Global $CO_2$ emissions from fossil fuels and industry remained nearly constant at 9.9 GtC in 2015, distributed among coal (41 %), oil (34 %), gas (19 %), cement (5.6 %), and gas flaring (0.7 %). Id. at 629.
[6] Will Steffen et al., The Trajectory of the Anthropocene: The Great Acceleration (2015), http://journals.sagepub.com/doi/abs/10.1177/2053019614564785.
[7] R. J. Andres et al., A synthesis of carbon dioxide emissions from fossil-fuel combustion, Biogeosciences, 9, 1851 (2012), http://www.biogeosciences.net/9/1845/2012/.
[8] R. J. Andres et al., A synthesis of carbon dioxide emissions from fossil-fuel combustion, Biogeosciences, 9, 1851 (2012), http://www.biogeosciences.net/9/1845/2012/.
[9] C. Le Quéré et al., Global Carbon Budget 2016, Earth Syst. Sci. Data 8, 630 (2016), http://www.earth-syst-sci-data.net/8/605/2016/.

1   Defendants took steps to protect their own assets from these threats through immense internal

2   investment in research, infrastructure improvements, and plans to exploit new opportunities in a

3   warming world.

4        6.     Instead of working to reduce the use and combustion of fossil fuel products, lower

5   the rate of greenhouse gas emissions, minimize the damage associated with continued high use

6   and combustion of such products, and ease the transition to a lower carbon economy, Defendants

7   concealed the dangers, sought to undermine public support for greenhouse gas regulation, and

8   engaged in massive campaigns to promote the ever-increasing use of their products at ever greater

9   volumes. Thus, each Defendant's conduct has contributed substantially to the buildup of $CO_2$ in

10  the environment that drives sea level rise.

11       7.     Defendants are directly responsible for 227.6 gigatons of $CO_2$ emissions between

12  1965 and 2015, representing 20.3% of total emissions of that potent greenhouse gas during that

13  period. Accordingly, Defendants are directly responsible for a substantial portion of committed

14  sea level rise (sea level rise that will occur even in the absence of any future emissions) because

15  of the consumption of their fossil fuel products.

16       8.     Extreme flooding events will more than double in frequency on California's Pacific

17  coast by 2050.[10] Flooding and storms will become more frequent and more severe, and average

18  sea level will rise substantially along California's coast, including in Imperial Beach. The City,

19  bordered on three sides by water, is particularly vulnerable to sea level rise, and has already spent

20  significant funds to study and mitigate the effects of global warming. Sea level rise already

21  adversely affects Imperial Beach and jeopardizes the City's wastewater infrastructure, beaches,

22  roads, public transportation, schools, other civil infrastructure and essential public services, and

23  communities.

---

26  [10] Sean Vitousek et al., Doubling of coastal flooding frequency within decades due to sea-level rise, Scientific
    Reports, (May 18, 2017) ("Only 10 cm of SLR doubles the flooding potential in high-latitude regions with small
27  shape parameters, notably the North American west coast (including the major population centers Vancouver,
    Seattle, San Francisco, and Los Angeles), and the European Atlantic coast."); USGS, In Next Decades, Frequency of
28  Coastal Flooding Will Double Globally (May 18, 2017), https://www.usgs.gov/news/next-decades-frequency-
    coastal-flooding-will-double-globally.

9. Defendants' production, promotion, marketing, and use of fossil fuel products, simultaneous concealment of the known hazards of those products, and their championing of anti-regulation and anti-science campaigns, actually and proximately caused Plaintiffs' injuries.

10. Accordingly, the City brings claims against Defendants for Public Nuisance on behalf of the People of California as well as itself, Strict Liability for Failure to Warn, Strict Liability for Design Defect, Private Nuisance, Negligence, Negligent Failure to Warn, and Trespass.

11. By this action, the City seeks to ensure that the parties responsible for sea level rise, and not Plaintiffs, local taxpayers and residents, bear the costs.

## II. <u>PARTIES</u>

### A. Plaintiffs

12. Plaintiff, the People of the State of California ("the People"), by and through the City Attorney for the City of Imperial Beach, brings this suit pursuant to Code of Civil Procedure section 731, and Civil Code sections 3479, 3480, 3491, and 3494, to abate the nuisance caused by sea level rise in the City's jurisdiction.

13. Plaintiff City of Imperial Beach ("Imperial Beach" or "the City"), a municipal corporation, is a political subdivision of the State of California. It is a city located in southwestern San Diego County.

a. The City is bordered by water on three sides, with the Pacific Ocean to the West, San Diego Bay and Otay River to the North, and the Tijuana River and Estuary to the South.[11]

b. Sea level has already risen significantly along both the City's ocean side and Bay side. The City anticipates and is planning for significant and destructive sea level rise by the year 2100.[12]

c. The sea level rise impacts on the City associated with an increase in average mean sea level height include, but are not limited to, increased inundation (permanent) and

---

[11] Revell Coastal, <u>2016 City of Imperial Beach Sea Level Rise Assessment</u> (September 2016) p. 1-2.
[12] Revell Coastal, <u>2016 City of Imperial Beach Sea Level Rise Assessment</u> (September 2016) p. 1-3.

**COMPLAINT**

flooding (temporary) in natural and built environments with higher tides and intensified wave and storm surge events; aggravated wave impacts, including erosion, damage, and destruction of built structures, as well as natural features like cliffs, beaches and dunes, with consequent landslides; changes in sediment supply that could alter or destroy natural coastal habitats like beaches and wetlands, which would otherwise naturally mitigate sea level rise impacts; saltwater intrusion on groundwater aquifers, agricultural land, and infrastructure; and magnification of other climate change impacts, due to the superimposition on sea level rise on shifts in precipitation patterns that result in more rain and attendant flooding; increased frequency and severity of storms that cause erosion, flooding, and temporary sea level rise increases; and others. Compounding these environmental impacts are cascading social and economic impacts, which are secondary and tertiary injuries to the City that will arise out of localized sea level rise-related damage.

d.      The City's civil infrastructure that will be impacted by climate change and consequent sea level rise includes, but is not limited to, stormwater and sewage transport systems; roads, bike paths and public transit facilities; schools; and real property, such as beaches and parks and related infrastructure; that are on or near the Pacific Ocean, and which have already suffered damage from rising sea levels and will suffer increasing damage in the future through rising sea levels and through the exacerbation of natural climate phenomena such as coastal erosion and El Niño.

**B.      Defendants**

14.     Defendants' are responsible for a substantial portion of the total greenhouse gases emitted between 1965 and 2015. Defendants, individually and collectively, are responsible for extracting, refining, processing, producing, promoting and marketing fossil fuel products, the normal and intended use of which has led to the emission of a substantial percentage of the total volume of greenhouse gases released into the atmosphere since 1965. Indeed, between 1965 and 2015, the named Defendants extracted from the earth enough fossil fuel materials (i.e. crude oil, coal, and natural gas) to account for more than one in every five tons of $CO_2$ and methane emitted worldwide. Accounting for their wrongful promotion and marketing activities, Defendants bear a dominant responsibility for global warming generally and for Plaintiffs' injuries in particular.

15.     When reference in this complaint is made to an act or omission of the Defendants, unless specifically attributed or otherwise stated, such references should be interpreted to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such an act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

16.     **Chevron Entities**

a.     Chevron Corporation is a multi-national, vertically integrated energy and chemicals company incorporated in the State of Delaware, with its global headquarters and principal place of business in San Ramon, California.

b.     Chevron U.S.A., Inc. is a Pennsylvania corporation with its principal place of business located in San Ramon, California. Chevron U.S.A. Inc. is a wholly owned subsidiary of Chevron Corporation.

c.     "Chevron" as used hereafter, means collectively, Defendants Chevron Corp. and Chevron U.S.A. Inc.

d.     Chevron operates through a web of U.S. and international subsidiaries at all levels of the fossil fuel supply chain. Chevron's and its subsidiaries' operations consist of exploring for, developing, and producing crude oil and natural gas; processing, liquefaction, transportation, and regasification associated with liquefied natural gas; transporting crude oil by major international oil export pipelines; transporting, storage, and marketing of natural gas; refining crude oil into petroleum products; marketing of crude oil and refined products; transporting crude oil and refined products by pipeline, marine vessel, motor equipment and rail car; basic and applied research in multiple scientific fields including of chemistry, geology, and engineering; and manufacturing and marketing of commodity petrochemicals, plastics for industrial uses, and fuel and lubricant additives.

17.     **ExxonMobil Corporation**

a.     ExxonMobil Corporation ("Exxon") is a multi-national, vertically integrated energy and chemicals company incorporated in the State of New Jersey with its

1   headquarters and principal place of business in Irving, Texas. Exxon is among the largest publicly
2   traded international oil and gas companies in the world.

3          b.     Exxon consists of numerous divisions and affiliates in all areas of the fossil
4   fuel industry, including exploration for and production of crude oil and natural gas; manufacture
5   of petroleum products; and transportation, marketing, and sale of crude oil, natural gas, and
6   petroleum products. Exxon is also a major manufacturer and marketer of commodity
7   petrochemical products.

8          c.     Exxon does substantial fossil fuel product related business in California,
9   and a substantial portion of its fossil fuel products are extracted, refined, transported, traded,
10  distributed, marketed and/or sold in California. Among other operations, more than 540 Exxon-,
11  Mobil-, or Esso-branded gas stations operate throughout the state, and Exxon owns and operates a
12  petroleum storage and transport facility in the San Ardo Oil Field in San Ardo, Monterey County,
13  California. From 1966 to 2016, Exxon owned and operated an oil refinery in Torrance, Los
14  Angeles County, California. Exxon Co. USA, an ExxonMobil subsidiary, operated a petroleum
15  refinery in Benicia, Solano County, California, from 1968 to 2000.

16      18.   **BP Entities**

17         a.     BP P.L.C. is a multi-national, vertically integrated energy and
18  petrochemical public limited company, registered in England and Wales with its principal place of
19  business in London, England. BP P.L.C. consists of three main operating segments: (1) exploration
20  and production, (2) refining and marketing, and (3) gas power and renewables.

21         b.     BP P.L.C. does substantial fossil-fuel related business in the United States,
22  by marketing through licensure; franchising its petroleum products in the U.S. under the BP,
23  ARCO and ARAL brands; and by operating oil and gas extraction and refining projects in the Gulf
24  of Mexico, Alaska, Arkansas, Colorado, New Mexico, Oklahoma, Texas, and Wyoming.

25         c.     BP America, Inc., is a wholly-owned subsidiary of BP P.L.C. BP America
26  Inc. is a vertically integrated energy and petrochemical company incorporated in the State of
27  Delaware with its headquarters and principal place of business in Houston, Texas. BP America,
28  Inc., consists of numerous divisions and affiliates in all aspects of the fossil fuel industry, including

1   exploration for and production of crude oil and natural gas; manufacture of petroleum products;

2   and transportation, marketing, and sale of crude oil, natural gas, and petroleum products. BP is

3   also a major manufacturer and marketer of commodity petrochemical products. BP America Inc.

4   is registered to do business in the State of California and has a registered agent for service of

5   process with the California Secretary of State.

6           d.     Defendants BP P.L.C. and BP America, Inc. are collectively referred to

7   herein as "BP."

8           e.     BP does substantial fossil fuel product-related business in California, and a

9   substantial portion of its fossil fuel products are extracted, refined, transported, traded, distributed,

10  marketed, and/or sold in California. Among other operations, BP operates 275 ARCO-licensed

11  and branded gas stations in California and more than 70 compressed natural gas and liquefied

12  natural gas fueling stations, provides natural gas used to power more than 6.9 million California

13  households, and distributes and markets petroleum-based lubricants marketed under the "Castrol"

14  brand name throughout the state. From 2000 to 2013, BP also owned and operated an oil refinery

15  in Carson, Los Angeles County, California. BP's marketing and trading business maintains an

16  office in Irvine, Orange County, California. BP maintains an energy research center in San Diego,

17  San Diego County, California.

18      19.  **Shell Entities**

19          a.     Royal Dutch Shell PLC is a vertically integrated, multinational energy and

20  petrochemical company. Royal Dutch Shell is incorporated in England and Wales, with its

21  headquarters and principle place of business in the Hague, Netherlands. Royal Dutch Shell PLC

22  consists of numerous divisions, subsidiaries and affiliates engaged in all aspects of the fossil fuel

23  industry, including exploration, development, extraction, manufacturing and energy production,

24  transport, trading, marketing and sales.

25          b.     Shell Oil Products Company LLC is a wholly-owned subsidiary of Royal

26  Dutch Shell PLC. Shell Oil Products Company LLC is incorporated in the State of Delaware and

27  maintains its principal place of business in Houston, Texas. Shell Oil Products Company LLC is

28  registered to do business in the State of California and has a registered agent for service of process

in California. Shell Oil Products Company LLC is an energy and petrochemical company involved in refining, transportation, distribution and marketing of Shell fossil fuel products.

c. Defendants Royal Dutch Shell PLC and Shell Oil Products Company LLC are collectively referred to as "Shell."

d. Shell does substantial fossil fuel product-related business in California, and a substantial portion of its fossil fuel products are extracted, refined, transported, traded, distributed, marketed and/or sold in California. Among other endeavors, Shell operates a petroleum refinery in Martinez, Contra Costa County, California; operates a distribution center in Carson, California; and produces heavy oil and natural gas within the state. Shell also owned and operated a refinery in Wilmington (Los Angeles), Los Angeles County, California from 1998 to 2007, and a refinery in Bakersfield, Kern County, California from 2001 to 2005. Shell also operates hundreds of Shell-branded gas stations in California.

20. **Citgo Petroleum Corporation ("Citgo")**

a. Citgo is a direct, wholly owned subsidiary of PDV America, Incorporated, which is a wholly owned subsidiary of PDV Holding, Incorporated. These organizations' ultimate parent is Petroleos de Venezuela, S.A. ("PDVSA"), an entity wholly owned by the Republic of Venezuela that plans, coordinates, supervises and controls activities carried out by its subsidiaries. Citgo is incorporated in the State of Delaware and maintains its headquarters in Houston, Texas.

b. Citgo and its subsidiaries are engaged in the refining, marketing, and transportation of petroleum products including gasoline, diesel fuel, jet fuel, petrochemicals, lubricants, asphalt, and refined waxes.

c. Citgo is registered to do business in the State of California and has designated an agent for service of process in California. Citgo further does substantial fossil fuel product-related business in California, and a substantial portion of its fossil fuel products are extracted, refined, transported, traded, distributed, marketed, and/or sold in California. For instance, Citgo sells significant volumes of fossil-fuel derived consumer motor oils and automobile lubricants through retail and wholesale distributers. Citgo further sells a wide variety of greases and oils for use in construction, mining, agricultural, and metalworking machinery and vehicles,

and in many other industrial and commercial settings, through licensed distributors in California.

21.   **ConocoPhillips Entities**

a.      ConocoPhillips is a multinational energy company incorporated in the State of Delaware and with its principal place of business in Houston, Texas. ConocoPhillips consists of numerous divisions, subsidiaries, and affiliates engaged in all aspects of the fossil fuel industry, including exploration, extraction, production, manufacture, transport, and marketing.

b.      ConocoPhillips Company is 100% owned by ConocoPhillips. ConocoPhillips Company is registered to do business in California and has a registered agent for service of process in California.

c.      Phillips 66 is a multinational energy and petrochemical company incorporated in Delaware and with its principal place of business in Houston, Texas. It encompasses downstream fossil fuel processing, refining, transport, and marketing segments that were formerly owned and/or controlled by ConocoPhillips. Phillips 66 is registered to do business in the State of California and has a registered agent for service of process in California.

d.      Defendants ConocoPhillips, ConocoPhillips Company, and Phillips 66 are collectively referred to herein as "ConocoPhillips."

e.      ConocoPhillips does substantial fossil fuel product-related business in California, and a substantial portion of its fossil fuel products are extracted, refined, transported, traded, distributed, marketed, and/or sold in California. For instance, ConocoPhillips owns and operates oil and natural gas terminals in California, owns and operates refineries in Arroyo Grande (San Luis Obispo County), Colton (San Bernardino County), and Wilmington (Los Angeles County), California, and distributes its products throughout California. Phillips 66 also owns and operates oil refineries in Rodeo (Contra Costa County), Santa Maria (Santa Barbara County), and Wilmington (Los Angeles County), California, each of which was owned and operated by ConocoPhillips and its predecessors in interest from 1997 to 2012.

22.   **Peabody Energy Corporation**

a.      Peabody Energy Corporation ("Peabody") is a multi-national energy company incorporated in the State of Delaware and with its principal place of business in St. Louis,

Missouri. Through a diverse web of affiliates and subsidiaries, Peabody is the world's largest coal extractor by volume.

b.       Peabody does and has done substantial fossil fuel product-related business in California, including exporting substantial volumes of coal through coal shipping terminals in California, particularly from the ports of Long Beach (Los Angeles County), Stockton (San Joaquin County), Richmond (Contra Costa County), and San Francisco. Peabody exported coal mined from its western state mining operations through the Los Angeles Export Terminal while that terminal was in operation from 1997 through 2003, and continues to export coal out of California ports.

23.    **Total Entities**

a.       Total E&P USA Inc. is a wholly owned subsidiary of Total S.A.—a French energy conglomerate—engaged in the North American segment of Total SA's fossil fuel products-related business. Total E&P USA Inc. and its subsidiaries are involved in the exploration for, extraction, transportation, research, and marketing of Total S.A.'s fossil fuel products. Total E&P USA Inc. is registered to do business in the State of California and has designated an agent for service of process in California.

b.       Total Specialties USA Inc., is a wholly owned subsidiary of Total SA, involved in the marketing and distribution of Total S.A.'s fossil fuel products. Total Specialties USA Inc. is incorporated in the State of Delaware and headquartered in Houston, Texas. Total Specialties USA Inc. is registered to do business in the State of California and has designated an agent for service of process in California. Total Specialties USA Inc. does substantial fossil fuel product-related business in California, and a substantial portion of its fossil fuel products are extracted, refined, transported, traded, distributed, marketed, and/or sold in California. For instance, Total Specialties USA Inc. maintains regular distributorship relationships with several California distributors of Total fossil fuel products, including engine oils, lubricants, greases, and industrial petroleum products.

SHER
EDLING LLP

**COMPLAINT**

11

24.    **Arch Coal, Inc.**

a.      Arch Coal, Inc. ("Arch Coal") is a publicly traded company incorporated in Delaware with its principal place of business in St. Louis, Missouri. It is the second largest coal producer in the United States, selling 128 million tons of coal in 2015, almost all of which it extracted from mines owned by the company and its wholly-owned subsidiary. Arch Coal explores for, extracts, produces, markets and distributes its fossil fuel products.

b.      Arch Coal's conducts substantial fossil fuel product-related business in California, including its ownership and long-term leasing of coal land in California. Arch Coal furthermore has historically exported substantial volumes of coal mined from its western state mines through California ports including Long Beach (Los Angeles County), Stockton (San Joaquin County), Richmond (Contra Costa County), and San Francisco.

c.      Arch Coal also owns a 99% stake in Arch Western Resources, LLC, which was created in a 1998 transaction under which Arch Coal absorbed all of Atlantic Ritchfield Company's domestic coal operations. Included in that transaction, Arch Western Resources acquired a 9% ownership stake in the Los Angeles Export Terminal, a coal export terminal operation in the Port of Los Angeles from 1997 through 2003. Arch Coal and Arch Western Resources both exported substantial volumes of coal, originating from their western state mining operations, including mines in Colorado and Utah, through the Export Terminal until its closure.

25.    **Eni Entities**

a.      Eni S.p.A. ("Eni") is a vertically integrated, multinational energy company focusing on petroleum and natural gas. Eni is incorporated in the Republic of Italy, with its principal place of business in Rome, Italy. With its consolidated subsidiaries, Eni engages in the exploration, development and production of hydrocarbons; in the supply and marketing of gas, liquid natural gas, and power; in the refining and marketing of petroleum products; in the production and marketing of basic petrochemicals, plastics and elastomers; in commodity trading; and in electricity marketing and generation.

b.      Eni Oil & Gas Inc. is incorporated in Texas, with its principal place of business in Houston, Texas. Eni Oil & Gas Inc., is a wholly owned subsidiary of Eni America Ltd.,

a Delaware corporation doing business in the United States. Eni America, Ltd. Is a wholly owned subsidiary of Eni UHL Ltd., a British corporation with its registered office in London, United Kingdom. Eni UHL Ltd. is a wholly owned subsidiary of Eni ULT, Ltd., a British corporation with its registered office on London, United Kingdom. Eni ULT, Ltd. is a wholly owned subsidiary of Eni Lasmo Plc, a British corporation with its registered office on London, United Kingdom. Eni Investments Plc, a British corporation with its registered office in London, United Kingdom, holds a 99.9%9 ownership interest in Eni Lasmo Plc (the other 0.01% ownership interest is held by another Eni entity, Eni UK Ltd, a British corporation with its registered office in London, United Kingdom). Eni S.p.A owns a 99.99% interest in Eni Investments Plc. Eni UK Ltd. holds the remainder interest in Eni Investments Plc. Collectively, these entities are referred to as "Eni."

        c.    Eni Oil & Gas Inc. is a successor-in-interest to Golden Eagle Refining Company, Inc. ("Golden Eagle"). At times relevant to this complaint, Golden Eagle did substantial fossil fuel-related business in California. Specifically, Golden Eagle owned and/or operated oil refineries in Carson (Los Angeles County) and Martinez (Contra Costa County), California, and owned and/or operated oil pipelines in or near Long Beach (Los Angeles County), California.

    26.   **Rio Tinto Group**

        a.    Rio Tinto PLC is incorporated in England and Wales, with its principal place of business in London, England. Rio Tino Limited is incorporated in the Commonwealth of Australia with its principle place of business in Melbourne, Australia. Collectively, these Rio Tinto PLC and Rio Tinto Limited, along with their affiliates, divisions and subsidiaries, including those described below, are referred to as "Rio Tinto."

        b.    Rio Tinto is a dual-listed, multinational, vertically integrated metals and mining corporation. Through its vast network of affiliates and subsidiaries, Riot Tinto extracts an array of metals and other commodities. Pertinent here, Rio Tinto explores for, extracts, produces, transports and markets coal.

        c.    Rio Tinto Energy America Inc. is a wholly owned subsidiary of Rio Tinto, incorporated in the State of Delaware, with its principal place of business in Gillette, Wyoming.

1 Previously known as Kennecott Energy, Rio Tinto Energy America Inc. operates coal mines in
2 Wyoming and Montana.

3         d.     Rio Tinto does substantial fossil fuel product-related business in California.
4 In 2007, for example, Hydrogen Energy California, a joint venture of BP and Rio Tinto, invested
5 $2.3 billion in a project to construct an experimental petroleum coke fired power plant in Kern
6 County, California.

7         e.     In addition, Rio Tinto's subsidiary Rio Tino Minerals, Inc., operates the
8 largest open pit mine in California, where it extracts approximately 30% of the world's refined
9 boron. Rio Tinto Minerals, Inc., has also registered substantial legislative and regulatory lobbying
10 activities in California related to Rio Tinto's fossil fuel products business since at least 2005,
11 including lobbying directed at legislation and regulation regarding greenhouse gas pollution
12 policy, air quality standards, and energy efficiency standards, as well as California's so-called
13 "cap-and-trade" carbon emissions program, such that the exercise of jurisdiction comports with
14 traditional notions of fair play and substantial justice.

15         f.     Rio Tinto Services Inc. is a Rio Tinto subsidiary incorporated in Delaware
16 and with its principal place of business in South Jordan, Utah. Rio Tinto Services, Inc. is registered
17 to do business in California and has designated an agent for service of process in California.

18     27.   **Statoil ASA**

19         a.     Statoil ASA ("Statoil") is an international, vertically integrated energy
20 company incorporated in the Kingdom of Norway and headquartered in Stavanger, Norway. The
21 Norwegian State is the majority shareholder in Statoil. Statoil's operations consist of multiple
22 segments, including exploration, production, extraction, marketing, processing, and technology
23 support of its fossil fuel products, which include both petroleum and natural gas products.

24         b.     Statoil has substantial contacts with California arising out of the production,
25 marketing, and promotion of its fossil fuel products. For instance, Statoil partnered with the
26 University of California, Berkeley (Alameda County), to review management of the company's
27 complex development projects; Statoil partnered on a methanol fueling station in Sacramento
28 (Sacramento County); Statoil was involved in a business project with a California company called

1  Quantum Technologies; and partnered with the University of California, San Diego's (San Diego

2  County) Scripps Institute of Oceanography.

3       28.    **Anadarko Entities**

4           a.      Anadarko Petroleum Corporation ("Anadarko") is incorporated in the State

5  of Delaware and maintains its principal place of business in The Woodlands, Texas. Anadarko is

6  a multinational, vertically integrated energy company comprised of multiple upstream and

7  downstream segments. These include exploration, production, gathering, processing, treating,

8  transporting, marketing, and selling fossil fuel products derived primarily from petroleum and

9  natural gas. In the United States, Anadarko entities operate fossil fuel product exploration and

10  production concerns in Texas, the Gulf of Mexico, Alaska, the Powder River Basin, Utah,

11  Colorado, and the Marcellus Shale Formation. Anadarko operates fossil fuel product production

12  and exploration activities internationally in Algeria, Ghana, Mozambique, and Columbia, among

13  others. Anadarko Petroleum Corporation is registered to do business in California and has

14  designated an agent for service of process in California.

15           b.      Anadarko Petroleum Corporation is a successor-in-interest to HS Resources

16  Inc. ("HS"). HS was an energy company headquartered in San Francisco, San Francisco County,

17  California. It owned natural gas reserves in Colorado, North Dakota, South Dakota, Montana, and

18  along the coasts of Texas and Louisiana, which it extracted and imported to California. HS was

19  acquired by Kerr-McGee Corporation in 2001. Kerr-McGee was an energy exploration and

20  production company owning oil and natural gas rights in the Gulf of Mexico, Colorado, and Utah,

21  with its corporate headquarters in Oklahoma. Anadarko Petroleum Corporation acquired Kerr-

22  McGee Corporation in 2006.

23       29.    **Occidental Entities**

24           a.      Occidental Petroleum Corporation is a multinational, vertically integrated

25  energy and chemical company incorporated in the State of Delaware and with its principal place

26  of business in Houston, Texas. Occidental's operations consist of three segments: Occidental's

27  operations consist of three segments: (1) the exploration for, extraction of, and production of oil

28  and natural gas products; (2) the manufacture and marketing of chemicals and vinyls; and (3)

1    processing, transport, storage, purchase, and marketing of oil, natural gas, and power. Occidental

2    Petroleum Corporation is registered to do business in the State of California and has designated an

3    agent for service of process in the State of California.

4            b.      Occidental Chemical Corporation, a manufacturer and marketer of

5    petrochemicals, such as polyvinyl chloride resins, is a wholly owned subsidiary of Occidental

6    Petroleum Corporation. Occidental Chemical Corporation is registered to do business in the State

7    of California and has designated an agent for service of process in the State of California.

8            c.      Defendants Occidental Petroleum Corporation and Occidental Chemical

9    Corporation are collectively referred to as "Occidental."

10           d.      Occidental does substantial fossil fuel product-related business in the State

11   of California, and a substantial portion of its fossil fuel products are extracted, refined, transported,

12   traded, distributed, marketed and/or sold in California. For instance, Occidental extracted and

13   transported its fossil fuel products from approximately 30,900 drilling locations within the San

14   Joaquin, Los Angeles, Ventura, and Sacramento Basins in California.

15           e.      In addition, Occidental conducts has conducted substantial activities in the

16   state, including marketing and promotion; efforts to avoid or minimize regulation of greenhouse

17   gas pollution in and from California; and efforts to influence statutory and regulatory debate

18   regarding fossil fuel consumption, electric power distribution, and greenhouse gas pollution

19   policies such that the exercise of jurisdiction comports with traditional notions of fair play and

20   substantial justice. Since 1999, Occidental Petroleum Corp. and its subsidiaries have reported more

21   than $4.6 million in lobbying expenditures directed at numerous statutory and regulatory proposals

22   before the California legislature and executive agencies, including the California Energy

23   Commission, California Air Resources Board, and California Public Utilities Commission, related

24   to its fossil fuel products business.

25       30.    **Repsol S.A.**

26           a.      Repsol S.A. ("Repsol") is a vertically integrated, multinational global

27   energy company, incorporated in the Kingdom of Spain, with its principal place of business in

28   Madrid, Spain. Repsol is involved in multiple aspects of the fossil fuel industry, including

exploration, production, marketing, and trading. Repsol engages in significant fossil fuel exploration and production activities in the United States, including in the Gulf of Mexico, the Marcellus Shale in Pennsylvania, the Eagle Ford Shale in South Texas, the Mississippi Lime in Oklahoma and Kansas, the North Slope in Alaska, and the Trenton-Black River in New York

  b. Repsol does substantial fossil fuel product-related business in the State of California, and a substantial portion of its fossil fuel products are extracted, refined, transported, traded, distributed, marketed and/or sold in California. For instance, Repsol subsidiary Repsol Energy North America Corporation, incorporated in the State of Texas and with its principal place of business in The Woodlands, Texas, is listed as a natural gas procurement, storage, transportation, scheduling, and risk management provider by Pacific Gas and Electric, a California utility. Repsol Energy North America Corporation is registered to do business in California and has designated an agent for service of process in California. Repsol subsidiary Repsol Trading USA Corporation, incorporated in the State of Texas and with its principal place of business in The Woodlands, Texas, is also registered do business in California and has designated an agent for service of process in California. Additionally, Repsol represents on its website that it is engaging in strategic opportunities involving its fossil fuel products in California, which may consist of crude oil, gasoline, diesel, and/or jet fuel.

  31. **Marathon Entities**

  a. Marathon Oil Company is an energy company incorporated in the State of Ohio and with its principal place of business in Houston, Texas. Marathon Oil Company is registered to do business in California and has designated an agent for service of process in California. Marathon Oil Company is a corporate ancestor of Marathon Oil Corporation and Marathon Petroleum Company.

  b. Marathon Oil Company is a successor-in-interest to Husky Oil Ltd. ("Husky"), which it acquired in 1984. During times relevant to this Complaint, Husky operated oil production facilities near Santa Maria (Santa Barbara County), California, where it produced nearly 1,100 barrels per day. During the period relevant to this litigation, Husky did substantial fossil fuel product-related business in California.

1            c.      Marathon Oil Corporation is a multinational energy company incorporated

2 in the State of Delaware and with its principal place of business in Houston, Texas. Marathon Oil

3 Corporation consists of multiple subsidiaries and affiliates involved in the exploration for,

4 extraction, production, and marketing of fossil fuel products.

5            d.      Marathon Petroleum Corporation is a multinational energy company

6 incorporated in Delaware and with its principal place of business in Findlay, Ohio. Marathon

7 Petroleum Corporation was spun off from the operations of Marathon Oil Corporation in 2011. It

8 consists of multiple subsidiaries and affiliates involved in fossil fuel product refining, marketing,

9 retail, and transport, including both petroleum and natural gas products.

10            e.      Defendants Marathon Oil Company, Marathon Oil Corporation, and

11 Marathon Petroleum Corporation are collectively referred to as "Marathon."

12     32.   **Hess Corporation**

13            a.      Hess Corp. ("Hess") is a global, vertically integrated petroleum exploration

14 and extraction company incorporated in the State of Delaware with its headquarters and principal

15 place of business in New York, New York.

16            b.      Hess is engaged in the exploration, development, production,

17 transportation, purchase, marketing and sale of crude oil and natural gas. Its oil and gas production

18 operations are located primarily in the United States, Denmark, Equatorial Guinea, Malaysia,

19 Thailand, and Norway. Prior to 2014, Hess also conducted extensive retail operations in its own

20 name and through subsidiaries. Hess owned and operated more than 1,000 gas stations throughout

21 the United States, including in California during times relevant to this complaint. Prior to 2013,

22 Hess also operated oil refineries in the continental United States and U.S. Virgin Islands.

23     33.   **Devon Energy Entities**

24            a.      Devon Energy Corp. ("Devon") is an independent energy company engaged

25 in the exploration, development, and production of oil, and natural gas. It is incorporated in the

26 State of Delaware and maintains its principal place of business in Oklahoma City, Oklahoma.

27 Devon is engaged in multiple aspects of the fossil fuel industry, including exploration,

28 development, production, and marketing of its fossil fuel products.

b.      Devon Energy Production Company, L.P. is a Devon subsidiary registered to do business in the State of California and with a designated agent for service of process in California. Devon Energy does substantial fossil fuel product-related business in California.

c.      Devon Energy Corp. is a successor-in-interest to the Pauley Petroleum Company ("Pauley"). At times relevant to this complaint, Pauley did substantial fossil-fuel related business in California. Specifically, this included owning and operating a petroleum refinery in Newhall (Los Angeles County), California from 1959 to 1989, and a refinery in Wilmington (Los Angeles, Los Angeles County), California from 1988 to 1992. Pauley merged with Hondo Oil and Gas Co. ("Hondo") in 1987. Subsequently, Devon Energy Corp. acquired Hondo in 1992.

d.      Defendants Devon Energy Production Company, L.P. and Devon Energy Corp. are collectively referred to as "Devon."

34.    **Encana Corporation**

a.      Encana Corp. is a Canadian corporation with its principal place of business in Calgary, Alberta, Canada. Encana is an extractor and marketer of oil and natural gas and has facilities including gas plants and gas wells in Colorado, Texas, Wyoming, Louisiana, and New Mexico. By approximately 2005, Encana was the largest independent owner and operator of natural gas storage facilities in North America.

b.      Encana has done and continues to do substantial fossil fuel product-related business in California. Between 1997 and 2006, Encana owned and operated the Wild Goose Storage underground natural gas storage facility in Butte County, California. In 2003, Encana began transporting natural gas through a 25-mile pipeline from the Wild Goose Station to a Pacific Gas & Electric Co. ("PG&E") compressor station in Colusa County, where gas entered the main PG&E pipeline. Encana invested in a 100 billion cubic foot expansion of the facility in 2004, bringing gas storage capacity at Wild Goose to 24 billion cubic feet.

35.    **Apache Corporation**

a.      Apache Corp. is a publicly traded Delaware corporation with its principal place of business in Houston, Texas. Apache is an oil and gas exploration and production company, with crude oil and natural gas exploration and extraction operations in the United States, Canada,

1    Egypt, and in the North Sea.

2             b.       During the time at issue, Apache extracted natural gas from wells developed

3    on approximately seven million acres of land held in the Canadian provinces of British Columbia,

4    Alberta, and Saskatchewan, and Apache did substantial fossil fuel product-related business in

5    California. Apache transported a substantial volume of the natural gas extracted from its Canadian

6    holdings to California, where it sold that gas to electric utilities, end-users, other fossil fuel

7    companies, supply aggregators, and other fossil fuel marketers. Apache directed sales of its natural

8    gas to California in addition to markets in Washington state, Chicago, and western Canada, to

9    intentionally retain a diverse customer base and maximize profits from the differential price rates

10   and demand levels in those respective markets.

11           36.    **Doe Defendants**

12           a.       The true names and capacities, whether individual, corporate, associate, or

13   otherwise of Defendants Does 1 through 100, inclusive, are unknown to Plaintiffs, who therefore

14   sue said Defendants by such fictitious names pursuant to California Code of Civil Procedure

15   Section 474. Plaintiffs are informed and believe, and on that basis allege, that each of the

16   fictitiously named Defendants is responsible in some manner for the acts and occurrences herein

17   alleged, and that Plaintiffs' damages were caused by such Defendants.

18           37.    **Relevant Non-Parties: Fossil Fuel Industry Associations**

19           38.    As set forth in greater detail below, each Defendant had actual knowledge that its

20   fossil fuel products were hazardous. Defendants obtained knowledge of the hazards of their

21   products independently and through their membership and involvement in trade associations.

22           39.    Each Defendant's fossil fuel promotion and marketing efforts were assisted by the

23   trade associations described below. Acting on behalf of the Defendants, the industry associations

24   engaged in a long-term course of conduct to misrepresent, omit, and conceal the dangers of

25   Defendants' fossil fuel products.

26           a.       **The American Petroleum Institute (API)**: API is a national trade

27   association representing the oil and gas industry, formed in 1919. The following Defendants and/or

28   their predecessors in interest are and/or have been API members at times relevant to this litigation:

Chevron, ExxonMobil, Shell, ConocoPhillips, Statoil, Anadarko, Occidental, Repsol, Marathon, EnCana, and Apache.[13]

    b.  **The American Coalition for Clean Coal Electricity (ACCCE)**: ACCCE is a national coal industry trade association. Arch Coal and Peabody were part of the ACCCE at times relevant to this complaint.[14]

    c.  **The National Mining Association (NMA)**: NMA is a national trade organization that advocates for mining interests, including coal mining. Arch Coal, Inc., Peabody Energy, and Rio Tinto/Kennecott Utah Copper are all members.[15]

    d.  **The Western States Petroleum Association (WSPA)**: WSPA is a trade association representing oil producers in Arizona, California, Nevada, Oregon and Washington.[16] Its members include, and at times relevant to this Complaint, have included, BP, Chevron, Shell, Occidental, and ExxonMobil.[17]

    e.  **The American Fuel and Petrochemical Manufacturers (AFPM)** is a national association of petroleum and petrochemical companies. At relevant times, its members included, but were not limited to, BP Petrochemicals, BP Products North America, Chevron U.S.A. Inc., CITGO Petroleum Corporation, Exxon Mobil Corporation, Occidental Chemical Corporation, Phillips 66, Shell Chemical Company, and Total Petrochemicals & Refining USA, Inc.[18]

    f.  **The Information Council for the Environment (ICE)**: ICE was formed by coal companies and their allies, including Western Fuels Association and the National Coal Association. Associated companies included Peabody, Pittsburg and Midway Coal Mining (Chevron),[19] and Island Creek Coal Company (Occidental).

---

[13] American Petroleum Institute (API), Members, http://www.api.org/membership/members.
[14] Energy and Policy Institute, ACCCE Members, https://www.documentcloud.org/documents/2199289-accce-members.html.
[15] National Mining Association (NMA), Members, http://nma.org/about-nma/member-list.
[16] WSPA, What is WSPA, https://www.wspa.org/what-is-wspa.
[17] WSPA, Member List, https://www.wspa.org/member-list.
[18] AFPM, Membership Directory, https://www.afpm.org/membership-directory/.
[19] Hereinafter, parenthetical references to Defendants indicate corporate ancestry and/or affiliation.

g.    **The Global Climate Coalition (GCC)**: GCC was an industry group formed to oppose greenhouse gas emission reduction policies and the Kyoto Protocol. It was founded in 1989 shortly after the first Intergovernmental Panel on Climate Change meeting was held, and disbanded in 2001. Founding members included the National Association of Manufacturers, the National Coal Association, the Edison Electric Institute, and the United States Chamber of Commerce. The GCC's early individual corporate members included Amoco (BP), API, Chevron, Exxon, Ford, Shell Oil, Texaco (Chevron) and Phillips Petroleum (ConocoPhillips). Over its existence other members and funders included ARCO (BP), BHP, the National Mining Association, and the Western Fuels Association. The coalition also operated for several years out of the National Association of Manufacturers' offices.

## III.    AGENCY

40.    At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator, and/or joint venturer of each of the remaining Defendants herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, and joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct was wrongful and/or constituted a breach of duty.

## IV.    JURISDICTION AND VENUE

41.    This court's personal jurisdiction over Defendants named herein is proper because each Defendant maintains substantial contacts with California by and through their fossil fuel business operations in this state, as described above, and because Plaintiffs' injuries described herein arose out of and relate to those operations and occurred in California.

42.    The Superior Court of California for Contra Costa County is a court of general jurisdiction and therefore has subject matter jurisdiction over this action.

43.    Venue is proper in Contra Costa County pursuant to Code of Civil Procedure sections 395 and 395.5, because Defendant Chevron maintains its corporate headquarters and principal place of business in Contra Costa County.

# V. FACTUAL BACKGROUND

## A. Global Warming—Observed Effects and Known Cause

44.   The Earth is warming at a rate unprecedented in human history.

45.   Atmospheric and ocean temperatures have both increased substantially since the beginning of the global industrial revolution, and the rate of warming has also dramatically increased since the end of World War II.

46.   In the geological short term, ocean and land surface temperatures have increased at a rapid pace during the late 20th and early 21st centuries:

      a.    2016 was the hottest year on record by globally averaged surface temperatures, exceeding mid-20th century mean ocean and land surface temperatures by approximately 1.69–1.78° F.[20] Eight of the twelve months in 2016 were hotter by globally averaged surface temperatures than those respective months in any previous year. October, November, and December 2016 showed the second hottest average surface temperatures for those months, second only to temperatures recorded in 2015.[21]

      b.    The Earth's hottest month ever recorded was February 2016, followed immediately by the second hottest month on record, March 2016.[22]

      c.    The second hottest year on record by globally averaged surface temperatures was 2015, and the third hottest was 2014.[23]

---

[20] NOAA, Global Summary Information – December 2016, https://www.ncdc.noaa.gov/sotc/summary-info/global/201612; NASA, NASA, NOAA Data Show 2016 Warmest Year on Record Globally (January 18, 2017), https://www.nasa.gov/press-release/nasa-noaa-data-show-2016-warmest-year-on-record-globally.
[21] NASA, NASA, NOAA Data Show 2016 Warmest Year on Record Globally (January 18, 2017), https://www.nasa.gov/press-release/nasa-noaa-data-show-2016-warmest-year-on-record-globally.
[22] Jugal K. Patel, How 2016 Became Earth's Hottest Year on Record, N.Y. Times (January 18, 2017), https://www.nytimes.com/interactive/2017/01/18/science/earth/2016-hottest-year-on-record.html.
[23] NASA, NASA, NOAA Data Show 2016 Warmest Year on Record Globally (January 18, 2017), https://www.nasa.gov/press-release/nasa-noaa-data-show-2016-warmest-year-on-record-globally.

d.    The ten hottest years on record by globally averaged surface temperature have all occurred since 1998, and sixteen of the seventeen hottest years have occurred since 2001.[24]

e.    Each of the past three decades has been warmer by average surface temperature than any preceding decade on record.[25]

f.    The period between 1983 and 2012 was likely the warmest 30-year period in the Northern Hemisphere since approximately 700 AD.[26]

47.    The average global surface and ocean temperature in 2016 was approximately 1.7° F warmer than the 20th century baseline, which is the greatest positive anomaly observed since at least 1880.[27] The increase in hotter temperatures and more frequent positive anomalies during the Great Acceleration is occurring both globally and locally, including in Imperial Beach. The graph below shows the increase in global land and ocean temperature anomalies since 1880, as measured against the 1910–2000 global average temperature.[28]

---

[24] Id.
[25] IPCC, 2014: Climate Change 2014: Synthesis Report, supra (2014), https://www.ipcc.ch/report/ar5/syr/.
[26] Id.
[27] NOAA, National Centers for Environmental Information, Climate at a Glance (Global Time Series) (June 2017) https://www.ncdc.noaa.gov/cag/time-series/global/globe/land_ocean/ytd/12/1880-2016.
[28] Id.

1

**Global Land and Ocean Temperature Anomalies, January - December**



48.     The mechanism by which human activity causes global warming and climate change is well established: ocean and atmospheric warming is overwhelmingly caused by anthropogenic greenhouse gas emissions.[29]

49.     When emitted, greenhouse gases trap heat within the Earth's atmosphere that would otherwise radiate into space.

50.     Greenhouse gases are largely byproducts of humans' burning fossil fuels to produce energy, and using fossil fuels to create petrochemical products.

51.     Human activity, particularly greenhouse gas emissions, is the primary cause of global warming and its associated effects on Earth's climate.

52.     Prior to World War II, most anthropogenic $CO_2$ emissions were caused by land-use practices, such as forestry and agriculture, which altered the ability of the land and global biosphere to absorb $CO_2$ from the atmosphere; the impacts of such activities on Earth's climate were relatively minor. Since the beginning of the Great Acceleration, however, both the annual rate and total volume of human $CO_2$ emissions have increased enormously following the advent of major

---

[29] IPCC, 2014: Climate Change 2014: Synthesis Report, supra, page 4 (2014), https://www.ipcc.ch/report/ar5/syr/.

**COMPLAINT**                                                    25

uses of oil, gas, and coal. The graph below shows that while $CO_2$ emissions attributable to forestry and other land-use change have remained relatively constant, total emissions attributable to fossil fuels have increased dramatically since the 1950s.[30]

**Total Annual Carbon Dioxide Emissions by Source, 1860-2015:**



53.     As human reliance on fossil fuels for industrial and mechanical processes has increased, so too have greenhouse gas emissions, especially of $CO_2$. The Great Acceleration is marked by a massive increase in the annual rate of fossil fuel emissions: more than half of all cumulative $CO_2$ emissions have occurred since 1988.[31] The rate of $CO_2$ emissions from fossil fuels and industry, moreover, has increased threefold since the 1960s, and by more than 60% since

[30] Global Carbon Project, Global Carbon Budget 2016 (November 14, 2016), www.globalcarbonproject.org/carbonbudget/16/files/GCP_CarbonBudget_2016.pdf, citing CDIAC; R.A. Houghton et al., Carbon emissions from land use and land-cover change (2012), http://www.biogeosciences.net/9/5125/2012/bg-9-5125-2012.html; Louis Giglio et al., Analysis of daily, monthly, and annual burned area using the fourth-generation global fire emissions database (2013), http://onlinelibrary.wiley.com/doi/10.1002/jgrg.20042/abstract; C. Le Quéré et al., Global Carbon Budget 2016, Earth Syst. Sci. Data 8 (2016), http://www.earth-syst-sci-data.net/8/605/2016/.
[31] R. J. Andres et al., A synthesis of carbon dioxide emissions from fossil-fuel combustion, Biogeosciences, 9, 1851 (2012), http://www.biogeosciences.net/9/1845/2012/.

1990.[32] The graph below illustrates the increasing rate of global $CO_2$ emissions since the industrial

era began.[33]

### Cumulative Annual Anthropogenic Carbon Dioxide Emissions, 1751-2014:



54.     Because of the increased use of fossil fuel products, concentrations of greenhouse

gases in the atmosphere are now at a level unprecedented in at least 800,000 years.[34] The graph

below illustrates the nearly 30% increase in atmospheric $CO_2$ concentration above pre-Industrial

levels since 1960.[35]

---

[32] C. Le Quéré et al., Global Carbon Budget 2016, Earth Syst. Sci. Data 8, 625, 630 (2016), http://www.earth-syst-sci-data.net/8/605/2016/ ("Global $CO_2$ emissions from fossil fuels and industry have increased every decade from an average of 3.1±0.2 GtC/yr in the 1960s to an average of 9.3±0.5 GtC/yr during 2006–2015").

[33] Peter Frumhoff, et al. The Climate Responsibilities of Industrial Carbon Producers, Climatic Change 132:157-171, 164 (2015).

[34] IPCC, 2014: Climate Change 2014: Synthesis Report, supra, page 4 (2014), https://www.ipcc.ch/report/ar5/syr/.

[35] C. Le Quéré et al., Global Carbon Budget 2016, Earth Syst. Sci. Data 8, 608 (2016), http://www.earth-syst-sci-data.net/8/605/2016/.

**Atmospheric Carbon Dioxide Concentration in Parts Per Million, 1960-2015:**



**B.      Sea Level Rise—Known Causes and Observed Effects**

55.      Sea level rise is the physical consequence of (a) the thermal expansion of ocean waters as they warm; (b) increased mass loss from land-based glaciers that are melting as ambient air temperature increases; and (c) the shrinking of land-based ice sheets due to increasing ocean and air temperature.[36]

56.      Of the increase in energy that has accumulated in the Earth's atmosphere between 1971 and 2010, more than 90% is stored in the oceans.[37]

57.      Anthropogenic forcing, in the form of greenhouse gas pollution largely from the production, use and combustion of fossil fuel products, is the dominant cause of global mean sea level rise since 1970, explaining at least 70% of the sea level rise observed between 1970 and 2000.[38] Natural radiative forcing—that is, causes of climate change not related to human activity—"makes essentially zero contribution [to observed sea level rise] over the twentieth century (2%

---

[36] NOAA, Is sea level rising, Ocean Facts http://oceanservice.noaa.gov/facts/sealevel.html.
[37] IPCC, 2014: Climate Change 2014: Synthesis Report, supra, page 4 (2014), https://www.ipcc.ch/report/ar5/syr/.
[38] Slangen et al., Anthropogenic Forcing Dominates Global Mean Sea-Level Rise Since 1970, Nature Climate Change, Vol. 6, 701 (2016).

over the period 1900–2005)."[39]

58.     Anthropogenic greenhouse gas pollution is the dominant factor in each of the independent causes of sea level rise, including the increase in ocean thermal expansion,[40] in glacier mass loss, and in more negative surface mass balance from the ice sheets.[41]

59.     There is a well-defined relation between cumulative emissions of $CO_2$ and committed global mean sea level. This relation, moreover, holds proportionately for committed regional sea level rise.[42]

60.     Nearly 100% of the sea level rise from any projected greenhouse gas emissions scenario will persist for at least 10,000 years.[43] This owes to the long residence time of $CO_2$ in the atmosphere that sustains temperature increases, and inertia in the climate system.[44]

61.     Anthropogenic greenhouse gas pollution caused the increased frequency and severity of extreme sea level events (temporary sea level height increases due to storm surges or extreme tides, exacerbated by elevated baseline sea level) observed during the Great Acceleration.[45] The incidence and magnitude of extreme sea level events has increased globally since 1970.[46] The impacts of such events, which generally occur with large storms, high tidal events, offshore low-pressure systems associated with high winds, or the confluence of any of these factors,[47] are exacerbated with higher average sea level, which functionally raises the baseline for the destructive impact of extreme weather and tidal events. Indeed, the magnitude and frequency of extreme sea level events can occur in the absence of increased intensity of storm

---

[39] Id.
[40] Id.
[41] Id.
[42] Peter U. Clark et al., Consequences of Twenty-First-Century Policy for Multi-Millennial Climate and Sea-Level Change, Nature Climate Change Vol. 6, 365 (2016).
[43] Peter U. Clark et al., Consequences of Twenty-First-Century Policy for Multi-Millennial Climate and Sea-Level Change, Nature Climate Change Vol. 6, 361 (2016).
[44] Peter U. Clark et al., Consequences of Twenty-First-Century Policy for Multi-Millennial Climate and Sea-Level Change, Nature Climate Change Vol. 6, 360 (2016).
[45] IPCC, 2013: Summary for Policymakers, page 7, Table SPM.1 (2013), https://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WGIAR5_SPM_brochure_en.pdf.
[46] IPCC, Climate Change 2013: The Physical Science Basis, Contribution of Working Group I to the Fifth Assessment Report of the IPCC, 290 (2013), http://www.climatechange2013.org/images/report/WG1AR5_ALL_FINAL.pdf.
[47] Id.

events, given the increased average elevation from which flooding and inundation events begin. These effects, and others, significantly and adversely affect Plaintiffs, with increased severity in the future.

62.     Historical greenhouse gas emissions alone through 2000 will cause a global mean sea level rise of at least 7.4 feet.[48] Additional greenhouse gas emissions from 2001–2015 have caused approximately 10 additional feet of committed sea level rise. Even immediate and permanent cessation of all additional anthropogenic greenhouse gas emissions would not prevent the eventual inundation of land at elevations between current average mean sea level and 17.4 feet of elevation in the absence of adaptive measures.

63.     The relationship between anthropogenic $CO_2$ emissions and committed sea level rise is nearly linear and always positive. For emissions, including future emissions, from the year 2001, the relation is approximately 0.25 inches of committed sea level rise per 1 $GtCO_2$ released. For the period 1965 to 2000, the relation is approximately 0.05 inches of committed sea level rose per 1 $GtCO_2$ released. For the period 1965 to 2015, normal use of Defendants' fossil fuel products caused a substantial portion of committed sea level rise. Each and every additional unit of CO2 emitted from the use of Defendants' fossil fuel products will add to the sea level rise already committed to the geophysical system.

64.     Projected onshore impacts associated with rising sea temperature and water level include increases in flooding and erosion; increases in the occurrence, persistence, and severity of storm surges; infrastructure inundation; public and private property damage; and pollution associated with damaged control and waste infrastructure, and the lack thereof. All of these effects significantly and adversely affect Plaintiffs.

65.     Sea level rise has already taken grave tolls on inhabited coastlines. For instance, the U.S. National Oceanic and Atmospheric Administration ("NOAA") estimates that nuisance flooding occurs from 300% to 900% more frequently within U.S. coastal communities today than

---

[48] Peter U. Clark et al., Consequences of Twenty-First-Century Policy for Multi-Millennial Climate and Sea-Level Change, Nature Climate Change Vol. 6, 365 (2016).

1 | just 50 years ago.[49]

2 |       66.    Nationwide, more than three quarters (76%) of flood days caused by high water

3 | levels from sea level rise between 2005 and 2014 (2,505 of the 3,291 flood days) would not have

4 | happened but for human-caused climate change. More than two-thirds (67%) of flood days since

5 | 1950 would not have happened without the sea level rise caused by increasing greenhouse

6 | gas emissions.[50]

7 |       67.    Regional expressions of sea level rise will differ from the global mean, and are

8 | especially influenced by changes in ocean and atmospheric dynamics, as well as the gravitational,

9 | deformational, and rotational effects of the loss of glaciers and ice sheets.[51] Due to these effects,

10 | Imperial Beach will experience significantly greater absolute committed sea level rise than the

11 | global mean.[52]

12 |       68.    The City is particularly vulnerable to sea level rise because its topography,

13 | geography, adjacent oceanography, and land use patterns make it particularly susceptible to

14 | injuries from sea level rise; and because Imperial Beach is projected, due to its geophysical

15 | characteristics, to experience a higher rate of sea level rise and a greater absolute amount of sea

16 | level rise than the global mean.[53]

17 |       69.    Given an emissions scenario in which the current rate of greenhouse gas pollution

18 | continues unabated, sea level in the San Diego Area, including Imperial Beach, will rise

19 | significantly and dangerously by the year 2100.[54]

20 |       70.    Imperial Beach's sea level rise vulnerability analyses anticipate extreme sea level

21 |

---

22 | [49] NOAA, Is sea level rising, Ocean Facts, http://oceanservice.noaa.gov/facts/sealevel.html.

23 | [50] Climate Central, Sea Level Rise Upping Ante on 'Sunny Day' Floods (October 17, 2016), http://www.climatecentral.org/news/climate-change-increases-sunny-day-floods-20784.

24 | [51] Peter U. Clark et al., Consequences of Twenty-First-Century Policy for Multi-Millennial Climate and Sea-Level Change, Nature Climate Change Vol. 6, 364, (2016).
[52] See id., Figure 3(c).

25 | [53] Global sea level rise is projected to be 82.7 cm (32.6 inches) above 2000 levels by 2100. See National Research Council, Sea-Level Rise for the Coasts of California, Oregon, and Washington: Past Present and Future (2012) at

26 | page 107 at Table 5.2; page 117 at Table 5.3. The San Francisco Bay Area sea level rise is projected to be 91.9 cm (36.2 inches) over 2000 by 2100. Id.

27 | [54] Gary Griggs et al., Rising Seas in California: An Update on Sea-Level Rise Science, California Ocean Science Trust, p. 26, Table 1(b) (April 2017), http://www.opc.ca.gov/webmaster/ftp/pdf/docs/rising-seas-in-california-an-

28 | update-on-sea-level-rise-science.pdf.

rise events equivalent to a 1% annual-chance storm wave event.[55] Such an event, compounded by anticipated increases in mean sea level height along the City, would likely turn the entire area of the City bounded by the Pacific Ocean, the San Diego Bay, the Tijuana Estuary, and 8th Street, into an island surrounded on all sides by water.[56]

71.     Without Defendants' fossil fuel-related greenhouse gas pollution, current sea level rise would have been far less than the observed sea level rise to date.[57] Similarly, committed sea level rise that will occur in the future would also be far less.[58]

**C.     Attribution**

72.     "Carbon factors" analysis, devised by the International Panel on Climate Change (IPCC), the United Nations International Energy Agency, and the U.S. Environmental Protection Agency, quantifies the amount of $CO_2$ emissions attributable to a unit of raw fossil fuel extracted from the Earth.[59] Emissions factors for oil, coal, liquid natural gas, and natural gas are different for each material but are nevertheless known and quantifiable for each.[60] This analysis accounts for the use of Defendants' fossil fuel products, including non-combustion purposes that sequester $CO_2$ rather than emit it (e.g., production of asphalt).

73.     Defendants' historical and current fossil fuel extraction and production records are publicly available in various fora. These include university and public library collections, company websites, company reports filed with the U.S. Securities and Exchange Commission, company histories, and other sources. The cumulative $CO_2$ and methane emissions attributable to Defendants' fossil fuel products were calculated by reference to such publicly available documents.

---

[55] Revell Coastal, 2016 City of Imperial Beach Sea Level Rise Assessment (September 2016) p. 4-1.
[56] Revell Coastal, 2016 City of Imperial Beach Sea Level Rise Assessment (September 2016) p. 2-2.
[57] Robert E. Kopp et al., Temperature-driven Global Sea-level Variability in the Common Era, Proceedings of the National Academy of Sciences, Vol. 113, No. 11, E1434-E1441, E1438 (2016), http://www.pnas.org/content/113/11/E1434.full.
[58]Peter U. Clark et al., Consequences of Twenty-First-Century Policy for Multi-Millennial Climate and Sea-Level Change, Nature Climate Change Vol. 6, 365 (2016).
[59] See Richard Heede, Tracing Anthropogenic Carbon Dioxide and Methane Emissions to Fossil Fuel and Cement Producers, 1854-2010, Climatic Change 122, 232-33 (2014), https://link.springer.com/article/10.1007/s10584-013-0986-y.
[60] See, e.g., id.

74.     While it is possible to distinguish $CO_2$ derived from fossil fuels from other sources, it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere. However, cumulative carbon analysis allows an accurate calculation of net annual $CO_2$ and methane emissions attributable to each Defendant by quantifying the amount and type of fossil fuels products each Defendant extracted and placed into the stream of commerce, and multiplying those quantities by each fossil fuel product's carbon factor..

75.     Defendants, through their extraction, promotion, marketing, and sale of their fossil fuel products, caused approximately 20% of global fossil fuel product-related $CO_2$ between 1965 and 2015, with contributions currently continuing unabated. This constitutes a substantial portion of all such emissions in history, and the attendant historical, projected, and committed sea level rise associated therewith.

76.     Total cumulative emissions increased from 470 GtC in 2000 to 600 GtC gigatons through 2015, representing an almost 30% increase in total emissions in only sixteen years.[61]

77.     By quantifying $CO_2$ and methane pollution attributable to Defendants by and through their fossil fuel products, ambient air and ocean temperature and sea level responses to those emissions are also calculable, and can be attributed to Defendants on an individual and aggregate basis. Individually and collectively, Defendants' extraction, sale, and promotion of their fossil fuel products are responsible for substantial increases in ambient (surface) temperature, ocean temperature, sea level, extreme storm events, and other adverse impacts on Plaintiffs described herein.

78.     Anthropogenic $CO_2$ emissions through 2015 have caused approximately 17.4 feet of committed mean global sea level rise.[62] Defendants, through their extraction, promotion, marketing, and sale of their fossil fuel products, caused a substantial portion of both those

---

[61] See C. Le Quéré et al., Global Carbon Budget 2016, Earth Syst. Sci. Data 8, 633, table 10 (2016), http://www.earth-syst-sci-data.net/8/605/2016/.

[62] Peter U. Clark et al., Consequences of Twenty-First-Century Policy for Multi-Millennial Climate and Sea-Level Change, Nature Climate Change Vol. 6, 365 (2016).

COMPLAINT

emissions and the attendant historical, projected, and committed sea level rise.

79.    As explained above, this analysis considers only the volume of raw material actually extracted from the Earth by these Defendants. Many of these Defendants actually are responsible for far greater volumes of emissions because they also refine, manufacture, produce, market, promote, and sell more fossil fuel derivatives than they extract themselves by purchasing fossil fuel products extracted by independent third parties.

80.    In addition, considering the Defendants' lead role in promoting, marketing, and selling their fossil fuels products between 1965 and 2015; their efforts to conceal the hazards of those products from consumers; their promotion of their fossil fuel products despite knowing the dangers associate with those products; their dogged campaign against regulation of those products based on falsehoods, omissions, and deceptions; and their failure to pursue less hazardous alternatives available to them, Defendants, individually and together, have substantially and measurably contributed to the Plaintiffs' sea level rise-related injuries.

**D.    Defendants Went to Great Lengths to Understand the Hazards Associated with and Knew or Should Have Known of the Dangers Associated with the Extraction, Promotion and Sale of Their Fossil Fuel Products.**

81.    By 1965, concern about the risks of anthropogenic greenhouse gas emissions reached the highest level of the United States' scientific community. In that year, President Lyndon B. Johnson's Science Advisory Committee Panel on Environmental Pollution reported that by the year 2000, anthropogenic $CO_2$ emissions would "modify the heat balance of the atmosphere to such an extent that marked changes in climate . . . could occur."[63] President Johnson announced in a special message to Congress that "[t]his generation has altered the composition of the atmosphere on a global scale through . . . a steady increase in carbon dioxide from the burning of fossil fuels."[64]

82.    These statements from the Johnson Administration, at a minimum, put Defendants on notice of the potentially substantial dangers to people, communities, and the planet associated

---

[63] President's Science Advisory Committee, Restoring the Quality of Our Environment: Report of the Environmental Pollution Panel, page 9 (November 1965), https://hdl.handle.net/2027/uc1.b4315678.
[64] President Lyndon B. Johnson, Special Message to Congress on Conservation and Restoration of Natural Beauty (February 8, 1965), http://acsc.lib.udel.edu/items/show/292.

**COMPLAINT**

1    with unabated use of their fossil fuel products. Moreover, Defendants had amassed a considerable

2    body of knowledge on the subject through their own independent efforts.

3        83.    In 1968, a Stanford Research Institute (SRI) report commissioned by the American

4    Petroleum Institute ("API") and made available to all of its members, concluded, among other

5    things:

6        If the Earth's temperature increases significantly, a number of events might be
         expected to occur including the melting of the Antarctic ice cap, a rise in sea levels,
7        warming of the oceans and an increase in photosynthesis. . . .

8        It is clear that we are unsure as to what our long-lived pollutants are doing to our
         environment; however, there seems to be no doubt that the potential damage to our
9        environment could be severe. . . . [T]he prospect for the future must be of serious
         concern.[65]

10

11       84.    In 1969, Shell memorialized an on-going 18-month project to collect ocean data

12   from oil platforms to develop and calibrate environmental forecasting theories related to predicting

13   wave, wind, storm, sea level, and current changes and trends.[66] Several Defendants and/or their

14   predecessors in interest participated in the project, including Esso Production Research Company

15   (ExxonMobil), Mobil Research and Development Company (ExxonMobil), Pan American

16   Petroleum Corporation (BP), Gulf Oil Corporation (Chevron), Texaco Inc. (Chevron), and the

17   Chevron Oil Field Research Company.

18       85.    In 1972, API members, including Defendants, received a status report on all

19   environmental research projects funded by API. The report summarized the 1968 SRI report

20   describing the impact of Defendants' fossil fuel products on the environment, including global

21   warming and sea level rise. Industry participants who received this report include: American

22   Standard of Indiana (BP), Asiatic (Shell), Ashland (Marathon), Atlantic Richfield (BP), British

23   Petroleum (BP), Chevron Standard of California (Chevron), Cities Service (Citgo), Continental

24   (ConocoPhillips), Dupont (former owner of Conoco), Esso Research (ExxonMobil), Ethyl

25   (formerly   affiliated   with   Esso,   which   was   subsumed   by   ExxonMobil),   Getty

26

27   [65] Elmer Robinson and R.C. Robbins, Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants, Stanford
     Research Institute (February 1968), https://www.smokeandfumes.org/documents/document16.
28   [66] M.M. Patterson, An Ocean Data Gathering Program for the Gulf of Mexico, Society of Petroleum Engineers
     (1969), https://www.onepetro.org/conference-paper/SPE-2638-MS.

SHER
EDLING LLP

(Lukoil/ExxonMobil), Gulf (Chevron, among others), Humble Standard of New Jersey (ExxonMobil/Chevron/BP), Marathon, Mobil (ExxonMobil), Pan American (BP), Phillips (ConocoPhillips), Shell, Standard of Ohio (BP), Texaco (Chevron), Union (Chevron), Edison Electric Institute (representing electric utilities), Bituminous Coal Research (coal industry research group), Mid-Continent Oil & Gas Association (presently the U.S. Oil & Gas Association, a national trade association), Western Oil & Gas Association, National Petroleum Refiners Association (presently the American Fuel and Petrochemical Manufacturers Association, a national trade association), Champlin (Anadarko), Skelly (Lukoil/ExxonMobil), Colonial Pipeline (ownership has included BP, Citgo, ExxonMobil, ConocoPhillips, Chevron entities, among others) and Caltex (Chevron), among others.[67]

86.    In a 1977 presentation and again in a 1978 briefing, Exxon scientists warned the Exxon Corporation Management Committee that $CO_2$ concentrations were building in the Earth's atmosphere at an increasing rate, that $CO_2$ emissions attributable to fossil fuels were retained in the atmosphere, and that $CO_2$ was contributing to global warming.[68] The report stated:

> There is general scientific agreement that the most likely manner in which mankind is influencing the global climate is through carbon dioxide release from the burning of fossil fuels . . . [and that] Man has a time window of five to ten years before the need for hard decisions regarding changes in energy strategies might become critical.[69]

87.    Thereafter, Exxon engaged in a research program to study the environmental fate of fossil fuel-derived greenhouse gases and their impacts, which included publication of peer-reviewed research by Exxon staff scientists and the conversion of a supertanker into a research vessel to study the greenhouse effect and the role of the oceans in absorbing anthropogenic $CO_2$. Much of this research was shared in a variety of fora, symposia, and shared papers through trade associations and directly with other Defendants.

---

[67] American Petroleum Institute, Environmental Research, A Status Report, Committee for Air and Water Conservation (January 1972), http://files.eric.ed.gov/fulltext/ED066339.pdf.
[68] Memo from J.F. Black to F.G. Turpin, The Greenhouse Effect, Exxon Research and Engineering Company (June 6, 1978), http://www.climatefiles.com/exxonmobil/1978-exxon-memo-on-greenhouse-effect-for-exxon-corporation-management-committee/.
[69] Id.

88.    Exxon scientists made the case internally for using company resources to build corporate knowledge about the impacts of the promotion, marketing, and consumption of Defendants' fossil fuel products. Exxon climate researcher Henry Shaw wrote in 1978: "The rationale for Exxon's involvement and commitment of funds and personnel is based on our need to assess the possible impact of the greenhouse effect on Exxon business. Exxon must develop a credible scientific team that can critically evaluate the information generated on the subject and be able to carry bad news, if any, to the corporation."[70] Moreover, Shaw emphasized the need to collaborate with universities and government to more completely understand what he called the "$CO_2$ problem."[71]

89.    In 1979, API and its members, including Defendants, convened a Task Force to monitor and share cutting edge climate research among the oil industry. The group was initially called the $CO_2$ and Climate Task Force, but changed its name to the Climate and Energy Task Force in 1980 (hereinafter referred to as "API $CO_2$ Task Force"). Membership included senior scientists and engineers from nearly every major U.S. and multinational oil and gas company, including Exxon, Mobil (ExxonMobil), Amoco (BP), Phillips (ConocoPhillips), Texaco (Chevron), Shell, Sunoco, Sohio (BP) as well as Standard Oil of California (BP) and Gulf Oil (Chevron, among others). The Task Force was charged with assessing the implications of emerging science on the petroleum and gas industries and identifying where reductions in greenhouse gas emissions from Defendants' fossil fuel products could be made.[72]

90.    In 1979, API sent its members a background memo related to the API $CO_2$ and Climate Task Force's efforts, stating that $CO_2$ concentrations were rising steadily in the atmosphere, and predicting when the first clear effects of climate change might be felt.[73]

---

[70]Henry Shaw, Memo to Edward David Jr. on the "Greenhouse Effect", Exxon Research and Engineering Company (December 7, 1978).
[71] Id.
[72]American Petroleum Institute, AQ-9 Task Force Meeting Minutes (March 18, 1980), http://insideclimatenews.org/sites/default/files/documents/AQ-9%20Task%20Force%20Meeting%20%281980%29.pdf (AQ-9 refers to the "CO2 and Climate" Task Force).
[73] Neela Banerjee, Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too, Inside Climate News (December 22, 2015), https://insideclimatenews.org/news/22122015/exxon-mobil-oil-industry-peers-knew-about-climate-change-dangers-1970s-american-petroleum-institute-api-shell-chevron-texaco.

91.     Also in 1979, Exxon scientists advocated internally for additional fossil fuel industry-generated atmospheric research in light of the growing consensus that consumption of fossil fuel products was changing the Earth's climate:

> "We should determine how Exxon can best participate in all these [atmospheric science research] areas and influence possible legislation on environmental controls. It is important to begin to anticipate the strong intervention of environmental groups and be prepared to respond with reliable and credible data. It behooves [Exxon] to start a very aggressive defensive program in the indicated areas of atmospheric science and climate because there is a good probability that legislation affecting our business will be passed. Clearly, it is in our interest for such legislation to be based on hard scientific data. The data obtained from research on the global damage from pollution, e.g., from coal combustion, will give us the needed focus for further research to avoid or control such pollutants."[74]

92.     That same year, Exxon Research and Engineering reported that: "The most widely held theory [about increasing $CO_2$ concentration] is that the increase is due to fossil fuel combustion, increasing $CO_2$ concentration will cause a warming of the earth's surface, and the present trend of fossil fuel consumption will cause dramatic environmental effects before the year 2050."[75] Further, the report stated that unless fossil fuel use was constrained, there would be "noticeable temperature changes" associated with an increase in atmospheric $CO_2$ from about 280 parts per million before the Industrial Revolution to 400 parts per million by the year 2010.[76] Those projections proved remarkably accurate—atmospheric $CO_2$ concentrations surpassed 400 parts per million in May 2013, for the first time in millions of years.[77] In 2015, the annual average $CO_2$ concentration rose above 400 parts per million, and in 2016 the annual low surpassed 400 parts per million, meaning atmospheric $CO_2$ concentration remained above that threshold all year.[78]

---

[74] Henry Shaw, Exxon Memo to H.N. Weinberg about "Research in Atmospheric Science", Exxon Inter-Office Correspondence (November 19, 1979), https://insideclimatenews.org/sites/default/files/documents/Probable%20Legislation%20Memo%20(1979).pdf.
[75] W.L. Ferrall, Exxon Memo to R.L. Hirsch about "Controlling Atmospheric $CO_2$", Exxon Research and Engineering Company (October 16 1979), http://insideclimatenews.org/sites/default/files/documents/CO2%20and%20Fuel%20Use%20Projections.pdf.
[76] Id.
[77] Nicola Jones, How the World Passed a Carbon Threshold and Why it Matters, Yale Environment 360 (Jan. 26, 2017), http://e360.yale.edu/features/how-the-world-passed-a-carbon-threshold-400ppm-and-why-it-matters.
[78] Id.

COMPLAINT

93.     In 1980, API's $CO_2$ Task Force members discussed the oil industry's responsibility to reduce $CO_2$ emissions by changing refining processes and developing fuels that emit less $CO_2$. The minutes from the Task Force's February 29, 1980, meeting included a summary of a presentation on "The $CO_2$ Problem" given by Dr. John Laurmann, which identified the "scientific consensus on the potential for large future climatic response to increased $CO_2$ levels" as a reason for API members to have concern with the "$CO_2$ problem" and informed attendees that there was "strong empirical evidence that rise [in $CO_2$ concentration was] caused by anthropogenic release of $CO_2$, mainly from fossil fuel combustion."[79] Moreover, Dr. Laurmann warned that the amount of $CO_2$ in the atmosphere could double by 2038, which he said would likely lead to a 2.5° C (4.5° F) rise in global average temperatures with "major economic consequences." He then told the Task Force that models showed a 5°C (9° F) rise by 2067, with "globally catastrophic effects."[80] A taskforce member and representative of Texaco leadership present at the meeting posited that the API $CO_2$ Task Force should develop ground rules for energy release of fuels and the cleanup of fuels as they relate to $CO_2$ creation.

94.     In 1980, the API $CO_2$ Task Force also discussed a potential area for investigation: alternative energy sources as a means of mitigating $CO_2$ emissions from Defendants' fossil fuel products. These efforts called for research and development to "Investigate the Market Penetration Requirements of Introducing a New Energy Source into World Wide Use." Such investigation was to include the technical implications of energy source changeover, research timing, and requirements.[81]

95.     By 1980, Exxon's senior leadership had become intimately familiar with the greenhouse effect and the role of $CO_2$ in the atmosphere. In that year, Exxon Senior Vice President and Board member George Piercy questioned Exxon researchers on the minutiae of the ocean's role in absorbing atmospheric $CO_2$, including whether there was a net $CO_2$ flux out of the ocean

---

[79] American Petroleum Institute, AQ-9 Task Force Meeting Minutes (March 18, 1980), http://insideclimatenews.org/sites/default/files/documents/AQ-9%20Task%20Force%20Meeting%20%281980%29.pdf (AQ-9 refers to the "$CO_2$ and Climate" Task Force).
[80] Id.
[81] Id.

1 into the atmosphere in certain zones where upwelling of cold water to the surface occurs, because

2 Piercy evidently believed that the oceans could absorb and retain higher concentrations of $CO_2$

3 than the atmosphere.[82] This inquiry aligns with Exxon supertanker research into whether the ocean

4 would act as a significant $CO_2$ sink that would sequester atmospheric $CO_2$ long enough to allow

5 unabated emissions without triggering dire climatic consequences. As described below, Exxon

6 eventually scrapped this research before it produced enough data from which to derive

7 a conclusion.[83]

8      96.     Also in 1980, Imperial Oil (ExxonMobil) reported to Esso and Exxon managers

9 and environmental staff that increases in fossil fuel usage aggravates $CO_2$ in the atmosphere.

10 Noting that the United Nations was encouraging research into the carbon cycle, Imperial reported

11 that "[t]echnology exists to remove $CO_2$ from [fossil fuel power plant] stack gases but removal of

12 only 50% of the $CO_2$ would double the cost of power generation." Imperial also reported that its

13 coordination department had been internally evaluating its and Exxon's products to determine

14 whether disclosure of a human health hazard was necessary. The report notes that Section (8e) of

15 Toxic Substances Control Act, 55 U.S.C. §§ 1601 et seq., requires that anyone who discovers that

16 a material or substance in commercial use is or may be a significant risk to human health must

17 report such findings to the Environmental Protection Agency within 15 days. Although greenhouse

18 gases are human health hazards (because they have serious consequences in terms of global food

19 production, disease virulence, and sanitation infrastructure, among other impacts), neither

20 Imperial, Exxon, nor any other Defendant has ever filed a disclosure with the U.S. Environmental

21 Protection Agency pursuant to the Toxic Substances Control Act. Exxon scientist Roger Cohen

22 warned his colleagues in a 1981 internal memorandum that "future developments in global data

23 gathering and analysis, along with advances in climate modeling, may provide strong evidence for

24

25

---

[82] Neela Banerjee, More Exxon Documents Show How Much It Knew About Climate 35 Years Ago, Inside Climate
26  News (Dec. 1, 2015), https://insideclimatenews.org/news/01122015/documents-exxons-early-co2-position-senior-
executives-engage-and-warming-forecast.
27 [83] Neela Banerjee et al., Exxon Believed Deep Dive Into Climate Research Would Protect Its Business, Inside
Climate News (Sept. 17, 2015), https://insideclimatenews.org/news/16092015/exxon-believed-deep-dive-into-
28  climate-research-would-protect-its-business.

SHER
EDLING LLP
**COMPLAINT**        40

1  a delayed $CO_2$ effect of a truly substantial magnitude," and that under certain circumstances it

2  would be "very likely that we will unambiguously recognize the threat by the year 2000."[84] Cohen

3  had expressed concern that the memorandum mischaracterized potential effects of unabated $CO_2$

4  emissions from Defendants' fossil fuel products: ". . . it is distinctly possible that the . . . [Exxon

5  Planning Division's] scenario will produce effects which will indeed be catastrophic (at least for

6  a substantial fraction of the world's population)."[85]

7       97.    In 1981, Exxon's Henry Shaw, the company's lead climate researcher at the time,

8  prepared a summary of Exxon's current position on the greenhouse effect for Edward David Jr.,

9  president of Exxon Research and Engineering, stating in relevant part:

10       • "Atmospheric $CO_2$ will double in 100 years if fossil fuels grow at 1.4%/ $a^2$.
11       • 3°C global average temperature rise and 10°C at poles if $CO_2$ doubles.
            o  Major shifts in rainfall/agriculture
12          o  Polar ice may melt"[86]

13       98.    In 1982, another report prepared for API by scientists at the Lamont-Doherty

14  Geological Observatory at Columbia University recognized that atmospheric $CO_2$ concentration

15  had risen significantly compared to the beginning of the industrial revolution from about 290 parts

16  per million to about 340 parts per million in 1981 and acknowledged that despite differences in

17  climate modelers' predictions, all models indicated a temperature increase caused by

18  anthropogenic $CO_2$ within a global mean range of 4° C (7.2° F). The report advised that there was

19  scientific consensus that "a doubling of atmospheric $CO_2$ from [] pre-industrial revolution value

20  would result in an average global temperature rise of $(3.0 \pm 1.5)$°C $[5.4 \pm 2.7$° F]." It went further,

21  warning that "[s]uch a warming can have serious consequences for man's comfort and survival

22  since patterns of aridity and rainfall can change, the height of the sea level can increase

23

---

24  [84] Roger W. Cohen, Exxon Memo to W. Glass about possible "catastrophic" effect of $CO_2$, Exxon Inter-Office
25  Correspondence (Aug. 18, 1981), http://www.climatefiles.com/exxonmobil/1981-exxon-memo-on-possible-emission-consequences-of-fossil-fuel-consumption/.
26  [85] Id.
    [86] Henry Shaw, Exxon Memo to E. E. David, Jr. about "$CO_2$ Position Statement", Exxon Inter-Office
27  Correspondence (May 15, 1981),
    https://insideclimatenews.org/sites/default/files/documents/Exxon%20Position%20on%20CO2%20%281981%29.pdf.

28

considerably and the world food supply can be affected."[87] Exxon's own modeling research confirmed this, and the company's results were later published in at least three peer-reviewed scientific papers.[88]

99.     Also in 1982, Exxon's Environmental Affairs Manager distributed a primer on climate change to a "wide circulation [of] Exxon management . . . intended to familiarize Exxon personnel with the subject."[89] The primer also was "restricted to Exxon personnel and not to be distributed externally."[90] The primer compiled science on climate change available at the time, and confirmed fossil fuel combustion as a primary anthropogenic contributor to global warming. The report estimated a $CO_2$ doubling around 2090 based on Exxon's long-range modeled outlook. The author warned that the melting of the Antarctic ice sheet could result in global sea level rise of five feet which would "cause flooding on much of the U.S. East Coast, including the State of Florida and Washington, D.C."[91] Indeed, it warned that "there are some potentially catastrophic events that must be considered," including sea level rise from melting polar ice sheets. It noted that some scientific groups were concerned "that once the effects are measurable, they might not be reversible."[92]

100.     In a summary of Exxon's climate modeling research from 1982, Director of Exxon's Theoretical and Mathematical Sciences Laboratory Roger Cohen wrote that "the time required for doubling of atmospheric $CO_2$ depends on future world consumption of fossil fuels." Cohen concluded that Exxon's own results were "consistent with the published predictions of more

---

[87] American Petroleum Institute, Climate Models and $CO_2$ Warming: A Selective Review and Summary, Lamont-Doherty Geological Observatory (Columbia University) (March 1982), https://assets.documentcloud.org/documents/2805626/1982-API-Climate-Models-and-CO2-Warming-a.pdf.
[88] See Roger W. Cohen, Exxon Memo summarizing findings of research in climate modeling, Exxon Research and Engineering Company (September 2, 1982), https://insideclimatenews.org/sites/default/files/documents/%2522Consensus%2522%20on%20CO2%20Impacts%20(1982).pdf (discussing research articles).
[89] M. B. Glaser, Exxon Memo to Management about "$CO_2$ 'Greenhouse' Effect", Exxon Research and Engineering Company (November 12, 1982), http://insideclimatenews.org/sites/default/files/documents/1982%20Exxon%20Primer%20on%20CO2%20Greenhouse%20Effect.pdf.
[90] Id.
[91] Id.
[92] Id.

1  complex climate models" and "in accord with the scientific consensus on the effect of increased

2  atmospheric $CO_2$ on climate."[93]

3       101.    At the fourth biennial Maurice Ewing Symposium at the Lamont-Doherty

4  Geophysical Observatory in October 1982, attended by members of API, Exxon Research and

5  Engineering Company president E.E. David delivered a speech titled: "Inventing the Future:

6  Energy and the $CO_2$ 'Greenhouse Effect.'"[94] His remarks included the following statement: "[F]ew

7  people doubt that the world has entered an energy transition away from dependence upon fossil

8  fuels and toward some mix of renewable resources that will not pose problems of $CO_2$

9  accumulation." He went on, discussing the human opportunity to address anthropogenic climate

10  change before the point of no return:

11         It is ironic that the biggest uncertainties about the $CO_2$ buildup are not in predicting
        what the climate will do, but in predicting what people will do. . . .[It] appears we
12         still have time to generate the wealth and knowledge we will need to invent the
        transition to a stable energy system.
13

14       102.    Throughout the early 1980s, at Exxon's direction, Exxon climate scientist Henry

15  Shaw forecasted emissions of $CO_2$ from fossil fuel use. Those estimates were incorporated into

16  Exxon's 21st century energy projections and were distributed among Exxon's various divisions.

17  Shaw's conclusions included an expectation that atmospheric $CO_2$ concentrations would double in

18  2090 per the Exxon model, with an attendant 2.3–5.6° F average global temperature increase. Shaw

19  compared his model results to those of the U.S. EPA, the National Academy of Sciences, and the

20  Massachusetts Institute of Technology, indicating that the Exxon model predicted a longer delay

21  than any of the other models, although its temperature increase prediction was in the mid-range of

22  the four projections.[95]

23

24  [93] Roger W. Cohen, Exxon Memo summarizing findings of research in climate modeling, Exxon Research and
   Engineering Company (September 2, 1982),
25  https://insideclimatenews.org/sites/default/files/documents/%2522Consensus%2522%20on%20CO2%20Impacts%2
   0(1982).pdf.
26  [94] E. E. David, Jr., Inventing the Future: Energy and the $CO_2$ Greenhouse Effect: Remarks at the Fourth Annual
   Ewing Symposium, Tenafly, NJ (1982), http://sites.agu.org/publications/files/2015/09/ch1.pdf.
27  [95] Neela Banerjee, More Exxon Documents Show How Much It Knew About Climate 35 Years Ago, Inside Climate
   News (Dec. 1, 2015), https://insideclimatenews.org/news/01122015/documents-exxons-early-co2-position-senior-
28  executives-engage-and-warming-forecast.

1  103. During the 1980s, many Defendants formed their own research units focused on

2 climate modeling. The API, including the API $CO_2$ Task Force, provided a forum for Defendants

3 to share their research efforts and corroborate their findings related to anthropogenic greenhouse

4 gas emissions.[96]

5  104. During this time, Defendants' statements express an understanding of their

6 obligation to consider and mitigate the externalities of unabated promotion, marketing, and sale of

7 their fossil fuel products. For example, in 1988, Richard Tucker, the president of Mobil Oil,

8 presented at the American Institute of Chemical Engineers National Meeting, the premier

9 educational forum for chemical engineers, where he stated:

> [H]umanity, which has created the industrial system that has transformed civilities, is also responsible for the environment, which sometimes is at risk because of unintended consequences of industrialization. . . . Maintaining the health of this life-support system is emerging as one of the highest priorities. . . . [W]e must all be environmentalists.

> The environmental covenant requires action on many fronts . . . the low-atmosphere ozone problem, the upper-atmosphere ozone problem and the greenhouse effect, to name a few. . . . Our strategy must be to reduce pollution before it is ever generated—to prevent problems at the source.

> Prevention means engineering a new generation of fuels, lubricants and chemical products. . . . Prevention means designing catalysts and processes that minimize or eliminate the production of unwanted byproducts. . . . Prevention on a global scale may even require a dramatic reduction in our dependence on fossil fuels—and a shift towards solar, hydrogen, and safe nuclear power. It may be possible that—just possible—that the energy industry will transform itself so completely that observers will declare it a new industry. . . . Brute force, low-tech responses and money alone won't meet the challenges we face in the energy industry.[97]

20  105. In 1989, Esso Resources Canada (ExxonMobil) commissioned a report on the

21 impacts of climate change on existing and proposed natural gas facilities in the Mackenzie River

22 Valley and Delta, including extraction facilities on the Beaufort Sea and a pipeline crossing

23 Canada's Northwest Territory.[98] It reported that "large zones of the Mackenzie Valley could be

---

[96] Neela Banerjee, Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too, Inside Climate News (December 22, 2015), https://insideclimatenews.org/news/22122015/exxon-mobil-oil-industry-peers-knew-about-climate-change-dangers-1970s-american-petroleum-institute-api-shell-chevron-texaco.

[97] Richard E. Tucker, High Tech Frontiers in the Energy Industry: The Challenge Ahead, AIChE National Meeting (November 30, 1988), https://hdl.handle.net/2027/pur1.32754074119482?urlappend=%3Bseq=522.

[98] Stephen Lonergan and Kathy Young, An Assessment of the Effects of Climate Warming on Energy Developments in the Mackenzie River Valley and Delta, Canadian Arctic, Energy Exploration & Exploitation, Vol. 7, Issue 5 (Oct. 1, 1989), http://journals.sagepub.com/doi/abs/10.1177/014459878900700508.

affected dramatically by climatic change" and that "the greatest concern in Norman Wells [oil town in North West Territories, Canada] should be the changes in permafrost that are likely to occur under conditions of climate warming." The report concluded that, in light of climate models showing a "general tendency towards warmer and wetter climate," operation of those facilities would be compromised by increased precipitation, increase in air temperature, changes in permafrost conditions, and significantly, sea level rise and erosion damage.[99] The authors recommended factoring these eventualities into future development planning and also warned that "a rise in sea level could cause increased flooding and erosion damage on Richards Island."

106.    In 1991, Shell produced a film called "Climate of Concern." The film advises that while "no two [climate change projection] scenarios fully agree, . . . [they] have each prompted the same serious warning. A warning endorsed by a uniquely broad consensus of scientists in their report to the UN at the end of 1990." The warning was an increasing frequency of abnormal weather, and of sea level rise of about one meter over the coming century. Shell specifically described the impacts of anthropogenic sea level rise on tropical islands, "barely afloat even now, . . . [f]irst made uninhabitable and then obliterated beneath the waves. Wetland habitats destroyed by intruding salt. Coastal lowlands suffering pollution of precious groundwater." It warned of "greenhouse refugees," people who abandoned homelands inundated by the sea, or displaced because of catastrophic changes to the environment. The video concludes with a stark admonition: "Global warming is not yet certain, but many think that the wait for final proof would be irresponsible. Action now is seen as the only safe insurance."[100]

107.    In the mid-1990s, ExxonMobil, Shell and Imperial Oil (ExxonMobil) jointly undertook the Sable Offshore Energy Project in Nova Scotia. The project's own Environmental Impact Statement declared: "The impact of a global warming sea-level rise may be particularly significant in Nova Scotia. The long-term tide gauge records at a number of locations along the

---

[99] Id.

[100] Jelmer Mommers, Shell made a film about climate change in 1991 (then neglected to heed its own warning), de Correspondent (Feb. 27, 2017), https://thecorrespondent.com/6285/shell-made-a-film-about-climate-change-in-1991-then-neglected-to-heed-its-own-warning/692663565-875331f6.

N.S. coast have shown sea level has been rising over the past century. . . . For the design of coastal and offshore structures, an estimated rise in water level, due to global warming, of 0.5 m [1.64 feet] may be assumed for the proposed project life (25 years)."[101]

108.   Climate change research conducted by Defendants and their industry associations frequently acknowledged uncertainties in their climate modeling—those uncertainties, however, were merely with respect to the magnitude and timing of climate impacts resulting from fossil fuel consumption, not that significant changes would eventually occur. The Defendants' researchers and the researchers at their industry associations harbored little doubt that climate change was occurring and that fossil fuel products were, and are, the primary cause.

109.   Despite the overwhelming information about the threats to people and the planet posed by continued unabated use of their fossil fuel products, Defendants failed to act as they reasonably should have to mitigate or avoid those dire adverse impacts. Defendants instead adopted the position, as described below, that the absence of meaningful regulations on the consumption of their fossil fuel products was the equivalent of a social license to continue the unfettered pursuit of profits from those products. This position was an abdication of Defendants' responsibility to consumers and the public, including Plaintiffs, to act on their unique knowledge of the reasonably foreseeable hazards of unabated production and consumption of their fossil fuel products.

**E.     Defendants Did Not Disclose Known Harms Associated with the Extraction, Promotion and Consumption of Their Fossil Fuel Products and Instead Affirmatively Acted to Obscure Those Harms and Engaged in a Concerted Campaign to Evade Regulation.**

110.   By 1988, Defendants had amassed a compelling body of knowledge about the role of anthropogenic greenhouse gases, and specifically those emitted from the normal use of Defendants' fossil fuel products, in causing global warming and sea level rise and the attendant consequences for human communities and the environment. On notice that their products were causing global climate change and dire effects on the planet, Defendants were faced with the

---

[101] ExxonMobil, Sable Project, Development Plan, <u>Volume 3 – Environmental Impact Statement</u> http://soep.com/about-the-project/development-plan-application/.

COMPLAINT

1  decision of whether to take steps to limit the damages their fossil fuel products were causing and

2  would continue to cause for virtually every one of Earth's inhabitants, including the People of the

3  State of California, and the City of Imperial Beach and its citizens.

4      111.   Defendants at any time before or thereafter could and should reasonably have taken

5  any of a number of steps to mitigate the damages caused by their fossil fuel products, and their

6  own comments reveal an awareness of what some of these steps may have been. Defendants should

7  have made reasonable warnings to consumers, the public, and regulators of the dangers known to

8  Defendants of the unabated consumption of their fossil fuel products, and they should have taken

9  reasonable steps to limit the potential greenhouse gas emissions arising out of their fossil

10  fuel products.

11      112.   But several key events during the period 1988–1992 appear to have prompted

12  Defendants to change their tactics from general research and internal discussion on climate change

13  to a public campaign aimed at evading regulation of their fossil fuel products and/or emissions

14  therefrom. These include:

15          a.   In 1988, National Aeronautics and Space Administration (NASA) scientists

16             confirmed that human activities were actually contributing to global

17             warming.[102] On June 23 of that year, NASA scientist James Hansen's

18             presentation of this information to Congress engendered significant news

19             coverage and publicity for the announcement, including coverage on the

20             front page of the New York Times.

21          b.   On July 28, 1988, Senator Robert Stafford and four bipartisan co-sponsors

22             introduced S. 2666, "The Global Environmental Protection Act," to regulate

23             $CO_2$ and other greenhouse gases. Four more bipartisan bills to significantly

24             reduce $CO_2$ pollution were introduced over the following ten weeks, and in

25             August, U.S. Presidential candidate George H.W. Bush pledged that his

26

27          [102] See Peter C. Frumhoff et al., The Climate Responsibilities of Industrial Carbon Producers, Climatic Change, Vol.

28          132, 161 (2015).

presidency would "combat the greenhouse effect with the White House effect."[103] Political will in the United States to reduce anthropogenic greenhouse gas emissions and mitigate the harms associated with Defendants' fossil fuel products was gaining momentum.

c.   In December 1988, the United Nations formed the Intergovernmental Panel on Climate Change (IPCC), a scientific panel dedicated to providing the world's governments with an objective, scientific analysis of climate change and its environmental, political, and economic impacts.

d.   In 1990, the IPCC published its First Assessment Report on anthropogenic climate change,[104] in which it concluded that (1) "there is a natural greenhouse effect which already keeps the Earth warmer than it would otherwise be," and (2) that

> emissions resulting from human activities are substantially increasing the atmospheric concentrations of the greenhouse gases carbon dioxide, methane, chlorofluorocarbons (CFCs) and nitrous oxide. These increases will enhance the greenhouse effect, resulting on average in an additional warming of the Earth's surface. The main greenhouse gas, water vapour, will increase in response to global warming and further enhance it.[105]

The IPCC reconfirmed these conclusions in a 1992 supplement to the First Assessment report.[106]

e.   The United Nations began preparation for the 1992 Earth Summit in Rio de Janeiro, Brazil, a major, newsworthy gathering of 172 world governments, of which 116 sent their heads of state. The Summit resulted in the United Nations Framework Convention on Climate Change (UNFCCC), an

---

[103] New York Times, The White House and the Greenhouse, May 9, 1998, http://www.nytimes.com/1989/05/09/opinion/the-white-house-and-the-greenhouse.html.
[104] See IPCC, Reports, http://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml.
[105] IPCC, Climate Change: The IPCC Scientific Assessment, Policymakers Summary (1990), http://www.ipcc.ch/ipccreports/far/wg_I/ipcc_far_wg_I_spm.pdf.
[106] IPCC, 1992 IPCC Supplement to the First Assessment Report (1992), http://www.ipcc.ch/publications_and_data/publications_ipcc_90_92_assessments_far.shtml.

international environmental treaty providing protocols for future negotiations aimed at "stabiliz[ing] greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system."[107]

113.    These world events marked a shift in public discussion of climate change, and the initiation of international efforts to curb anthropogenic greenhouse emissions – developments that had stark implications for, and would have diminished the profitability of, Defendants' fossil fuel products.

114.    But rather than collaborating with the international community by acting to forestall, or at least decrease, their fossil fuel products' contributions to global warming, sea level rise, and injuries to Imperial Beach and other coastal communities, Defendants embarked on a decades-long campaign designed to maximize continued dependence on their products and undermine national and international efforts like the Kyoto Protocol to rein in greenhouse gas emissions.

115.    Defendants' campaign, which focused on concealing, discrediting, and/or misrepresenting information that tended to support restricting consumption of (and thereby decreasing demand for) Defendants' fossil fuel products, took several forms. The campaign enabled Defendants to accelerate their business practice of exploiting fossil fuel reserves, and concurrently externalize the social and environmental costs of their fossil fuel products. These activities stood in direct contradiction to Defendants' own prior recognition that the science of anthropogenic climate change was clear and that the greatest uncertainties involved responsive human behavior, not scientific understanding of the issue.

116.    Defendants took affirmative steps to conceal, from Plaintiffs and the general public, the foreseeable impacts of the use of their fossil fuel products on the Earth's climate and associated harms to people and communities. Defendants embarked on a concerted public relations campaign to cast doubt on the science connecting global climate change to fossil fuel products and

---

[107] United Nations, United Nations Framework Convention on Climate Change, Article 2 (1992), https://unfccc.int/resource/docs/convkp/conveng.pdf.

greenhouse gas emissions, in order to influence public perception of the existence of anthropogenic global warming and sea level rise. The effort included promoting their hazardous products through advertising campaigns and the initiation and funding of climate change denialist organizations, designed to influence consumers to continue using Defendants' fossil fuel products irrespective of those products' damage to communities and the environment.

117.   For example, in 1988, Joseph Carlson, an Exxon public affairs manager, described the "Exxon Position," which included among others, two important messaging tenets: (1) "[e]mphasize the uncertainty in scientific conclusions regarding the potential enhanced Greenhouse Effect;" and (2) "[r]esist the overstatement and sensationalization [sic] of potential greenhouse effect which could lead to noneconomic development of non-fossil fuel resources."[108]

118.   In 1991, for example, the Information Council for the Environment ("ICE"), whose members included affiliates, predecessors and/or subsidiaries of Defendants, including Peabody, Ohio Valley Coal Company (Murray Energy), Pittsburg and Midway Coal Mining (Chevron), and Island Creek Coal Company (Occidental), launched a national climate change science denial campaign with full-page newspaper ads, radio commercials, a public relations tour schedule, "mailers," and research tools to measure campaign success. Included among the campaign strategies was to "reposition global warming as theory (not fact)." Its target audience included older less-educated males who are "predisposed to favor the ICE agenda, and likely to be even more supportive of that agenda following exposure to new info" as well as younger, lower-income women likely to be "green" consumers but who "are also most likely to soften their support for federal legislation after hearing new information on global warming."[109] The effort focused on a few select cities for their test marketing; these cities were selected on the basis that the majority of their electricity came from coal, they were home to members of the U.S. House of Representatives Energy and Commerce or Ways and Means committees, and they had low media costs.[110]

---

[108]Joseph M. Carlson, Exxon Memo on "The Greenhouse Effect" (August 3, 1988), https://assets.documentcloud.org/documents/3024180/1998-Exxon-Memo-on-the-Greenhouse-Effect.pdf.
[109] Union of Concerned Scientists, Deception Dossier #5: Coal's "Information Council on the Environment" Sham, (1991), http://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-5_ICE.pdf.
[110] Id.

119.    An implicit goal of ICE's advertising campaign was to change public opinion and avoid regulation. A memo from Richard Lawson, president of the National Coal Association asked members to contribute to the ICE campaign with the justification that "policymakers are prepared to act [on global warming]. Public opinion polls reveal that 60% of the American people already believe global warming is a serious environmental problem. Our industry cannot sit on the sidelines in this debate."[111]

120.    The following images are examples of ICE-funded print advertisements challenging the validity of climate science and intended to obscure the scientific consensus on anthropogenic climate change and induce political inertia to address it.[112]

 


121.    In 1996, Exxon released a publication called "Global Warming: Who's Right? Facts about a debate that's turned up more questions than answers." In the publication's preface, Exxon CEO Lee Raymond stated that "taking drastic action immediately is unnecessary since many scientists agree there's ample time to better understand the climate system." The subsequent article described the greenhouse effect as "unquestionably real and definitely a good thing," while

---

[111] Naomi Oreskes, My Facts Are Better Than Your Facts: Spreading Good News about Global Warming (2010), in Peter Howlett et al., How Well Do Facts Travel?: The Dissemination of Reliable Knowledge, 136-166. Cambridge University Press. doi:10.1017/CBO9780511762154.008.8.
[112] Union of Concerned Scientists, Deception Dossier #5: Coal's "Information Council on the Environment" Sham, page 47-49 (1991), http://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-5_ICE.pdf.

1   ignoring the severe consequences that would result from the influence of the increased $CO_2$

2   concentration on the Earth's climate. Instead, it characterized the greenhouse effect as simply

3   "what makes the earth's atmosphere livable." Directly contradicting their own internal reports and

4   peer-reviewed science, the article ascribed the rise in temperature since the late 19th century to

5   "natural fluctuations that occur over long periods of time" rather than to the anthropogenic

6   emissions that Exxon and other scientists had confirmed were responsible. The article also falsely

7   challenged the computer models that projected the future impacts of unabated fossil fuel product

8   consumption, including those developed by Exxon's own employees, as having been "proved to

9   be inaccurate." The article contradicted the numerous reports circulated among Exxon's staff, and

10  by the API, by stating that "the indications are that a warmer world would be far more benign than

11  many imagine . . . moderate warming would reduce mortality rates in the US, so a slightly warmer

12  climate would be more healthful." Raymond concluded his preface by attacking advocates for

13  limiting the use of his company's fossil fuel products as "drawing on bad science, faulty logic, or

14  unrealistic assumptions" – despite the important role that Exxon's own scientists had played in

15  compiling those same scientific underpinnings.[113]

16      122.    In a speech presented at the World Petroleum Congress in Beijing in 1997 at which

17  many of the Defendants were present, Exxon CEO Lee Raymond reiterated these views. This time,

18  he presented a false dichotomy between stable energy markets and abatement of the marketing,

19  promotion, and sale of fossil fuel products known to Defendants to be hazardous. He stated:

> Some people who argue that we should drastically curtail our use of fossil fuels for environmental reasons . . . my belief [is] that such proposals are neither prudent nor practical. With no readily available economic alternatives on the horizon, fossil fuels will continue to supply most of the world's and this region's energy for the foreseeable future.

> Governments also need to provide a stable investment climate…They should avoid the temptation to intervene in energy markets in ways that give advantage to one competitor over another or one fuel over another.

---

[113] Exxon Corp., Global warming: who's right?, (1996), https://www.documentcloud.org/documents/2805542-Exxon-Global-Warming-Whos-Right.html.

We also have to keep in mind that most of the greenhouse effects comes from natural sources . . . Leaping to radically cut this tiny sliver of the greenhouse pie on the premise that it will affect climate defies common sense and lacks foundation in our current understanding of the climate system.

Let's agree there's a lot we really don't know about how climate will change in the 21st century and beyond . . . It is highly unlikely that the temperature in the middle of the next century will be significantly affected whether policies are enacted now or 20 years from now. It's bad public policy to impose very costly regulations and restrictions when their need has yet to be proven.[114]

123.    Imperial Oil (ExxonMobil) CEO Robert Peterson falsely denied the established connection between Defendants' fossil fuel products and anthropogenic climate change in the Summer 1998 Imperial Oil Review, "A Cleaner Canada":

[T]his issue [referring to climate change] has absolutely nothing to do with pollution and air quality. Carbon dioxide is not a pollutant but an essential ingredient of life on this planet . . . .[T]he question of whether or not the trapping of 'greenhouse gases will result in the planet's getting warmer . . . has no connection whatsoever with our day-to-day weather.

There is absolutely no agreement among climatologists on whether or not the planet is getting warmer, or, if it is, on whether the warming is the result of man-made factors or natural variations in the climate. . . .I feel very safe in saying that the view that burning fossil fuels will result in global climate change remains an unproved hypothesis.[115]

124.    Mobil (ExxonMobil) paid for a series of "advertorials," advertisements located in the editorial section of the New York Times and meant to look like editorials rather than paid ads. These ads discussed various aspects of the public discussion of climate change and sought to undermine the justifications for tackling greenhouse gas emissions as unsettled science. The 1997 advertorial below[116] argued that economic analysis of emissions restrictions was faulty and inconclusive and therefore a justification for delaying action on climate change.

---

[114] Lee R. Raymond, Energy – Key to growth and a better environment for Asia-Pacific nations, World Petroleum Congress (October 13, 1997), https://assets.documentcloud.org/documents/2840902/1997-Lee-Raymond-Speech-at-China-World-Petroleum.pdf.
[115] Robert Peterson, A Cleaner Canada in Imperial Oil Review (Summer 1998), http://www.documentcloud.org/documents/2827818-1998-Imperial-Oil-Robert-Peterson-A-Cleaner-Canada.html
[116] Mobil, When Facts Don't Square with the Theory, Throw Out the Facts (1997) New York Times, A31 (August 14, 1997), https://www.documentcloud.org/documents/705550-mob-nyt-1997-aug-14-whenfactsdontsquare.html.

1

2

like race.    But when we no longer allow those    who was dragged from his sister's    who have the power to do something
choices, both civility and common    car by police officers and shot in the    about those officers, but choose not
sense will have been diminished. □    face at point-blank range. The cops    to.    □

3
ep

4
utionary.
 veto, Coo-
tayer is the
aident who
tion passed
ongress by
ower as a
Cain of Ari-
e line item
rvery incen-
use it judi-
s egregious

5

6

7
ver his eco-
olish budget
wo-thirds of
r, good rid-
s being arbi-
a — as it did
he stronger

8

9

10
Item veto in
n President,
tipled to op-
Democratic
iers may do
n their bud-
residents has
the item veto
ef budgetary
substantive
rerald budg-
promoting. □

11

12

13

14

15
e

16
is apart and
re're talking
option. Joseph
e Rutelmyer
nd an affair
He is respon-
certainty, but

17

18

19
tes is divorce
decades have
it many wives
iven them no
n the antiqua-
ction" law is
e state where
t Dorothy Hu-
in the courts?
a victory for
slues, as some
it's not even a
nost women in
, only 12 states
ution of affec-
L.

20

21

22

23
is a vindica-
eeful Dorothy
k a jury of her
s justified. In
they came in
oporting her.
at?    □

24

25

26

27

28

## When facts
## don't square with the theory,
## throw out the facts

That seems to characterize the administration's attitude on two of its own studies which show that international efforts to curb global warming could spark a big run-up in energy prices.

For months, the administration—playing its cards close to the vest—has promised to provide details of the emission reduction plan it will put on the table at the climate change meeting in Kyoto, Japan, later this year. It also promised to evaluate the economics of that policy and measure its impact. Those results are important because the proposals submitted by other countries thus far would be disruptive and costly to the U.S. economy.

Yet, when the results from its own economic models were finally generated, the administration started distancing itself from the findings and models that produced them. The administration's top economic advisor said that economic models can't provide a "definitive answer" on the impact of controlling emissions. The effort, she said, was "futile." At best, the models can only provide a "range of potential impacts."

Frankly, we're puzzled. The White House has promised to lay the economic facts before the public. Yet, the administration's top advisor said such an analysis won't be based on models and it will "preclude...detailed numbers." If you don't provide numbers and don't rely on models, what kind of rigorous economic examination can Congress and the public expect?

We're also puzzled by ambivalence over models. The administration downplays the utility of economic models to forecast cost impacts 10–15 years from now, yet its negotiators accept as gospel the 50–100-year predictions of global warming that have been generated by climate models—many of which have been criticized as seriously flawed.

The second study, conducted by Argonne National Laboratory under a contract with the Energy Department, examined what would

happen if the U.S. had to commit to higher energy prices under the emission reduction plans that several nations had advanced last year. Such increases, the report concluded, would result in "significant reductions in output and employment" in six industries—aluminum, cement, chemical, paper and pulp, petroleum refining and steel.

Hit hardest, the study noted, would be the chemical industry, with estimates that up to 30 percent of U.S. chemical manufacturing capacity would move offshore to developing countries. Job losses could amount to some 200,000 in that industry, with another 100,000 in the steel sector. And despite the substantial loss of U.S. jobs and manufacturing capacity, the net emission reduction would be insignificant since developing countries will not be bound by the emission targets of a global warming treaty.

Downplaying Argonne's findings, the Energy Department noted that the study used outdated energy prices (mid-1996), didn't reflect the gains that would come from international emissions trading and failed to factor in the benefits of accelerated developments in energy efficiency and low-carbon technologies.

What it failed to mention is just what these new technologies are and when we can expect their benefits to kick in. As for emissions trading, many economists have theorized about the role they could play in reducing emissions, but few have grappled with the practicality of implementing and policing such a scheme.

We applaud the goals the U.S. wants to achieve in these upcoming negotiations—namely, that a final agreement must be "flexible, cost-effective, realistic, achievable and ultimately global in scope." But until we see the details of the administration's policy, we are concerned that plans are being developed in the absence of rigorous economic analysis. Too much is at stake to simply ignore facts that don't square with preconceived theories.



**Mobil** The energy
to make a difference.

http://www.mobil.com

©•1997 Mobil Corporation

125.    In 1998, API, on behalf of Defendants, among other fossil fuel companies and organizations supported by fossil fuel corporate grants, developed a Global Climate Science Communications Plan that stated that unless "climate change becomes a non-issue . . . there may be no moment when we can declare victory for our efforts." Rather, API proclaimed that "[v]ictory will be achieved when . . . average citizens 'understand' (recognize) uncertainties in climate science; [and when] recognition of uncertainties becomes part of the 'conventional wisdom.'"[117] The multi-million-dollar, multi-year proposed budget included public outreach and the dissemination of educational materials to schools to "begin to erect a barrier against further efforts to impose Kyoto-like measures in the future"[118] – a blatant attempt to disrupt international efforts, pursuant to the UNFCCC, to negotiate a treaty that curbed greenhouse gas emissions.

126.    Soon after, API distributed a memo to its members identifying public agreement on fossil fuel products' role in climate change as its highest priority issue.[119] The memorandum illuminates API's and Defendants' concern over the potential regulation of Defendants' fossil fuel products: "Climate is at the center of the industry's business interests. Policies limiting carbon emissions reduce petroleum product use. That is why it is API's highest priority issue and defined as 'strategic.'"[120] Further, the API memo stresses many of the strategies that Defendants individually and collectively utilized to combat the perception of their fossil fuel products as hazardous. These included:

      a.      Influencing the tenor of the climate change "debate" as a means to establish that greenhouse gas reduction policies like the Kyoto Protocol were not necessary to responsibly address climate change;

---

[117] Joe Walker, E-mail to Global Climate Science Team, attaching the Draft Global Science Communications Plan (April 3, 1998), https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.
[118] Joe Walker, E-mail to Global Climate Science Team, attaching the Draft Global Science Communications Plan (April 3, 1998), https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.
[119] Committee on Oversight and Government Reform, Allegations of Political Interference with Government Climate Change Science, page 51 (March 19, 2007), https://ia601904.us.archive.org/25/items/gov.gpo.fdsys.CHRG-110hhrg37415/CHRG-110hhrg37415.pdf.
[120] Id.

b.     Maintaining strong working relationships between government regulators and communications-oriented organizations like the Global Climate Coalition, the Heartland Institute, and other groups carrying Defendants' message minimizing the hazards of the unabated use of their fossil fuel products and opposing regulation thereof;

c.     Building the case for (and falsely dichotomizing) Defendants' positive contributions to a "long-term approach" (ostensibly for regulation of their products) as a reason for society to reject short term fossil fuel emissions regulations, and engaging in climate change science uncertainty research; and

d.     Presenting Defendants' positions on climate change in domestic and international forums, including by preparing rebuttals to IPCC reports.

127.     Additionally, Defendants mounted a campaign against regulation of their business practices in order to continue placing their fossil fuel products into the stream of commerce, despite their own knowledge and the growing national and international scientific consensus about the hazards of doing so. These efforts came despite Defendants' recent recognition that "risks to nearly every facet of life on Earth . . . could be avoided only if timely steps were taken to address climate change."[121]

128.     The Global Climate Coalition (GCC), on behalf of Defendants and other fossil fuel companies, funded advertising campaigns and distributed material to generate public uncertainty around the climate debate, with the specific purpose of preventing U.S. adoption of the Kyoto Protocol, despite the leading role that the U.S. had played in the Protocol negotiations.[122] Despite an internal primer stating that various "contrarian theories" [i.e., climate change skepticism] do

---

[121] Neela Banerjee, <u>Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too</u>, Inside Climate News (December 22, 2015), https://insideclimatenews.org/news/22122015/exxon-mobil-oil-industry-peers-knew-about-climate-change-dangers-1970s-american-petroleum-institute-api-shell-chevron-texaco.

[122] Neela Banerjee, <u>Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too</u>, Inside Climate News (December 22, 2015), https://insideclimatenews.org/news/22122015/exxon-mobil-oil-industry-peers-knew-about-climate-change-dangers-1970s-american-petroleum-institute-api-shell-chevron-texaco.

**COMPLAINT**

not "offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change," GCC excluded this section from the public version of the backgrounder and instead funded efforts to promote some of those same contrarian theories over subsequent years.[123]

129.   The efforts by the Defendants and other fossil fuel interests to sow uncertainty and prevent regulation have been successful. GCC and its cohorts staved off greenhouse gas regulation in the U.S., as indicated by U.S. Undersecretary of State Paula Dobriansky's talking points compiled before a 2001 meeting with GCC representatives: "POTUS [President of the United States] rejected Kyoto, in part, based on [GCC's] input."[124] When GCC disbanded later that year, it commemorated the occasion on its website by stating that "the industry voice on climate change has served its purpose by contributing to a new national approach to global warming."[125]

130.   A key strategy in Defendants' efforts to discredit scientific consensus on climate change and the IPCC was to bankroll scientists who, although accredited, held fringe opinions that were even more questionable given the sources of their research funding. These scientists obtained part or all of their research budget from Defendants directly or through Defendant-funded organizations like API,[126] but they frequently failed to disclose their fossil fuel industry underwriters.[127]

131.   Creating a false sense of disagreement in the scientific community (despite the consensus that its own scientists, experts, and managers had previously acknowledged) has had an evident impact on public opinion. A 2007 Yale University-Gallup poll found that while 71% of

---

[123] Gregory J. Dana, Memo to AIAM Technical Committee Re: Global Climate Coalition (GCC) – Primer on Climate Change Science – Final Draft, Association of International Automobile Manufacturers (January 18, 1996), http://www.webcitation.org/6FyqHawb9.

[124] Ken Brill, Briefing Memorandum to Under Secretary Dobriansky, Your Meeting with members of the Global Climate Coalition, June 21, 2001, 9:10 – 9:50 a.m., United States Department of State (June 20, 2001), http://insideclimatenews.org/sites/default/files/documents/Global%20Climate%20Coalition%20Meeting%20%2820 01%29.pdf.

[125] Global Climate Coalition, A Voice for Business in the Global Warming Debate (April 3, 2001) https://web.archive.org/web/20030408231206/http:/globalclimate.org/index.htm.

[126] Willie Soon and Sallie Baliunas, Proxy Climatic and Environmental Changes of the Past 1000 Years, Climate Research 23, 88-110 (January 31, 2003), http://www.int-res.com/articles/cr2003/23/c023p089.pdf.

[127] Newsdesk, Smithsonian Statement: Dr. Wei-Hock (Willie) Soon, Smithsonian (February 26, 2015), http://newsdesk.si.edu/releases/smithsonian-statement-dr-wei-hock-willie-soon.

Americans personally believed global warming was happening, only 48% believed that there was a consensus among the scientific community, and 40% believed there was a lot of disagreement among scientists over whether global warming was occurring.[128]

132.    2007 was the same year the IPCC published its Fourth Assessment Report, in which it concluded that "there is *very high confidence* that the net effect of human activities since 1750 has been one of warming."[129] The IPCC defined "very high confidence" as at least a 9 out of 10 chance.[130]

133.    Defendants borrowed pages out of the playbook of prior denialist campaigns. A "Global Climate Science Team" ("GCST") was created that mirrored a front group created by the tobacco industry, known as The Advancement of Sound Science Coalition, whose purpose was to sow uncertainty about the fact that cigarette smoke is carcinogenic. The GCST's membership included Steve Milloy (a key player on the tobacco industry's front group), Exxon's senior environmental lobbyist; an API public relations representative; and representatives from Chevron and Southern Company that drafted API's 1998 Communications Plan. There were no scientists on the "Global Climate Science Team." GCST developed a strategy to spend millions of dollars manufacturing climate change uncertainty. Between 2000 and 2004, Exxon donated $110,000 to Milloy's efforts and another organization, the Free Enterprise Education Institute and $50,000 to the Free Enterprise Action Institute, both registered to Milloy's home address.[131]

134.    Defendants by and through their trade association memberships, worked directly, and often in a deliberately obscured manner, to evade regulation of the emissions resulting from use of their fossil fuel products. For instance, the American Coalition for Clean Coal Electricity

---

[128] American Opinions on Global Warming: A Yale/Gallup/Clearvision Poll, Yale Program on Climate Change Communication (July 31, 2007), http://climatecommunication.yale.edu/publications/american-opinions-on-global-warming//.

[129] IPCC, 2007: Summary for Policymakers, page 3 (emphasis in original), Climate Change 2007: The Physical Science Basis. Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change (2007), https://www.ipcc.ch/pdf/assessment-report/ar4/wg1/ar4-wg1-spm.pdf.

[130] Id.

[131] Seth Shulman et al. Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science, Union of Concerned Scientists, 19 (January 2007), http://www.ucsusa.org/sites/default/files/legacy/assets/documents/global_warming/exxon_report.pdf.

1    (ACCCE), on behalf of Defendants, hired a lobbying firm, which posed as various nonprofits and

2    sent letters to persuade members of Congress to vote against the American Clean Energy and

3    Security Act of 2009, which would have imposed a carbon cap and trade program in the U.S.[132]

4    Instead, the letters falsely and misleadingly purported to come from groups representing local

5    minority communities, including a local NAACP chapter and a Latino advocacy group.[133]

6            135.   The same year, in 2009, a leaked email revealed a campaign by API to organize

7    "grass roots" rallies of "energy citizens" to coincide with the United States Congress's August

8    recess, to oppose the Clean Energy and Security Act, the climate change bill that had just passed

9    the House and was headed to the Senate for debate.[134] Ostensibly intended to "allow people to

10   voice their concerns" and opposing the need for concerted efforts to combat climate change, emails

11   from API to its members state that "it's important our views be heard," and that "success for these

12   events will be the diversity of the participants expressing the same message," which was ultimately

13   misleading and contrary to the acknowledged scientific consensus.[135] The purpose of the events

14   was to "put a human face" on the industry's misleading and unsupported position regarding the

15   cause of changes to the climate and to reinforce that misleading position in the minds of the public.

16   The same emails to API members stated that "our messages on [similar] legislation work extremely

17   well and are very persuasive with the general public and policy influentials." Moreover, the email

18   stated that API would "provide the up-front resources to ensure logistical issues do not become a

19   problem," but insisted that member companies "provide significant attendance."[136]

20           136.   Emails between American Fuel & Petrochemical Manufacturers ("AFPM"), a

21   national lobbying group, and the office of then-Oklahoma Attorney General Scott Pruitt evidence

22

23   [132] Union of Concerned Scientists, Deception Dossier #4: American Coalition for Clean Coal Electricity Forged
      Letters (2009) http://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-4_ACCCE-
24   forged-letters.pdf.
      [133] Brian McNeill, Lobbying letters to Perriello found to be fakes, Richmond Times-Dispatch (Aug. 1, 2009)
25   http://www.richmond.com/news/lobbying-letters-to-perriello-found-to-be-fakes/article_3f8f5a2b-cf38-54d9-98f7-
      ba21c4eb51fe.html.
26   [134] Alex Kaplun, 'Energy Citizens' Take Aim at Climate Legislation, N.Y. Times (Aug. 12, 2009)
      http://www.nytimes.com/gwire/2009/08/12/12greenwire-energy-citizens-take-aim-at-climate-legislatio-54732.html.
27   [135] Phil Radford, Letter to Jack Gerard, President & CEO of API, Greenpeace (August 2009)
      https://www.desmogblog.com/sites/beta.desmogblog.com/files/GP%20API%20letter%20August%202009-1.pdf.
28   [136] Id.

an effort to influence EPA regulations that would have mitigated reliance on Defendants' fossil fuel products by requiring renewable fuel production.[137] BP Petrochemicals, BP Products North America, Chevron U.S.A. Inc., CITGO Petroleum Corporation, Exxon Mobil Corporation, Occidental Chemical Corporation, Phillips 66, Shell Chemical Company, Total Petrochemicals & Refining USA, Inc., are among AFPM's members.

137. A 2014 presentation revealed that the Western States Petroleum Association, on behalf of Defendants, among other fossil fuel companies, funded dozens of supposedly grassroots organizations to block progressive energy regulation.[138] This practice is called "astroturfing": astroturf is meant to look like grass, but it is fake. Similarly, large companies and corporate organizations like WSPA fund fake grassroots movements in an effort to gain credibility from the public, who does not know the true source of the propaganda.

138. Beyond direct interference, Defendants have funded dozens of think tanks, front groups, lobbyists, and dark money foundations pushing climate change denial. These include the Competitive Enterprise Institute, the Heartland Institute, Frontiers for Freedom, Committee for a Constructive Tomorrow, and Heritage Foundation. From 1998 to 2014 ExxonMobil spent almost $31 million funding numerous organizations misrepresenting the scientific consensus that Defendants' fossil fuel products were causing climate change, sea level rise, and injuries to Imperial Beach, among other coastal communities.[139] Several Defendants have been linked to other groups that undermine the scientific basis linking Defendants' fossil fuel products to climate change and sea level rise, including the Energy & Environment Legal Institute (Arch Coal[140]) and the Frontiers of Freedom Institute, the George C. Marshall Institute, and the Center for the Study of Carbon Dioxide and Global Change (Peabody Energy).[141]

---

[137] Email chain from Moskowitz to Eubanks, Renewable Fuel Standard -Background Information (July 13, 2013) https://www.documentcloud.org/documents/3472961-2013-Pruitt-and-American-Fuel-and-Petrochemical.html.
[138] WSPA Priority Issues, Western States Petroleum Association (November 11, 2014) https://www.indybay.org/uploads/2014/12/12/washington_research_council_-_cathy_reheis-boyd.pdf.
[139] ExxonSecrets.org, ExxonMobil Climate Denial Funding 1998-2014 http://exxonsecrets.org/html/index.php.
[140] Seth Shulman et al. Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science, Union of Concerned Scientists, 19 (January 2007), http://www.ucsusa.org/sites/default/files/legacy/assets/documents/global_warming/exxon_report.pdf.
[141] In re: Peabody Energy Corporation, et al., (E.D. Mo.), Certificate of Service, Doc. Number 602, 140 (May 27, 2016), https://www.documentcloud.org/documents/2859772.

139.   Exxon acknowledged its own previous success in sowing uncertainty and slowing mitigation through funding of climate denial groups. In its 2007 Corporate Citizenship Report, Exxon declared: "In 2008, we will discontinue contributions to several public policy research groups whose position on climate change could divert attention from the important discussion on how the world will secure the energy required for economic growth in an environmentally responsible manner."[142] Despite this pronouncement, Exxon remained financially associated with several such groups after the report's publication.

140.   Defendants could have contributed to the global effort to mitigate the impacts of greenhouse gas emissions by, for example delineating practical policy goals and regulatory structures that would have allowed them to continue their business ventures while reducing greenhouse gas emissions and supporting a transition to a lower carbon future. Instead, Defendants undertook a momentous effort to evade international and national regulation of greenhouse gas emissions to enable them to continue unabated fossil fuel production.

141.   As a result of Defendants' tortious, false and misleading conduct, reasonable consumers of Defendants' fossil fuel products and policy-makers, have been deliberately and unnecessarily deceived about: the role of fossil fuel products in causing global warming and sea level rise; the acceleration of global warming since the mid-20th century and the continuation thereof; and about the fact that the continued increase in fossil fuel product consumption that creates severe environmental threats and significant economic costs for coastal communities, including Imperial Beach. Reasonable consumers and policy makers have also been deceived about the depth and breadth of the state of the scientific evidence on anthropogenic climate change, and in particular, on the strength of the scientific consensus demonstrating the role of fossil fuels in causing both climate change and a wide range of potentially destructive impacts, including sea level rise.

---

[142] ExxonMobil, 2007 Corporate Citizenship Report (December 31, 2007).

F.    **In Contrast to their Public Statements, Defendants' Internal Actions Demonstrate their Awareness of and Intent to Profit from the Unabated Use of Fossil Fuel Products.**

142.    In contrast to their public-facing efforts challenging the validity of the scientific consensus about anthropogenic climate change, Defendants' acts and omissions evidence their internal acknowledgement of the reality of sea level rise and its likely consequences. These actions include, but are not limited to, making multi-billion-dollar infrastructure investments for their own operations that acknowledge the reality of coming anthropogenic climate-related change. These investments included (among others), raising offshore oil platforms to protect against sea level rise; reinforcing offshore oil platforms to withstand increased wave strength and storm severity; and developing and patenting designs for equipment intended to extract crude oil and/or natural gas in areas previously unreachable because of the presence of polar ice sheets.[143]

143.    For example, in 1973 Exxon obtained a patent for a cargo ship capable of breaking through sea ice[144] and for an oil tanker[145] designed specifically for use in previously unreachable areas of the Arctic.

144.    In 1974, Chevron obtained a patent for a mobile arctic drilling platform designed to withstand significant interference from lateral ice masses,[146] allowing for drilling in areas with increased ice floe movement due to elevated temperature.

145.    That same year, Texaco (Chevron) worked toward obtaining a patent for a method and apparatus for reducing ice forces on a marine structure prone to being frozen in ice through natural weather conditions,[147] allowing for drilling in previously unreachable Arctic areas that would become seasonally accessible.

---

[143] Amy Lieberman and Suzanne Rust, Big Oil braced for global warming while it fought regulations, L.A. Times (December 31, 2015) http://graphics.latimes.com/oil-operations/.

[144] Patents, Icebreaking cargo vessel, Exxon Research Engineering Co. (April 17, 1973) https://www.google.com/patents/US3727571.

[145] Patents, Tanker vessel, Exxon Research Engineering Co. (July 17, 1973) https://www.google.com/patents/US3745960.

[146] Patents, Arctic offshore platform, Chevron Res (August 27, 1974) https://www.google.com/patents/US3831385.

[147] Patents, Mobile, arctic drilling and production platform, Texaco Inc. (February 26, 1974) https://www.google.com/patents/US3793840.

146.    Shell obtained a patent similar to Texaco's (Chevron) in 1984.[148]

147.    In 1989, Norske Shell, Royal Dutch Shell's Norwegian subsidiary, altered designs for a natural gas platform planned for construction in the North Sea to account for anticipated sea level rise. Those design changes were ultimately carried out by Shell's contractors, adding substantial costs to the project.[149]

  a.    The Troll field, off the Norwegian coast in the North Sea, was proven to contain large natural oil and gas deposits in 1979, shortly after Norske Shell was approved by Norwegian oil and gas regulators to operate a portion of the field.

  b.    In 1986, the Norwegian parliament granted Norske Shell authority to complete the first development phase of the Troll field gas deposits, and Norske Shell began designing the "Troll A" gas platform, with the intent to begin operation of the platform in approximately 1995. Based on the very large size of the gas deposits in the Troll field, the Troll A platform was projected to operate for approximately 70 years.

  c.    The platform was originally designed to stand approximately 100 feet above sea level—the amount necessary to stay above waves in a once-in-a-century strength storm.

  d.    In 1989, Shell engineers revised their plans to increase the above-water height of the platform by 3–6 feet, specifically to account for higher anticipated average sea levels and increased storm intensity due to global warming over the platform's 70-year operational life.[150]

---

[148] Patents, Arctic offshore platform, Shell Oil Company (January 24, 1984) https://www.google.com/patents/US4427320.
[149] Greenhouse Effect: Shell Anticipates A Sea Change, N.Y. Times (December 20, 1989) http://www.nytimes.com/1989/12/20/business/greenhouse-effect-shell-anticipates-a-sea-change.html.
[150] Id.; Amy Lieberman and Suzanne Rust, Big Oil braced for global warming while it fought regulations, L.A. Times (December 31, 2015), http://graphics.latimes.com/oil-operations/.

**COMPLAINT**

e.   Shell projected that the additional 3–6 feet of above-water construction would increase the cost of the Troll A platform by as much as $40 million.

**G.    Defendants' Actions Prevented the Development of Alternatives That Would Have Eased the Transition to a Less Fossil Fuel Dependent Economy.**

148.   The harms and benefits of Defendants' conduct can be balanced in part by weighing the social benefit of extracting and burning a unit of fossil fuels against the costs that a unit of fuel imposes on society, known as the "social cost of carbon" or "SCC."

149.   Because climatic responses to atmospheric temperature increases are non-linear, and because greenhouse gas pollution accumulates in the atmosphere, some of which does not dissipate for potentially thousands of years (namely $CO_2$), there is broad agreement that SCC increases as emissions rise, and as the climate warms. Relatedly, as atmospheric $CO_2$ levels and surface temperature increase, the costs of remediating any individual environmental injury—for example infrastructure to mitigate sea level rise, and changes to agricultural processes—also increases. In short, each additional ton of $CO_2$ emitted into the atmosphere will have a greater net social cost as emissions increase, and each additional ton of $CO_2$ will have a greater net social cost as global warming accelerates.

150.   A critical corollary of the non-linear relationship between atmospheric $CO_2$ concentrations and SCC is that delayed efforts to curb those emissions have increased environmental harms and increase the magnitude and cost to remediate harms that have already occurred or are locked in by previous emissions. Therefore, Defendants' campaign to obscure the science of climate change and to expand the extraction and use of fossil fuels greatly increased and continues to increase the harms and rate of harms suffered by the City and the People.

151.   The consequences of delayed action on climate change, exacerbated by Defendants' actions, has already drastically increased the cost of mitigating further harm. Had concerted action begun even as late as 2005, an annual 3.5% reduction in $CO_2$ emissions to lower atmospheric $CO_2$

1  to 350 ppm by the year 2100 would have restored earth's energy balance[151] and halted future global

2  warming, although such efforts would not forestall committed sea level rise already locked in.[152]

3  If efforts do not begin until 2020, however, a 15% annual reduction will be required to restore the

4  Earth's energy balance by the end of the century.[153] Earlier steps to reduce emissions would have

5  led to smaller – and less disruptive – measures needed to mitigate the impacts of fossil fuel

6  production.

7      152.    The costs of inaction and the opportunities to confront anthropogenic climate

8  change and sea level rise caused by normal consumption of their fossil fuel products, were not lost

9  on Defendants. In a 1997 speech by John Browne, Group Executive for BP America, at Stanford

10  University, Browne described Defendants' and the entire fossil fuel industry's responsibility and

11  opportunities to reduce use of fossil fuel products, reduce global $CO_2$ emissions, and mitigate the

12  harms associated with the use and consumption of such products:

13      A new age demands a fresh perspective of the nature of society and responsibility.

14      We need to go beyond analysis and to take action. It is a moment for change and
15      for a rethinking of corporate responsibility. . . .

16      [T]here is now an effective consensus among the world's leading scientists and
17      serious and well informed people outside the scientific community that there is a
        discernible human influence on the climate, and a link between the concentration
18      of carbon dioxide and the increase in temperature.

19      The prediction of the IPCC is that over the next century temperatures might rise by
        a further 1 to 3.5 degrees centigrade [1.8° – 6.3° F], and that sea levels might rise
20      by between 15 and 95 centimetres [5.9 and 37.4 inches]. Some of that impact is
        probably unavoidable, because it results from current emissions. . . .
21

22  _____

23  [151] "Climate equilibrium" is the balance between Earth's absorption of solar energy and its own energy radiation.
    Earth is currently out of equilibrium due to the influence of anthropogenic greenhouse gases, which prevent
    radiation of energy into space. Earth therefore warms and move back toward energy balance. Reduction of global
24  $CO_2$ concentrations to 350 ppm is necessary to re-achieve energy balance, if the aim is to stabilize climate without
    further global warming and attendant sea level rise. *See* James Hansen et al., Assessing "Dangerous Climate
25  Change": Required Reduction of Carbon Emissions to Protect Young People, Future Generations and Nature, 8
    PLOS ONE 1, 4-5 (December 3, 2013), http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0081648.
26  [152] James Hansen et al., Assessing "Dangerous Climate Change": Required Reduction of Carbon Emissions to
    Protect Young People, Future Generations and Nature, 8 PLOS ONE 1, 10 (December 3, 2013),
27  http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0081648.
    [153] James Hansen et al., Assessing "Dangerous Climate Change": Required Reduction of Carbon Emissions to
28  Protect Young People, Future Generations and Nature, 8 PLOS ONE 1, 10 (December 3, 2013),
    http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0081648.

[I]t would be unwise and potentially dangerous to ignore the mounting concern.

The time to consider the policy dimensions of climate change is not when the link between greenhouse gases and climate change is conclusively proven ... but when the possibility cannot be discounted and is taken seriously by the society of which we are part. . . .

We [the fossil fuel industry] have a responsibility to act, and I hope that through our actions we can contribute to the much wider process which is desirable and necessary.

BP accepts that responsibility and we're therefore taking some specific steps.

To control our own emissions.

To fund continuing scientific research.

To take initiatives for joint implementation.

To develop alternative fuels for the long term.

And to contribute to the public policy debate in search of the wider global answers to the problem."[154]

153.    Despite Defendants' knowledge of the foreseeable, measurable harms associated with the unabated consumption and use of their fossil fuel products, and despite the existence and Defendants' knowledge of technologies and practices that could have helped to reduce the foreseeable dangers associated with their fossil fuel products, Defendants continued to market and promote heavy fossil fuel use, dramatically increasing the cost of abatement. At all relevant times, Defendants were deeply familiar with opportunities to reduce the use of their fossil fuel products, reduce global $CO_2$ emissions associated therewith, and mitigate the harms associated with the use and consumption of such products. Examples of that recognition include, but are not limited to the following:

a.    In 1963, Esso (Exxon) obtained multiple patents on technologies for fuel

---

[154] John Browne, BP Climate Change Speech to Stanford, Climate Files (May 19, 1997), http://www.climatefiles.com/bp/bp-climate-change-speech-to-stanford/.

cells, including on the design of a fuel cell and necessary electrodes,[155] and on a process for increasing the oxidation of a fuel, specifically methanol, to produce electricity in a fuel cell.[156]

    b.    In 1970, Esso (ExxonMobil) obtained a patent for a "low-polluting engine and drive system" that used an interburner and air compressor to reduce pollutant emissions, including $CO_2$ emissions, from gasoline combustion engines (the system also increased the efficiency of the fossil fuel products used in such engines, thereby lowering the amount of fossil fuel product necessary to operate engines equipped with this technology).[157]

154.    Defendants could have made major inroads to mitigate Plaintiffs' injuries through technology by developing and employing technologies to capture and sequester greenhouse gases emissions associated with conventional use of their fossil fuel products. Defendants had knowledge dating at least back to the 1960s, and indeed, internally researched and perfected many such technologies. For instance:

    a.    The first patent for enhanced oil recovery technology, a process by which $CO_2$ is captured and reinjected into oil deposits, was granted to an ARCO (BP) subsidiary in 1952.[158] This technology could have been further developed as a carbon capture and sequestration technique;

    b.    Phillips Petroleum Company (ConocoPhillips) obtained a patent in 1966 for a "Method for recovering a purified component from a gas" outlining a process to remove carbon from natural gas and gasoline streams;[159] and

---

[155] Patents, Fuel cell and fuel cell electrodes, Exxon Research Engineering Co. (December 31, 1963) https://www.google.com/patents/US3116169.

[156] Patents, Direct production of electrical energy from liquid fuels, Exxon Research Engineering Co. (December 3, 1963) https://www.google.com/patents/US3113049.

[157] Patents, Low-polluting engine and drive system, Exxon Research Engineering Co. (May 16, 1970) https://www.google.com/patents/US3513929.

[158] James P. Meyer, Summary of Carbon Dioxide Enhanced Oil Recovery ($CO_2$EOR) Injection Well Technology, American Petroleum Institute, page 1, http://www.api.org/~/media/Files/EHS/climate-change/Summary-carbon-dioxide-enhanced-oil-recovery-well-tech.pdf.

[159] Patents, Method for recovering a purified component from a gas, Phillips Petroleum Co (January 11, 1966) https://www.google.com/patents/US3228874.

SHER
EDLING LLP

**COMPLAINT**

67

1    c.    In 1973, Shell was granted a patent for a process to remove acidic gases,

2    including $CO_2$, from gaseous mixtures.

3    155.    Despite this knowledge, Defendants' later forays into the alternative energy sector

4    were largely pretenses. For instance, in 2001, Chevron developed and shared a sophisticated

5    information management system to gather greenhouse gas emissions data from its explorations

6    and production to help regulate and set reduction goals.[160] Beyond this technological

7    breakthrough, Chevron touted "profitable renewable energy" as part of its business plan for several

8    years and launched a 2010 advertising campaign promoting the company's move towards

9    renewable energy. Despite all this, Chevron rolled back its renewable and alternative energy

10    projects in 2014.[161]

11    156.    Similarly, ConocoPhillips' 2012 Sustainable Development report declared

12    developing renewable energy a priority in keeping with their position on sustainable development

13    and climate change.[162] Their 10-K filing from the same year told a different story: "As an

14    independent E&P company, we are solely focused on our core business of exploring for,

15    developing and producing crude oil and natural gas globally."[163]

16    157.    Likewise, while Shell orchestrated an entire public relations campaign around

17    energy transitions towards net zero emissions, a fine-print disclaimer in its 2016 net-zero pathways

18    report reads: "We have no immediate plans to move to a net-zero emissions portfolio over our

19    investment horizon of 10–20 years."[164]

20    158.    BP, appearing to abide by the representations Lord Browne made in his speech

21    described in paragraph 152, above, engaged in a rebranding campaign to convey an air of

22

23

---

[160] Chevron, Chevron Press Release – Chevron Introduces New System to Manage Energy Use (September 25, 2001) https://www.chevron.com/stories/chevron-introduces-new-system-to-manage-energy-use.
[161] Benjamin Elgin, Chevron Dims the Lights on Green Power, Bloomberg (May 29, 2014) https://www.bloomberg.com/news/articles/2014-05-29/chevron-dims-the-lights-on-renewable-energy-projects.
[162] ConocoPhillips, Sustainable Development (2013) http://www.conocophillips.com/sustainable-development/Documents/2013.11.7%201200%20Our%20Approach%20Section%20Final.pdf.
[163] ConocoPhillips Form 10-K, U.S. Securities and Exchange Commission Webpage (December 31, 2012) https://www.sec.gov/Archives/edgar/data/1163165/000119312513065426/d452384d10k.htm.
[164] Energy Transitions Towards Net Zero Emissions (NZE), Shell (2016), https://drive.google.com/file/d/0B_L1nw8WLu0Bbi1QWnJRcHlZblE/view.

environmental stewardship and renewable energy to its consumers. This included renouncing its membership in the GCC in 2007, changing its name from "British Petroleum" to "BP" while adopting the slogan "Beyond Petroleum," and adopting a conspicuously green corporate logo. However, BP's self-touted "alternative energy" investments during this turnaround included investments in natural gas, a fossil fuel, and in 2007 the company reinvested in Canadian tar sands, a particularly high-carbon source of oil.[165] The company ultimately abandoned its wind and solar assets in 2011 and 2013, respectively, and even the "Beyond Petroleum" moniker in 2013.[166]

159.    After posting a $10 billion quarterly profit, Exxon in 2005 stated that "We're an oil and gas company. In times past, when we tried to get into other businesses, we didn't do it well. We'd rather re-invest in what we know."[167]

160.    Even if Defendants did not adopt technological or energy source alternatives that would have reduced use of fossil fuel products, reduced global greenhouse gas pollution, and/or mitigated the harms associated with the use and consumption of such products, Defendants could have taken other practical, cost-effective steps to reduce the use of their fossil fuel products, reduce global greenhouse gas pollution associated therewith, and mitigate the harms associated with the use and consumption of such products. These alternatives could have included, among other measures:

        a.    Accepting scientific evidence on the validity of anthropogenic climate change and the damages it will cause people and communities, including Plaintiffs, and the environment. Mere acceptance of that information would have altered the debate from *whether* to combat climate change and sea level rise to *how* to combat it; and avoided much of the public confusion that has ensued over nearly 30 years, since at least 1988;

---

[165] Fred Pearce, Greenwash: BP and the Myth of a World 'Beyond Petroleum,' The Guardian, (November 20, 2008) https://www.theguardian.com/environment/2008/nov/20/fossilfuels-energy.
[166] Javier E. David, 'Beyond Petroleum' No More? BP Goes Back to Basics, CNBC (April 20, 2013) http://www.cnbc.com/id/100647034.
[167] James R. Healy, Alternate Energy Not in Cards at ExxonMobil (October 28, 2005) https://usatoday30.usatoday.com/money/industries/energy/2005-10-27-oil-invest-usat_x.htm.

**COMPLAINT**

b.   Forthrightly communicating with Defendants' shareholders, banks, insurers, the public, regulators and Plaintiffs about the global warming and sea level rise hazards of Defendants' fossil fuel products that were known to Defendants, would have enabled those groups to make material, informed decisions about whether and how to address climate change and sea level rise vis-à-vis Defendants' products;

c.   Refraining from affirmative efforts, whether directly, through coalitions, or through front groups, to distort public debate, and to cause many consumers and business and political leaders to think the relevant science was far less certain that it actually was;

d.   Sharing their internal scientific research with the public, and with other scientists and business leaders, so as to increase public understanding of the scientific underpinnings of climate change its relation to Defendants' fossil fuel products;

e.   Supporting and encouraging policies to avoid dangerous climate change, and demonstrating corporate leadership in addressing the challenges of transitioning to a low-carbon economy;

f.   Prioritizing alternative sources of energy through sustained investment and research on renewable energy sources to replace dependence on Defendants' inherently hazardous fossil fuel products;

g.   Adopting their shareholders' concerns about Defendants' need to protect their businesses from the inevitable consequences of profiting from their fossil fuel products. Over the period of 1990-2015, Defendants' shareholders proposed hundreds of resolutions to change Defendants' policies and business practices regarding climate change. These included increasing renewable energy investment, cutting emissions, and performing carbon risk assessments, among others.

161.   Despite their knowledge of the foreseeable harms associated with the consumption of Defendants' fossil fuel products, and despite the existence and fossil fuel industry knowledge of opportunities that would have reduced the foreseeable dangers associated with those products, Defendants wrongfully and falsely promoted, campaigned against regulation of, and concealed the hazards of use of their fossil fuel products.

**H.    Defendants Caused Plaintiffs' Injuries**

162.   Defendants individually and collectively extracted a substantial percentage of all raw fossil fuels extracted globally since 1965.

163.   $CO_2$ emissions that are attributable to fossil fuels that Defendants extracted from the Earth and injected into the market are responsible for a substantial percentage of greenhouse gas pollution since 1965.

164.   Defendants' individual and collective conduct, including, but not limited to, their extraction, refining, and/or formulation of fossil fuel products; their introduction of fossil fuel products into the stream of commerce; their wrongful promotion of their fossil fuel products and concealment of known hazards associated with use of those products; and their failure to pursue less hazardous alternatives available to them; is a substantial factor in causing the increase in global mean temperature and consequent increase in global mean sea surface height since 1965.

165.   Defendants have actually and proximately caused the sea levels to rise, increased the destructive impacts of storm surges, increased coastal erosion, exacerbated the onshore impact of regular tidal ebb and flow, caused saltwater intrusion, and caused consequent social and economic injuries associated with the aforementioned physical and environmental impacts, among other impacts, resulting in inundation, destruction, and/or other interference with Plaintiffs' property and citizenry.

166.   Plaintiffs have already incurred, and will foreseeably continue to incur, injuries and damages because of sea level rise caused by Defendants' conduct.

167.   But for Defendants' conduct, Plaintiffs would have suffered no or far less injuries and damages than they have, and will foreseeably endure, due to expected anthropogenic sea level rise.

168.   The San Diego area, including Imperial Beach, has experienced significant sea level rise over the last half century attributable to Defendants' conduct.[168] Imperial Beach will experience additional, significant, and dangerous sea level rise within the next eighty years given unabated greenhouse gas emissions,[169] and the increases will continue and accelerate. Additionally, Imperial Beach will experience greater committed sea level rise due to the "locked in" greenhouse gases already emitted.[170] The City will suffer greater overall sea level rise than the global average.[171]

169.   Imperial Beach finalized its Sea Level Rise Vulnerability Analysis on October 5, 2016.[172] The Assessment is the City's first analysis of its overall vulnerability to sea level rise and its impacts from permanent inundation, temporary flooding caused by storm events, erosion, and saltwater intrusion. The Assessment identifies actual risks to the City with various sea level rise projections and the consequences associated with taking no action to prevent or mitigate the expected impacts.[173]

170.   Land use impacts to the City associated are likely to include, but are not limited to:

    a.   Coastal erosive forces compromising 683 residential, commercial and open space parcels within the City. Economic vulnerability associated with erosion's impact on real property is valued at over $106 million. Coastal flooding will impact 1,538 parcels, and cause over $38 million in damages, primarily to residential and commercial buildings. Regular tidal inundation

---

[168] Griggs, et al. (CA Ocean Protection Council Science Advisory Team Working Group), Rising Seas in California: An Update on Sea-Level Rise Science, California Ocean Science Trust (April 2017) p. 23, box 2, figure 2.
[169] Griggs, et al. (CA Ocean Protection Council Science Advisory Team Working Group), Rising Seas in California: An Update on Sea-Level Rise Science, California Ocean Science Trust (April 2017) p. 27, table 1(c).
[170] Peter U. Clark et al., Consequences of Twenty-First-Century Policy for Multi-Millennial Climate and Sea-Level Change, Nature Climate Change Vol. 6, 363-65 (2016).
[171] Global sea level rise is projected to be 82.7 cm (32.6 inches) above 2000 levels by 2100. See National Research Council, Sea-Level Rise for the Coasts of California, Oregon, and Washington: Past Present and Future (2012) at page 107 at Table 5.2; page 117 at Table 5.3. The San Francisco Bay Area sea level rise is projected to be 91.9 cm (36.2 inches) over 2000 by 2100. Id.
[172] Revell Coastal, 2016 City of Imperial Beach Sea Level Rise Assessment (September 2016).
[173] See Revell Coastal, 2016 City of Imperial Beach Sea Level Rise Assessment (September 2016) p. 1-3, table 1-1.

SHER
EDLING LLP

COMPLAINT

72

will damage 447 parcels including two elementary schools, and cost over $34 million.[174]

b.  Flooding of as much as 29.6 miles – approximately 40% – of the City's roads, as well as erosive damage to 5.4 miles and regular tidal inundation of 4.3 miles of roads.[175]

c.  Flooding of critical public transportation infrastructure, including 9 bus stops, 3.9 miles of bus route, and 3.8 miles of bicycle pathway. This infrastructure will also be compromised by erosion and regular tidal inundation.[176]

d.  Damages to over 81,000 feet of wastewater transmission pipe, 9 pump stations, and 311 manholes within the City. Over 24,000 feet of stormwater pipes and 42 outlets will be impacted as well.[177]

e.  Bayside and West View Elementary Schools will be impacted by regular tidal inundation and coastal flooding, necessitating relocation of those school sites. Six buildings at Bayside Elementary are already exposed during storm events and will become routinely exposed by tidal flooding with 1.6 feet of sea level rise.[178]

f.  Coastal flooding and tidal inundation will compromise known hazardous materials sites within the City, including five businesses and two underground storage tank sites.[179]

171.   The following figure describes the extent of coastal flooding hazards in Imperial Beach due to sea level rise to different elevations. As the image shows, much of the City, including

---

[174] Revell Coastal, 2016 City of Imperial Beach Sea Level Rise Assessment (September 2016), Appendix A, p. A-2.
[175] Revell Coastal, 2016 City of Imperial Beach Sea Level Rise Assessment (September 2016), Appendix A, p. A-6.
[176] Revell Coastal, 2016 City of Imperial Beach Sea Level Rise Assessment (September 2016), Appendix A, p. A-8.
[177] Revell Coastal, 2016 City of Imperial Beach Sea Level Rise Assessment (September 2016), Appendix A, p. A-10-12.
[178] Revell Coastal, 2016 City of Imperial Beach Sea Level Rise Assessment (September 2016), Appendix A, p. A-14
[179] Revell Coastal, 2016 City of Imperial Beach Sea Level Rise Assessment (September 2016), Appendix A, p. A-16.

some of its most critical infrastructure and valuable Ocean-, Bay-, and Estuary-front property, will be inundated with expected sea level increases.[180]



172.    As a direct and proximate result of the acts and omissions of the Defendants' alleged herein, Plaintiff has incurred significant expenses related to planning for and predicting future sea level rise injuries to its real property, improvements thereon, civil infrastructure, and citizens, in order to preemptively mitigate and/or prevent such injuries. This includes performing a Sea Level Vulnerability Assessment in 2016 at significant expense to the City that describes the extent of mitigation and adaptation measures the City must undertake in order to prevent significantly more expensive sea-level rise related injuries.

173.    As a direct and proximate result of Defendants' acts and omissions alleged herein, Plaintiffs have incurred sea level rise-related injuries and damages. These include infrastructural repair and reinforcement of roads and beach access.

---

[180] Revell Coastal, 2016 City of Imperial Beach Sea Level Rise Assessment (September 2016), p. 4-5, figure 4-2.

174.    As a direct and proximate result of Defendants' acts and omissions alleged herein, Plaintiffs' real property has been inundated by sea water, causing injury and damages thereto and to improvements thereon, and preventing free passage on, use of, and normal enjoyment of that real property, or permanently destroying it.

175.    Defendants' conduct as described herein is therefore an actual, substantial, and proximate cause of Plaintiffs' sea level rise-related injuries.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Public Nuisance on Behalf of the People of the State of California)

#### (Against All Defendants)

176.    The People incorporate by reference each and every allegation contained above, as though set forth herein in full.

177.    Defendants, and each of them, by their affirmative acts and omissions, have created, contributed to, and assisted in creating, a condition in City of Imperial Beach, and permitted that condition to persist, which constitutes a nuisance by, *inter alia*, increasing local sea level, increasing the frequency and intensity of flooding, and increasing the intensity and frequency of storms and storm-related damage to the City and its residents.

178.    Defendants specifically created, contributed to, and/or assisted, and/or were a substantial contributing factor in the creation of the public nuisance, by, *inter alia*:

    a.    extracting raw fossil fuel products, including crude oil, coal, and natural gas from the Earth, and placing those fossil fuel products into the stream of commerce;

    b.    affirmatively and knowingly promoting the sale and use of fossil fuel products which Defendants knew to be hazardous and knew would lead to global warming, sea level rise, more frequent and more intense flooding, and more frequent and more intense storm surges;

    c.    affirmatively and knowingly concealing the hazards that Defendants knew would result from the normal use of their fossil fuel products by

misrepresenting and casting doubt on the integrity of scientific information related to climate change;

d.  disseminating and funding the dissemination of information intended to mislead customers, consumers, elected officials and regulators regarding known and foreseeable risk of climate change and its consequences, which follow from the normal, intended use and foreseeable misuse of Defendants' fossil fuel products;

e.  affirmatively and knowingly campaigning against the regulation of their fossil fuel products, despite knowing the hazards associated with the normal use of those products, in order to continue profiting from use of those products by externalizing those known costs onto people, the environment, and communities, including the People; and failing to warn the public about the hazards associated with the use of fossil fuel products.

179.  The condition created by Defendants substantially and negatively affects the interests of the public at large. In particular, higher sea level, increased storm frequency and intensity, and increased flooding: (1) are harmful and dangerous to human health; (2) are indecent and offensive to the senses of the ordinary person; (3) obstruct and threaten to obstruct the free use of the People's property so as to interfere with the comfortable enjoyment of life and property; and (4) obstruct and threaten to obstruct the free passage and use of navigable lakes, rivers, bays, streams, canals, basins, public parks, squares, streets, and/or highways within City of Imperial Beach.

180.  The People of the State of California have a common right to be free from the increased severity of these hazards due to climate change and sea level rise.

181.  The seriousness of rising sea levels and increased weather volatility and flooding is extremely grave, and outweighs the social utility of Defendants' conduct because, *inter alia*,

a.  interference with the public's rights as described above is expected to become so regular and severe that it will cause permanent inundation;

**COMPLAINT**

b.     the ultimate nature of the harm is the destruction of real and personal property, rather than mere annoyance;

c.     the interference borne is the loss of property and infrastructure within City of Imperial Beach, which will actually be borne by Plaintiff's citizens as loss of use of public property and infrastructure and diversion of tax dollars away from other public services to sea level rise;

d.     Plaintiff's coastal property, which serves myriad uses including residential, infrastructural, commercial and ecological, is not suitable for regular inundation;

e.     the social benefit of placing fossil fuels into the stream of commerce is outweighed by the availability of other sources of energy that could have been placed into the stream of commerce that would not have caused sea level rise; Defendants, and each of them, knew of the external costs of placing their fossil fuel products into the stream of commerce, and rather than striving to mitigate those externalities, Defendants instead acted affirmatively to obscure them from public consciousness;

f.     the cost to society of each ton of greenhouse gases emitted into the atmosphere increases as total global emissions increase, so that unchecked extraction and consumption of fossil fuel products is more harmful and costly than moderated extraction and consumption; and

g.     it was practical for Defendants, and each of them, in light of their extensive knowledge of the hazards of placing fossil fuel products into the stream of commerce and extensive scientific engineering expertise, to develop better technologies and to pursue and adopt known, practical, and available technologies, energy sources, and business practices that would have mitigated their greenhouse gas pollution and eased the transition to a lower carbon economy.

182.   This public nuisance affects and/or interferes with an entire community's and/or a considerable number of persons in the State of California right to health, safety, peace, comfort, and convenience.

183.   Defendants' wrongful conduct was oppressive, malicious, and fraudulent, in that their conduct was willful, intentional, and in conscious disregard for the rights of others. Defendants' conduct was so vile, base, and contemptible that it would be looked down upon and despised by reasonable people, justifying an award of punitive and exemplary damages in an amount subject to proof at trial, and justifying equitable disgorgement of all profits Defendants obtained through their unlawful and outrageous conduct.

184.   As a direct and proximate result of Defendants' conduct, as set forth above, the common rights enjoyed by the People of the State of California and by the general public in the City of Imperial Beach have been unreasonably interfered with because Defendants knew or should have known that their conduct would create a continuing problem with long-lasting significant negative effects on the rights of the public.

185.   Defendants' actions are a direct and legal cause of the public nuisance.

186.   The People of the State of California, acting through the City of Imperial Beach, have a clearly ascertainable right to have the public nuisance created by Defendants abated.

187.   Defendants' acts and omissions as alleged herein are indivisible causes of Plaintiff the People of the State of California's injuries and damage as alleged herein.

188.   Wherefore, the People of the State of California pray for relief as set forth below.

## SECOND CAUSE OF ACTION

### (Public Nuisance on Behalf of City of Imperial Beach)

### (Against All Defendants)

189.   Plaintiff City of Imperial Beach incorporates by reference each and every allegation contained above, as though set forth herein in full.

190.   Defendants, and each of them, by their acts and omission, have created a condition and permitted that condition to persist, which constitutes a nuisance by increasing sea level,

increasing the frequency and intensity of flooding, and increasing the intensity and frequency of storms, all of which have resulted in, and will continue to result in, injury to Plaintiff.

191.  The condition created by Defendants substantially and negatively affects the interests of the public at large. In particular, higher sea level, increased storm frequency and intensity, and increased flooding: (1) are harmful and dangerous to human health; (2) are indecent and offensive to the senses of the ordinary person; (3) obstruct and threaten to obstruct the free use of the People's property so as to interfere with the comfortable enjoyment of life and property; and (4) obstruct and threaten to obstruct the free passage and use of navigable lakes, rivers, bays, streams, canals, basins, public parks, squares, streets, and/or highways within City of Imperial Beach.

192.  Plaintiff City of Imperial Beach includes coastal communities with substantial numbers of residents and citizens living on and near the coast, and substantial numbers of businesses and amenities on or near the coast; the condition created by Defendants therefore affects substantial numbers of people in Plaintiff's communities at the same time.

193.  The seriousness of rising sea levels and increased weather volatility and flooding is extremely grave, and outweighs the social utility of Defendants' conduct. The seriousness of the harm to Plaintiff City of Imperial Beach outweighs the benefit of Defendants' and each of their conduct, because

> a.  the interference with Plaintiff's property is expected to become so regular and severe as to be a permanent inundation;
>
> b.  the nature of the harm is the destruction of Plaintiff's property, rather than mere annoyance;
>
> c.  the interference borne by Plaintiff is the loss of its property and infrastructure, which will actually be borne by Plaintiff's citizens as loss of use of public property and infrastructure and diversion of tax dollars away from other public services to sea level rise;

d.  Plaintiff's coastal public and private property, which serves myriad uses including residential, infrastructural, commercial and ecological, is not suitable for regular inundation;

e.  the burden on Plaintiff to mitigate and prevent the interference with its property is significant and severe, as costs associated with addressing sea level rise caused by Defendants are projected to be in the billions of dollars over the next several decades;

f.  the social benefit of the purpose of placing fossil fuels into the stream of commerce, if any, is outweighed by the availability of other sources of energy that could have been placed into the stream of commerce that would not have caused sea level rise; Defendants, and each of them, knew of the external costs of placing their fossil fuel products into the stream of commerce, and rather than striving to mitigate those externalities, instead acted affirmatively to obscure them from public consciousness;

g.  the social cost of each ton of $CO_2$ emitted into the atmosphere increases as total global emissions increase, so that unchecked extraction and consumption of fossil fuel products is more harmful and costly than moderated extraction and consumption; and

h.  it was practical for Defendants, and each of them, in light of their extensive knowledge of the hazards of placing fossil fuel products into the stream of commerce and extensive scientific engineering expertise, to develop better technologies and to pursue and adopt known, practical, and available technologies, energy sources, and business practices that would have mitigated their greenhouse gas pollution and eased the transition to a lower carbon economy.

194.  In addition to the harms suffered by the public at large, Plaintiff has suffered special injuries different in kind. Among other harms,

a.  Plaintiff has been forced to spend or set aside significant funds to assess, plan for, and enact infrastructure changes needed to mitigate rising sea levels on Plaintiff's publicly owned beaches and other public coastal property;

b.  Plaintiff has had to plan for and provide additional emergency and other public services in response to more frequent and more intense flooding and storm surges on both properties owned by Plaintiffs, and properties owned, leased, and utilized by residents, citizens, and visitors to Plaintiffs' communities.

195.  Defendants' wrongful conduct was oppressive, malicious, and fraudulent, in that their conduct was willful, intentional, and in conscious disregard for the rights of others. Defendants' conduct was so vile, base, and contemptible that it would be looked down upon and despised by reasonable people, justifying an award of punitive and exemplary damages in an amount subject to proof at trial, and justifying equitable disgorgement of all profits Defendants obtained through their unlawful and outrageous conduct.

196.  As a direct and proximate result of Defendants' conduct, as set forth above, the City of Imperial Beach has been unreasonably interfered with because Defendants knew or should have known that their conduct would create a continuing problem with long-lasting significant negative effects on the rights of the public.

197.  Defendants' actions are a direct and legal cause of the public nuisance.

198.  Defendants' acts and omissions as alleged herein are indivisible causes of Plaintiff City of Imperial Beach's injuries and damage as alleged herein.

199.  Wherefore, Plaintiff prays for relief as set forth below.

## THIRD CAUSE OF ACTION

### (Strict Liability—Failure to Warn on behalf of City of Imperial Beach)

### (Against All Defendants)

200.  Plaintiff City of Imperial Beach incorporates by reference each and every allegation contained above, as though set forth herein in full.

SHER
EDLING LLP

201.  Defendants, and each of them, extracted raw fossil fuel products, including crude oil, coal, and natural gas from the Earth, and placed those fossil fuel products into the stream of commerce.

202.  Defendants, and each of them, extracted, refined, formulated, designed, packaged, distributed, tested, constructed, fabricated, analyzed, recommended, merchandised, advertised, promoted and/or sold fossil fuel products, which were intended by Defendants, and each of them, to be burned for energy, refined into petrochemicals, and refined and/or incorporated into petrochemical products including fuels and plastics.

203.  Defendants, and each of them, heavily marketed, promoted, and advertised fossil fuel products and their derivatives, which were sold or used by their respective affiliates and subsidiaries. Defendants received direct financial benefit from their affiliates' and subsidiaries' sales of fossil fuel products. Defendants' role as promoter and marketer was integral to their respective businesses and a necessary factor in bringing fossil fuel products and their derivatives to the consumer market, such that Defendants had control over, and a substantial ability to influence, the manufacturing and distribution processes of their affiliates and subsidiaries.

204.  Throughout the times at issue, Defendants individually and collectively knew or should have known, in light of the scientific knowledge generally accepted at the time, that fossil fuel products, whether used as intended or misused in a foreseeable manner, release greenhouse gases into the atmosphere that inevitably cause *inter alia* global warming, sea level rise, increased intensity and frequency of nuisance flooding, and increased intensity and frequency of storm surges.

205.  Throughout the times at issue and continuing today, fossil fuel products presented and still present a substantial risk of injury to Plaintiffs through the climate effects described above, whether used as intended or misused in a reasonably foreseeable manner.

206.  Throughout the times at issue, the ordinary consumer would not recognize that the use or foreseeable misuse of fossil fuel products causes global and localized changes in climate, including those effects described herein.

207.     Throughout the times at issue, Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time, and advanced pseudo-scientific theories of their own, and developed public relations campaigns and materials that prevented reasonable consumers from recognizing the risk that fossil fuel products would cause grave climate changes, including those described herein.

208.     Defendants, and each of them, failed to adequately warn customers, consumers, elected officials and regulators of known and foreseeable risk of climate change and the consequences that inevitably follow from the normal, intended use and foreseeable misuse of Defendants' fossil fuel products.

209.     Defendants' wrongful conduct was oppressive, malicious, and fraudulent, in that their conduct was willful, intentional, and in conscious disregard for the rights of others. Defendants' conduct was so vile, base, and contemptible that it would be looked down upon and despised by reasonable people, justifying an award of punitive and exemplary damages in an amount subject to proof at trial, and justifying equitable disgorgement of all profits Defendants obtained through their unlawful and outrageous conduct.

210.     As a direct and proximate result of the defects previously described, fossil fuel products caused Plaintiff City of Imperial Beach to sustain the injuries and damages set forth in this Complaint, including damage to publicly owned infrastructure and real property, and the creation and maintenance of a nuisance that interferes with the rights of the County, its residents, and of the People.

211.     Defendants' acts and omissions as alleged herein are indivisible causes of Plaintiff City of Imperial Beach's injuries and damage as alleged herein.

212.     Wherefore, Plaintiff prays for relief as set forth below.

### FOURTH CAUSE OF ACTION

### (Strict Liability—Design Defect on behalf of City of Imperial Beach)

### (Against All Defendants)

213.     Plaintiff City of Imperial Beach incorporates by reference each and every allegation contained above, as though set forth herein in full.

214.   Defendants, and each of them, extracted raw fossil fuel products, including crude oil, coal, and natural gas from the Earth and placed those fossil fuel products into the stream of commerce.

215.   Defendants, and each of them, extracted, refined, formulated, designed, packaged, distributed, tested, constructed, fabricated, analyzed, recommended, merchandised, advertised, promoted and/or sold fossil fuel products, which were intended by Defendants, and each of them, to be burned for energy, refined into petrochemicals, and refined and/or incorporated into petrochemical products including but not limited to fuels and plastics.

216.   Defendants, and each of them, heavily marketed, promoted, and advertised fossil fuel products and their derivatives, which were sold or used by their respective affiliates and subsidiaries. Defendants' received direct financial benefit from their affiliates' and subsidiaries' sales of fossil fuel products. Defendants role as promoter and marketer was integral to their respective businesses and a necessary factor in bringing fossil fuel products and their derivatives to the consumer market, such that Defendants had control over, and a substantial ability to influence, the manufacturing and distribution processes of their affiliates and subsidiaries.

217.   Throughout the time at issue, fossil fuel products have not performed as safely as an ordinary consumer would expect them to because greenhouse gas emissions from their use cause numerous global and local changes to Earth's climate. In particular, ordinary consumers did not expect that:

a.   fossil fuel products are the primary cause of global warming since the dawn of the industrial revolution, and by far the primary cause of global warming acceleration in the 20th and 21st centuries;

b.   fossil fuel products are the primary cause of accelerating sea level rise since the beginning of the 20th century;

c.   unmitigated use of fossil fuel products causes increased frequency and intensity of nuisance flooding in coastal communities;

d.   fossil fuel products cause increased frequency and intensity of storm surges in coastal communities;

    e.     by increasing sea level rise, nuisance flooding, and storm surges, fossil fuel products cause damage to publicly and privately owned coastal infrastructure and buildings, including homes;

    f.     the social cost of each ton of $CO_2$ emitted into the atmosphere increases as total global emissions increase, so that unchecked extraction and consumption of fossil fuel products is more harmful and costly than moderated extraction and consumption; and

    g.     for these reasons and others, the unmitigated use of fossil fuel products present significant threats to the environment and human health and welfare, especially in coastal communities.

218.    Throughout the times at issue, Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time, advanced pseudo-scientific theories of their own, and developed public relations materials, among other public messaging efforts, that prevented reasonable consumers from forming an expectation that fossil fuel products would cause grave climate changes, including those described herein.

219.    Additionally, and in the alternative, Defendants' fossil fuel products are defective because the risks they pose to consumers and to the public, including and especially to Plaintiff, outweigh their benefits.

    a.     the gravity of the potential harms caused by fossil fuel products is extreme; global warming and its attendant consequences are guaranteed to occur following the use or foreseeable misuse of fossil fuel products because fossil fuel products inherently release greenhouse gases into the atmosphere; and global warming would continue to occur for decades even if all greenhouse gas emissions ceased.

    b.     the social benefit of the purpose of placing fossil fuels into the stream of commerce is overshadowed by the availability of other sources of energy that could have been placed into the stream of commerce that would not have caused sea level rise and accordingly Plaintiffs' injuries; Defendants,

and each of them, knew of the external costs of placing their fossil fuel products into the stream of commerce, and rather than striving to mitigate those externalities, instead acted affirmatively to obscure them from public consciousness.

c.   Defendants' campaign of disinformation regarding global warming and the climatic effects of fossil fuel products prevented customers, consumers, regulators, and the general public from taking steps to mitigate the inevitable consequences of fossil fuel consumption, and incorporating those consequences into either short-term decisions or long-term planning.

d.   the cost to society of each ton of $CO_2$ emitted into the atmosphere increases as total global emissions increase so that unchecked extraction and consumption of fossil fuel products is more harmful and costly than moderated extraction and consumption.

e.   it was practical for Defendants, and each of them, in light of their extensive knowledge of the hazards of placing fossil fuel products into the stream of commerce, to pursue and adopt known, practical, and available technologies, energy sources, and business practices that would have mitigated their greenhouse gas pollution and eased the transition to a lower carbon economy, reduced global $CO_2$ emissions, and mitigated the harms associated with the use and consumption of such products.

220.   Defendants' individual and aggregate fossil fuel products were used in a manner for which they were intended to be used, or misused in a manner foreseeable to Defendants and each of them, by individual and corporate consumers, the result of which was the addition of $CO_2$ emissions to the global atmosphere with attendant global and local consequences.

221.   As a direct and proximate result of the defects in fossil fuel products described herein, Plaintiff sustained the injuries and damages set forth in this Complaint, including damage to publicly and privately owned infrastructure and real property.

222.    Defendants' wrongful conduct was oppressive, malicious, and fraudulent, in that their conduct was willful, intentional, and in conscious disregard for the rights of others. Defendants' conduct was so vile, base, and contemptible that it would be looked down upon and despised by reasonable people, justifying an award of punitive and exemplary damages in an amount subject to proof at trial, and justifying equitable disgorgement of all profits Defendants obtained through their unlawful and outrageous conduct.

223.    Defendants' acts and omissions as alleged herein are indivisible causes of Plaintiff City of Imperial Beach's injuries and damage as alleged herein.

224.    Wherefore, Plaintiff prays for relief as set forth below.

## FIFTH CAUSE OF ACTION

### (Private Nuisance on behalf of City of Imperial Beach)

### (Against All Defendants)

225.    Plaintiff City of Imperial Beach incorporates by reference each and every allegation contained above, as though set forth herein in full.

226.    Plaintiff owns and manages extensive property within City of Imperial Beach borders that has been injured and will be injured by rising sea levels.

227.    Defendants, and each of them, by their acts and omission, have created a condition on Plaintiff's property, and permitted that condition to persist, which constitutes a nuisance by increasing sea level, increasing the frequency and intensity of flooding, and increasing the intensity and frequency of storms.

228.    The condition created by Defendants substantially and negatively affects Plaintiff's interest in its own coastal real property. In particular, higher sea level, increased storm frequency and intensity, and increased flooding are:

  a. harmful and dangerous to human health;

  b. indecent and offensive to the senses of the ordinary person;

  c. threatening to obstruct the free use of Plaintiff's property and property owned by Plaintiff's residents and citizens, so as to interfere with the comfortable enjoyment of life and property; and

d.    threatening to obstruct the free passage and use of navigable lakes, rivers, bays, streams, canals, basins, public parks, squares, streets, and/or highways within Plaintiff's communities.

229.    The condition described above created by Defendants' conduct substantially interferes with Plaintiff's use and quiet enjoyment of its coastal properties.

230.    Plaintiff has not consented to Defendants' conduct in creating the condition that has led to sea level rise and its associated harms.

231.    The ordinary person, and the ordinary city or county in Plaintiff's position, would be reasonably annoyed and disturbed by Defendants' conduct and the condition created thereby, because, *inter alia*, it infringes on Plaintiff's ability to provide public space to residents and visitors, and has forced Plaintiff to plan for and provide additional emergency and other public services in response to more frequent and more intense flooding and storm surges on properties owned by Plaintiff.

232.    The seriousness of rising sea levels and increased weather volatility and flooding is extremely grave, and outweighs the social utility of defendants' conduct. The seriousness of the harm to Plaintiff outweighs the benefit of Defendants' and each of their conduct, because:

a.    the interference with Plaintiff's property is expected to become so regular and severe as to be a permanent inundation;

b.    the nature of the harm is the destruction of Plaintiff's public and private real and personal property, rather than mere annoyance;

c.    the interference borne by Plaintiff is the loss of its private and public property and infrastructure, which will actually be borne by Plaintiff's citizens as loss of use of public property and infrastructure and diversion of tax dollars away from other public services to sea level rise;

d.    Plaintiff's coastal public and private property, which serves myriad uses including residential, infrastructural, commercial and ecological, is not suitable for regular inundation;

e.  the burden on Plaintiff to mitigate and prevent the interference with its property is significant and severe, as costs associated with addressing sea level rise caused by Defendants are projected to be in the billions of dollars over the next several decades;

f.  the social benefit of the purpose of placing fossil fuels into the stream of commerce is overshadowed by the availability of other sources of energy that could have been placed into the stream of commerce that would not have caused sea level rise; Defendants, and each of them, knew of the external costs of placing their fossil fuel products into the stream of commerce, and rather than striving to mitigate those externalities, Defendants acted affirmatively to obscure those costs from public consciousness;

g.  the social cost each ton of $CO_2$ emitted into the atmosphere increases as total global emissions increase, so that unchecked extraction and consumption of fossil fuel products is more harmful and costly than moderated extraction and consumption;

h.  Defendants' campaign of disinformation regarding global warming and the climatic effects of fossil fuel products prevented customers, consumers, regulators, and the general public from staking steps to mitigate the inevitable consequences of fossil fuel consumption, and incorporating those consequences into either short-term decisions or long-term planning; and

i.  it was practical for Defendants, and each of them, in light of their extensive knowledge of the hazards of placing fossil fuel products into the stream of commerce, to pursue and adopt known, practical, and available technologies, energy sources, and business practices that would have mitigated their greenhouse gas pollution and eased the transition to a lower carbon economy, reduced global $CO_2$ emissions, and mitigated the harms associated with the use and consumption of such products.

233.   Defendants' conduct was a direct and proximate cause of Plaintiff's injuries, and a substantial factor in the harms suffered by Plaintiff as described in this Complaint.

234.   Defendants' acts and omissions as alleged herein are indivisible causes of Plaintiff City of Imperial Beach's injuries and damage as alleged herein.

235.   Wherefore, Plaintiff prays for relief as set forth below.

## SIXTH CAUSE OF ACTION

### (Negligence on Behalf of City of Imperial Beach)

### (Against All Defendants)

236.   Plaintiff City of Imperial Beach incorporates by reference each and every allegation contained above, as though set forth herein in full.

237.   Defendants knew or should have known of the climate effects inherently caused by the normal use and operation of their fossil fuel products, including the likelihood and likely severity of global and local sea level rise and its consequences, and including Plaintiff's injuries and damages described herein.

238.   Defendants, collectively and individually, had a duty to use due care in developing, designing, testing, inspecting and distributing their fossil fuel products. That duty obligated Defendants collectively and individually to, *inter alia*, prevent defective products from entering the stream of commerce, and prevent reasonably foreseeable harm that could have resulted from the ordinary use or reasonably foreseeable misuse of Defendants' products.

239.   Defendants, and each of them, breached their duty of due care by, *inter alia*:

    a.   allowing fossil fuel products to enter the stream of commerce, despite knowing them to be defective due to their inevitable propensity to cause sea level rise and its consequences;

    b.   failing to act on the information and warnings they received from their own internal research staff, as well as from the international scientific community, that the unabated extraction, promotion and sale of their fossil fuel products would result in material dangers to the public, including City of Imperial Beach;

c.    failing to take actions including but not limited to pursuing and adopting known, practical, and available technologies, energy sources, and business practices that would have mitigated their greenhouse gas pollution and eased the transition to a lower carbon economy; shifting to non-fossil fuel products, and researching and/or offering technologies to mitigate $CO_2$ emissions in conjunction with sale and distribution of their fossil fuel products; and pursuing other available alternatives that would have prevented or mitigated the injuries to Plaintiff caused by sea level rise that Defendants, and each of them, knew or should have foreseen would inevitably result from use of Defendants' fossil fuel products;

d.    engaging in a campaign of disinformation regarding global warming and the climatic effects of fossil fuel products that prevented customers, consumers, regulators, and the general public from staking steps to mitigate the inevitable consequences of fossil fuel consumption, and incorporating those consequences into either short-term decisions or long-term planning.

240.    Defendants individual and collective acts and omissions were actual, substantial causes of sea level rise and its consequences, including Plaintiff's injuries and damages set forth herein, as sea levels would not have risen to the levels that caused Plaintiff's injuries but for Defendants introduction of their fossil fuel products into the stream of commerce.

241.    Defendants individual and collective acts and omissions were proximate causes of sea level rise and its consequences, including Plaintiff's injuries and damages set forth herein. No other act, omission, or natural phenomenon intervened in the chain of causation between Defendants' conduct and Plaintiff's injuries and damages, or superseded Defendants' breach of their duties' substantiality in causing Plaintiff's injuries and damages.

242.    As a direct and proximate result of Defendants' and each of their acts and omissions, Plaintiff sustained injuries and damages as set forth herein.

243.    Defendants' acts and omissions as alleged herein are indivisible causes of Plaintiff City of Imperial Beach's injuries and damage as alleged herein.

SHER
EDLING LLP

**COMPLAINT**

91

244.    Defendants' wrongful conduct was oppressive, malicious, and fraudulent, in that their conduct was willful, intentional, and in conscious disregard for the rights of others. Defendants' conduct was so vile, base, and contemptible that it would be looked down upon and despised by reasonable people, justifying an award of punitive and exemplary damages in an amount subject to proof at trial, and justifying equitable disgorgement of all profits Defendants obtained through their unlawful and outrageous conduct.

245.    Wherefore, Plaintiff prays for relief as set forth below.

## SEVENTH CAUSE OF ACTION

### (Negligence - Failure to Warn on Behalf of City of Imperial Beach)

### (Against All Defendants)

246.    Plaintiff City of Imperial Beach incorporates by reference each and every allegation contained above, as though set forth herein in full.

247.    Defendants knew or should have known, based on information passed to them from their internal research divisions and affiliates and/or from the international scientific community, of the climate effects inherently caused by the normal use and operation of their fossil fuel products, including the likelihood and likely severity of global warming, global and local sea level rise, and their associated consequences, including Plaintiff's injuries and damages described herein.

248.    Defendants knew or should have known, based on information passed to them from their internal research divisions and affiliates and/or from the international scientific community, that the climate effects described above rendered their fossil fuel products dangerous, or likely to be dangerous, when used as intended or misused in a reasonably foreseeable manner.

249.    Throughout the times at issue, Defendants failed to adequately warn any consumers or any other party of the climate effects that inevitably flow from the use or foreseeable misuse of their fossil fuel products.

250.    Throughout the times at issue, Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time, advanced pseudo-scientific theories of their own, and developed public relations materials that

1    prevented reasonable consumers from recognizing the risk that fossil fuel products would cause

2    grave climate changes, undermining and rendering ineffective any warnings that Defendants may

3    have also disseminated.

4         251.    Given the grave dangers presented by the climate effects that inevitably flow from

5    the normal use or foreseeable misuse of fossil fuel products, a reasonable extractor, manufacturer,

6    formulator, seller, or other participant responsible for introducing fossil fuel products into the

7    stream of commerce, would have warned of those known, inevitable climate effects.

8         252.    Defendants' conduct was a direct and proximate cause of Plaintiff's injuries and a

9    substantial factor in the harms suffered by Plaintiff as described in this Complaint.

10        253.    Defendants' acts and omissions as alleged herein are indivisible causes of Plaintiff

11   City of Imperial Beach's injuries and damage as alleged herein.

12        254.    Defendants' wrongful conduct was oppressive, malicious, and fraudulent, in that

13   their conduct was willful, intentional, and in conscious disregard for the rights of others.

14   Defendants' conduct was so vile, base, and contemptible that it would be looked down upon and

15   despised by reasonable people, justifying an award of punitive and exemplary damages in an

16   amount subject to proof at trial, and justifying equitable disgorgement of all profits Defendants

17   obtained through their unlawful and outrageous conduct.

18        255.    Wherefore, Plaintiff prays for relief as set forth below.

19                            **EIGHTH CAUSE OF ACTION**

20                  **(Trespass on Behalf of City of Imperial Beach)**

21                          **(Against All Defendants)**

22        256.    Plaintiff City of Imperial Beach incorporates by reference each and every allegation

23   contained above, as though set forth herein in full.

24        257.    Plaintiff City of Imperial Beach owns, leases, occupies, and/or controls real

25   property within Plaintiff's city boundaries and within communities located within the City.

26        258.    Defendants, and each of them, have intentionally, recklessly, or negligently caused

27   ocean waters to enter Plaintiff City of Imperial Beach's property, by extracting, refining,

28   formulating, designing, packaging, distributing, testing, constructing, fabricating, analyzing,

recommending, merchandising, advertising, promoting, marketing, and/or selling fossil fuel products, knowing those products in their normal operation and use or foreseeable misuse would cause global and local sea levels to rise, cause flooding to become more frequent and more intense, and cause storm surges to become more frequent and more intense.

259.    Plaintiff City of Imperial Beach did not give permission for Defendants, or any of them, to cause ocean water to enter its property.

260.    Plaintiff City of Imperial Beach has been and continues to be actually injured and continues to suffer damages as a result of Defendants and each of their having caused ocean water to enter their real property, by *inter alia* submerging real property owned by Plaintiff, causing flooding which has invaded and threatens to invade real property owned by Plaintiff and rendered it unusable, and causing storm surges and heightened waves which have invaded and threatened to invade real Property owned by Plaintiff and rendered it unusable.

261.    Defendants' and each Defendant's introduction of their fossil fuel products into the stream of commerce was a substantial factor in causing the injuries and damages to Plaintiff's public and private real property.

262.    Defendants' acts and omissions as alleged herein are indivisible causes of Plaintiff City of Imperial Beach's injuries and damage as alleged herein.

263.    Defendants' wrongful conduct was oppressive, malicious, and fraudulent, in that their conduct was willful, intentional, and in conscious disregard for the rights of others. Defendants' conduct was so vile, base, and contemptible that it would be looked down upon and despised by reasonable people, justifying an award of punitive and exemplary damages in an amount subject to proof at trial, and justifying equitable disgorgement of all profits Defendants obtained through their unlawful and outrageous conduct.

264.    Wherefore, Plaintiff prays for relief as set forth below.

\ \ \

**VII.   PRAYER FOR RELIEF**

    1.     Compensatory damages in an amount according to proof;

    2.     Equitable relief to abate the nuisances complained of herein;

    3.     Reasonable attorneys' fees pursuant to California Code of Civil Procedure 1021.5 or otherwise;

    4.     Punitive damages;

    5.     Disgorgement of profits;

    6.     Costs of suit; and

    7.     For such and other relief as the court may deem proper.


Dated: July 17, 2017                       **McDOUGAL, LOVE, BOEHMER, FOLEY, LYON & CANLAS, CITY ATTORNEY FOR CITY OF IMPERIAL BEACH**

By: _Jennifer Lyon (MS)_
JENNIFER LYON, CITY ATTORNEY
By: STEVEN E. BOEHMER, ASSISTANT CITY ATTORNEY


**SHER EDLING LLP**

By: _Linda Sher_
VICTOR M. SHER
MATTHEW K. EDLING
TIMOTHY R. SLOANE
MARTIN D. QUIÑONES

*Attorneys for The City of Imperial Beach, a municipal corporation, and on behalf of the People of the State of California*

VIII.  **JURY DEMAND**

Plaintiff City of Imperial Beach demands a jury trial on all issues so triable.

Dated:  July 17, 2017

McDOUGAL,  LOVE,  BOEHMER,  FOLEY, LYON & CANLAS, CITY ATTORNEY FOR CITY OF IMPERIAL BEACH

By:  *Jennifer Lyon (vms)*

JENNIFER LYON, CITY ATTORNEY
By: STEVEN E. BOEHMER, ASSISTANT
CITY ATTORNEY

**SHER EDLING LLP**

By:  *Victor Sher*

VICTOR M. SHER
MATTHEW K. EDLING
TIMOTHY R. SLOANE
MARTIN D. QUIÑONES

*Attorneys for The City of Imperial Beach, a municipal corporation, and on behalf of the People of the State of California*

# EXHIBIT A

# Truth or CO₂nsequences

**M**AJOR FOSSIL FUEL COMPANIES have known the truth for nearly 50 years: their oil, gas, and coal products create greenhouse gas pollution that warms the planet and changes our climate. They've known for decades that the consequences could be catastrophic and that only a narrow window of time existed to take action before the damage might not be reversible. They have nevertheless engaged in a coordinated, multi-front effort to conceal and contradict their own knowledge of these threats, discredit the growing body of publicly available scientific evidence, and persistently create doubt in the minds of customers, consumers, regulators, the media, journalists, teachers, and the general public about the reality and consequences of climate change.

This timeline highlights information, alleged in the Complaints filed by San Mateo County, Marin County, and Imperial Beach, that comes from key industry documents and other sources. It illustrates what the industry knew, when they knew it, and what they didn't do to prevent the impacts that are now imposing real costs on people and communities around the country. While the early warnings from the industry's own scientists and experts often acknowledged the uncertainties in their projections, those uncertainties were typically about the timing and magnitude of the climate change impacts – not about whether those impacts would occur or whether the industry's oil, gas, and coal were the primary cause. On those latter points, as these documents show, they were quite certain.

| DATE | DOCUMENT | TEXT |
|---|---|---|
| NOV. 5, 1965 | "RESTORING THE QUALITY OF OUR ENVIRONMENT," REPORT OF THE ENVIRONMENTAL POLLUTION PANEL, PRESIDENT'S SCIENCE ADVISORY COMMITTEE | **President Lyndon Johnson's Science Advisory Committee finds that** "[P]ollutants have altered on a global scale the carbon dioxide content of the air" and "[M]an is unwittingly conducting a vast geophysical experiment" by burning fossil fuels that are injecting CO2 into the atmosphere. The committee concludes that by the year 2000, we could see "measurable and perhaps marked changes in climate, and will almost certainly cause significant changes in the temperature and other properties of the stratosphere." |
| FEB. 1968 | "SOURCES, ABUNDANCE, AND FATE OF GASEOUS ATMOSPHERIC POLLUTANTS," REPORT PREPARED BY STANFORD RESEARCH INSTITUTE SCIENTISTS ELMER ROBINSON AND R.C. ROBBINS FOR THE AMERICAN PETROLEUM INSTITUTE (API) | **The American Petroleum Institute commissions a report finding that:**<br>• "[A]lthough there are other possible sources for the additional CO2 now being observed in the atmosphere, none seems to fit the presently observed situation as well as the fossil fuel 'emanation' theory."<br>• "Significant temperature changes are almost certain to occur by the year 2000, and these could bring about climatic changes."<br>• "There seems to be no doubt that the potential damage to our environment could be severe."<br>• "What is lacking, however, is an application of these CO2 data to air pollution technology and work toward systems in which CO2 emissions would be brought under control." |
| JUNE 6, 1978 | PRESENTATION SHARED WITH EXXON MANAGEMENT COMMITTEE FROM EXXON RESEARCH AND ENGINEERING SCIENCE ADVISOR, JAMES BLACK | **Exxon Science Advisor James Black tells the company's Management Committee that** "[T]here is general scientific agreement that the most likely manner in which mankind is influencing the global climate is through carbon dioxide release from the burning of fossil fuels" and that "[M]an has a time window of five to ten years before the need for hard decisions regarding changes in energy strategy might become critical." |
| SEPT. 17, 1978 | CONGRESS PASSES NATIONAL CLIMATE POLICY ACT | **Congress passes the National Climate Policy Act to help** "the Nation and the world to understand and respond to natural and man-induced climate processes and their implications." |

# Truth or $CO_2$nsequences

| DATE | DOCUMENT | TEXT |
|---|---|---|
| DEC. 7, 1978 | CO2 RESEARCH PROPOSAL FROM EXXON RESEARCH AND ENGINEERING'S ENVIRONMENTAL AREA MANAGER, HENRY SHAW | **Exxon scientist Henry Shaw proposes that the company initiate a comprehensive research program** *"to assess the possible impact of the greenhouse effect on Exxon business."* He argues that the company needs *"a credible scientific team that can critically evaluate the information generated on the subject and be able to carry bad news, if any, to the corporation."* |
| OCT. 16, 1979 | "CONTROLLING THE CO2 CONCENTRATION IN THE ATMOSPHERE," STUDY BY EXXON EMPLOYEE STEVE KNISELY | **An Exxon internal study finds that:**<br>• *"The present trend of fossil fuel consumption will cause dramatic environmental effects before the year 2050."*<br>• *"[R]ecognizing the uncertainty, there is a possibility that an atmospheric CO2 buildup will cause adverse environmental effects in enough areas of the world to consider limiting the future use of fossil fuels as major energy sources."*<br>• *"The <u>potential</u> problem is great and urgent."* |
| FEB. 29, 1980 | MEETING MINUTES FROM THE AMERICAN PETROLEUM INSTITUTE'S (API'S) CO2 AND CLIMATE TASK FORCE: PRESENTATION BY DR. J. LAURMAN | **Dr. J. Laurman tells API's Climate Task Force that** *"there is a scientific consensus on the potential for large future climatic response to increased CO2 levels"* and that *"remedial actions will take a long time to become effective."* |
| AUG. 6, 1980 | "REVIEW OF ENVIRONMENTAL PROTECTION ACTIVITIES FOR 1978-1979," IMPERIAL OIL REPORT | **An internal "Review of Environmental Protection Activities for 1978-1979" by Imperial Oil, which was distributed widely to Exxon/Esso Corporate Managers, finds that** *"[T]echnology exists to remove CO2 from stack gases but removal of only 50% of the CO2 would double the cost of power generation."* |
| AUG. 18, 1981 | MEMO FROM ROGER COHEN, DIRECTOR OF EXXON'S THEORETICAL AND MATHEMATICAL SCIENCE LABORATORY, TO SCIENTIST WERNER GLASS | **Exxon Strategic Planning Manager Roger Cohen comments on an internal assessment of CO2 emissions and the greenhouse effect that is prepared at the request of Senior VP and Director Morey O'Loughlin:**<br>• *"[I]t is very likely that we will unambiguously recognize the threat by the year 2000 because of advances in climate modeling and the beginning of real experimental confirmation of the CO2 effect."*<br>• *"Whereas I can agree with the statement that our best guess is that observable effects in the year 2030 will be 'well short of catastrophic', it is distinctly possible that the [Planning Division's] scenario will later produce effects that will indeed be catastrophic (at least for a substantial fraction of the earth's population)."* |
| APRIL 1, 1982 | "CO2 'GREENHOUSE' EFFECT," INTERNALLY DISTRIBUTED SUMMARY BY EXXON MANAGER M.B. GLASER OF A TECHNICAL REVIEW PREPARED BY EXXON RESEARCH AND ENGINEERING COMPANY'S COORDINATION AND PLANNING DIVISION | **An internal Exxon "CO2 'Greenhouse Effect' Summary" finds that** *"[T]here is concern among some scientific groups that once the effects are measurable, they might not be reversible and little could be done to correct the situation in the short term"* and that *"[M]itigation of the 'greenhouse effect' could require major reductions in fossil fuel combustion."* |

# Truth or CO₂nsequences

| DATE | DOCUMENT | TEXT |
|---|---|---|
| **SEPT. 2, 1982** | MEMO FROM ROGER COHEN, DIRECTOR OF EXXON'S THEORETICAL AND MATHEMATICAL SCIENCE LABORATORY, TO EXXON MANAGEMENT INCLUDING PRESIDENT OF EXXON CORPORATION'S RESEARCH AND ENGINEERING, E. E. DAVID JR. | **The Director of Exxon's Theoretical and Mathematical Sciences Laboratory, Roger Cohen, summarizes the findings of their research in climate modeling:**<br>• *"[O]ver the past several years a clear scientific consensus has emerged regarding the expected climatic effects of increased atmospheric CO2."*<br>• *"It is generally believed that the first unambiguous CO2-induced temperature increase will not be observable until around the year 2000."*<br>• *"[T]he results of our research are in accord with the scientific consensus on the effect of increased atmospheric CO2 on climate."* |
| **OCT. 1982** | "INVENTING THE FUTURE: ENERGY AND THE CO2 'GREENHOUSE' EFFECT," E. E. DAVID JR. REMARKS AT THE FOURTH ANNUAL EWING SYMPOSIUM, TENAFLY, NJ | **In a speech, E. E. David Jr., President of Exxon Research and Engineering Company, states:** *"It is ironic that the biggest uncertainties about the CO2 buildup are not in predicting what the climate will do, but in predicting what people will do. . .[It] appears we still have time to generate the wealth and knowledge we will need to invent the transition to a stable energy system."* |
| **SUMMER 1988** | PUBLIC AWARENESS OF THE GREENHOUSE EFFECT AND EFFORTS TO COMBAT IT RAMP UP | **The summer of 1988 sees a flurry of activity around climate change policy:**<br>• Dr. James Hansen, Director of NASA's Goddard Institute for Space Studies, tells Congress that the Institute's greenhouse effect research shows *"the global warming is now large enough that we can ascribe with a high degree of confidence a cause and effect relationship with the greenhouse effect."*<br>• At least four bipartisan bills are introduced in Congress, three championed by Republicans, to regulate greenhouse gas emissions. |
| **AUG. 3, 1988** | "THE GREENHOUSE EFFECT," DRAFT WRITTEN BY JOSEPH M. CARLSON, AN EXXON PUBLIC AFFAIRS MANAGER | Despite declaring the Greenhouse Effect *"one of the most significant environmental issues for the 1990s,"* Carlson writes that Exxon's position should be to *"emphasize the uncertainty in scientific conclusions regarding the potential enhanced Greenhouse Effect."* |
| **AUG. 31, 1988** | VICE PRESIDENT GEORGE H.W. BUSH CAMPAIGN SPEECH IN MICHIGAN | **Vice President George H.W. Bush, in a speech while running for President, says** *"[T]hose who think we are powerless to do anything about the greenhouse effect forget about the 'White House effect'; as President, I intend to do something about it."* |
| **DEC. 6, 1988** | THE INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE (IPCC) IS FORMED | The IPCC is formed in December 1988 by the World Meteorological Organization (WMO) and the United Nations Environment Programme (UNEP) to provide policymakers with regular assessments of the scientific basis of climate change, its impacts and future risks, and options for adaptation and mitigation. |
| **DEC. 20, 1989** | "GREENHOUSE EFFECT: SHELL ANTICIPATES A SEA CHANGE," ARTICLE IN THE NEW YORK TIMES | **A New York Times article reports:** *"In what is considered the first major project that takes account of the changes the greenhouse effect is expected to bring, [Shell] engineers are designing a huge platform that anticipates rising water in the North Sea by raising the platform from the standard 30 meters - the height now thought necessary to stay above the waves that come in a once-a-century storm - to 31 or 32 meters."* |

## Truth or CO$_2$nsequences

| DATE | DOCUMENT | TEXT |
|---|---|---|
| 1991 | "CLIMATE OF CONCERN," DOCUMENTARY PRODUCED AND DISTRIBUTED BY SHELL | **Shell releases a 30-minute educational video** warning of climate change's negative consequences ranging from sea level rise and wetland destruction to *"greenhouse refugees."* It concludes: *"Global warming is not yet certain, but many think that the wait for final proof would be irresponsible. Action now is seen as the only safe insurance."* |
| MAY 1991 | INFORMATION COUNCIL FOR THE ENVIRONMENT (ICE) PR CAMPAIGN | The Information Council for the Environment (ICE), formed by the coal industry, launches a national climate change science denial campaign with data collection, full-page newspaper ads, radio commercials, a PR tour, and mailers. |
| DEC. 1995 | "PREDICTING FUTURE CLIMATE CHANGE: A PRIMER," GLOBAL CLIMATE COALITION'S (GCC) INTERNAL PRIMER DRAFT, PREPARED BY GCC'S SCIENCE TECHNICAL ADVISORY COMMITTEE V. THEIR PUBLICLY DISTRIBUTED BACKGROUNDER, "SCIENCE AND GLOBAL CLIMATE CHANGE: WHAT DO WE KNOW? WHAT ARE THE UNCERTAINTIES?" | **The Global Climate Coalition (GCC), a fossil fuel industry group, drafts an internal primer analyzing "contrarian theories" and concluding that they do not** *"offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change."* However, a publicly distributed version excluded this section while focusing on scientific disagreement and uncertainty by citing some of those same contrarian scientists. |
| FALL 1996 | "GLOBAL WARMING: WHO'S RIGHT? FACTS ABOUT A DEBATE THAT'S TURNED UP MORE QUESTIONS THAN ANSWERS," PUBLICATION FROM EXXON CORPORATION | **An eight-page Exxon publication** questions the negative impact the greenhouse effect might have and plays up the uncertainty. The introductory statement by Lee Raymond, Exxon's chairman and CEO, claims that *"[S]cientific evidence remains inconclusive as to whether human activities affect global climate."* |
| APRIL 3, 1998 | "GLOBAL SCIENCE COMMUNICATIONS ACTION PLAN," DRAFT BY THE AMERICAN PETROLEUM INSTITUTE (API) | **The American Petroleum Institute develops a multi-million dollar communications and outreach plan to ensure that** *"climate change becomes a non-issue."* It maintains that *"[V]ictory will be achieved when...uncertainties in climate science [become] part of the 'conventional wisdom.'"* |
| DEC. 11, 2000 | LETTER FROM LLOYD KEIGWIN, SENIOR SCIENTIST AT THE WOODS HOLE OCEANOGRAPHIC INSTITUTION, TO PETER ALTMAN, NATIONAL CAMPAIGN COORDINATOR FOR EXXONMOBIL | **A senior scientist at Woods Hole Oceanographic Institution, Lloyd Keigwin, sends a letter to Exxon's Peter Altman,** summarizing their email and phone conversations regarding Exxon's misleading use of Keigwin's study results. *"The sad thing is that a company with the resources of ExxonMobil is exploiting the data for political purposes when they could actually get much better press by supporting research into the role of the ocean in climate change."* |
| JUNE 20, 2001 | "YOUR MEETING WITH MEMBERS OF THE GLOBAL CLIMATE COALITION," US DEPARTMENT OF STATE MEMO AND TALKING POINTS | **Talking points for State Department Undersecretary Paula Dobriansky's meeting with the Global Climate Coalition at API's headquarters:** *"POTUS rejected Kyoto, in part, based on input from you."* |

# Truth or CO$_2$nsequences

| DATE | DOCUMENT | TEXT |
|---|---|---|
| SEPT. 26, 2002 | LETTER FROM MICHAEL MACCRACKEN, RETIRING SENIOR SCIENTIST FROM THE OFFICE OF THE US GLOBAL CHANGE RESEARCH PROGRAM, TO EXXON CEO LEE RAYMOND: "RE: WITH REGARD TO THE EXXONMOBIL FACSIMILE ON FEBRUARY 6, 2001 FROM DR. AG RANDOL TO MR. JOHN HOWARD OF THE COUNCIL ON ENVIRONMENTAL QUALITY" | Michael MacCracken, the former director of the National Assessment Coordination Office of the US Global Change Research Program, writes to Exxon CEO Lee Raymond in response to ExxonMobil's criticism of a US climate change assessment: *"In my earlier experience, arguing for study of adaptation had been a position of industry, but now when this was attempted, ExxonMobil argued this was premature. Roughly, this is equivalent to turning your back on the future and putting your head in the sand—with this position, it is no wonder ExxonMobil is the target of environmental and shareholder critics...Certainly, there are uncertainties, but decisions are made under uncertainty all the time—that is what executives are well paid to do. In this case, ExxonMobil is on the wrong side of the international scientific community, the wrong side of the findings of all the world's leading academies of science, and the wrong side of virtually all of the world's countries as expressed, without dissent, in the IPCC reports...To call ExxonMobil's position out of the mainstream is thus a gross understatement. There can be all kinds of perspectives about what one might or might not do to start to limit the extent of the change, but to be in opposition to the key scientific findings is rather appalling for such an established and scientific organization."* |
| OCT. 21, 2002 | MARKUPS BY PHILIP COONEY, CHIEF OF STAFF FOR THE WHITE HOUSE COUNCIL ON ENVIRONMENTAL QUALITY, ON A DRAFT STRATEGIC PLAN FOR THE CLIMATE CHANGE SCIENCE PROGRAM | Philip Cooney, Chief of Staff for the White House Council of Environmental Quality and a former lawyer and lobbyist for the American Petroleum Institute with no scientific credentials, edits a Draft Strategic Plan for the US Climate Change Science Program to introduce uncertainty about global warming and its impacts. In 2005, Cooney resigns after being accused of doctoring scientific reports and is hired by Exxon. A Union of Concerned Scientists report published samples of Cooney's edits (p.56). |
| JUNE 11, 2009 | "THE PROPORTIONALITY OF GLOBAL WARMING TO CUMULATIVE CARBON EMISSIONS," PUBLICATION BY DAMON MATTHEWS PUBLISHED IN NATURE | Damon Matthews publishes seminal research in the peer-reviewed Nature journal showing a linear relationship between greenhouse gas emissions and increasing global temperatures. |
| AUG. 12, 2009 | EMAIL FROM API CEO JACK GERARD TO API'S MEMBERSHIP REGARDING A SERIES OF "ENERGY CITIZEN" RALLIES IN 20 STATES DURING THE END OF THE CONGRESSIONAL RECESS | The American Petroleum Institute's CEO, Jack Gerard, emails API's membership promising *"up front resources"* and encouraging turnout for "Energy Citizen" rallies in about 20 states. Gerard says they are *"collaborating closely with the allied oil and natural gas associations"* in order to *"aim a loud message at those states' U.S. Senators to avoid the mistakes embodied in the House climate bill."* |
| NOV. 22, 2013 | "TRACING ANTHROPOGENIC CARBON DIOXIDE AND METHANE EMISSIONS TO FOSSIL FUEL AND CEMENT PRODUCERS, 1854-2010," PUBLICATION BY RICK HEEDE PUBLISHED IN CLIMATIC CHANGE | Rick Heede, co-founder and director of the Climate Accountability Institute, authors a peer-reviewed study revealing that 90 producers of oil, natural gas, coal, and cement – the "carbon majors" – are responsible for 63 percent of cumulative industrial CO2 and methane emissions worldwide between 1751 and 2010. Just 28 companies are responsible for 25 percent of all emissions since 1965. |

# Truth or CO₂nsequences

| DATE | DOCUMENT | TEXT |
|---|---|---|
| NOV. 11, 2014 | "WSPA PRIORITY ISSUES," PRESENTATION BY WESTERN STATES PETROLEUM ASSOCIATION PRESIDENT CATHERINE REHEIS-BOYD | **The Western States Petroleum Association, a top lobbying and trade association for the oil industry, describes in a presentation the** "*campaigns and coalitions [it has] activated that have contributed to WSPA's advocacy goals and continue to respond to aggressive anti-oil initiatives in the West,*" including investment "*in several coalitions that are best suited to drive consumer and grassroots messages to regulators and policymakers.*" |
| SEPT. 2016 | "2016 CITY OF IMPERIAL BEACH SEA LEVEL RISE ASSESSMENT" | **The City of Imperial Beach, California, releases a report** that assesses the city's vulnerability to sea level rise and identifies adaptation strategies, along with estimated costs, to address those impacts. |
| APRIL 2017 | STATE OF CALIFORNIA, MARIN COUNTY, AND SAN MATEO COUNTY SEA LEVEL RISE ASSESSMENT REPORTS | **The State of California, along with San Mateo and Marin Counties, release separate reports** that assess the impacts of sea level rise on their communities, detailing the substantial monetary losses, infrastructure and property damage, and decrease in quality of life residents will face. |
| JUNE 26, 2017 | "THE INCREASING RATE OF GLOBAL MEAN SEA-LEVEL RISE DURING 1993-2014," CHEN, ET.AL., PUBLISHED IN NATURE CLIMATE CHANGE | **A new peer-reviewed study** confirms that the rate of sea level rise is accelerating and concludes that, for coastal communities, it "*highlights the importance and urgency of mitigating climate change and formulating coastal adaptation plans to mitigate the impacts of ongoing sea level rise.*" |

SUPERIOR COURT - MAR1  3Z
COUNTY OF CONTRA COSTA
MARTINEZ, CA  94553

THE CITYOF IMPERIAL BEACH VS CHEVRON

MSC17-01227

NOTICE OF ASSIGNMENT TO DEPARTMENT SEVENTEEN FOR CASE
MANAGEMENT DETERMINATION

THIS FORM, A COPY OF THE NOTICE TO PLAINTIFFS, THE ADR INFORMATION
SHEET, AND A BLANK CASE MANAGEMENT STATEMENT ARE TO BE SERVED
UPON ALL OPPOSING PARTIES, ALL PARTIES SERVED WITH SUMMONS AND
COMPLAINT/CROSS-COMPLAINT.

1. This matter has been assigned to Department 17, Judge B. Goode
presiding, for all purposes; Department 17 is designated as the
complex litigation department of the Court and as such (a) hears all
cases wherein a designation of complex case has been made and (b)
conducts hearings, in cases that this court determines, on a pre-
liminary basis may be complex, to determine whether the case should
remain in the complex litigation program.

2. All counsel are required to appear in Dept. 17 on 09/19/17
   at 8:30 a.m.
       (a) If the case has been designated as complex, and no counter-
           designation has been filed, the Court will hold its first
           case management conference at that time.
       (b) If the case has been assigned to Department 17 on a
           preliminary basis the Court will hold a hearing to determine
           if the matter is, or is not, complex. If the matter is
           determined to be complex, the Court will then proceed with
           the first case management conference.

3. Each party shall file and serve a Case Management Conference
Statement five (5) days before this hearing and be prepared to
participate effectively in the Conference, including being thoroughly
familiar with the case and able to discuss the suitability of the case
for private mediation, arbitration or the use of a special master or
referee.

4. Prior to the conference counsel for plaintiff shall meet and confer
with counsel for each other party in an effort to precisely define the
the issues in the case, discuss the possiblity of early mediation, the
identities of possible other parties, and their respective plans for
discovery.

5. Until the time of the conference the following INTERIM ORDERS shall
be in effect:

   A. Plaintiff shall diligently proceed in locating and serving each
      and every defendant.  It is the Court's intention that each party
      be served in sufficient time to have entered an appearance within
      the time allowed by law and to attend the first conference.
   B. All discovery shall be stayed excepting as all parties to the
      action might otherwise stipulate or the Court otherwise order.
   C. No party shall destroy any writing or other evidence in its
      possession or under its control which bears in any way upon the
      matters which are the subject of this litigation.
   D. Within the time for any party to file an answer or demurrer
      such party may alternatively file a notice of general appearance.
      In such event the time for filing of an answer or demurrer
      shall be extended to twenty (20) days following the first
      conference unless the Court shall, at that time, set a different
      schedule.
   E. Counsel for each party shall do a conflict check to determine
      whether such counsel might have a possible conflict of interest
      as to any present or contemplated future party.

BY ORDER OF THE COURT

*Superior Court of California, County of Contra Costa*

# <u>UNLIMITED</u> JURISDICTION

## Civil Actions

## PACKET

### What you will find in this packet:

- **Notice To Plaintiffs** (CV-655a-INFO)

- **Notice To Defendants** (CV-655d-INFO)

- **ADR Case Management Stipulation and Order** (CV-655b)

- **Case Management Statement** (CM-110)

- **Alternative Dispute Resolution (ADR) Information** (CV-655c-INFO)

*You Can Get Court Forms FREE at:  www.cc-courts.org/forms*

## Superior Court of California, County of Contra Costa

# NOTICE TO PLAINTIFFS
In Unlimited Jurisdiction Civil Actions

## AFTER YOU FILE YOUR COURT CASE:

1. **Have the forms the clerk gives you served on all defendants in this case:**
   a. The Complaint
   b. The Summons
   c. The Notice of Case Management Conference (shows hearing date and time)
   d. The Notice to Defendants  (Local Court Form CV-655d-INFO)
   e. Blank: Case Management Statement (Judicial Council Form CM-110)
   f. Blank: Stipulation and Order to Attend ADR and Delay First Case Management Conference 90 Days  (Local Court Form CV-655b)
   g. Alternative Dispute Resolution (ADR) Information (Local Court Form CV-655c-INFO)

2. Within 60 days of the date you filed the complaint **you must prove that the forms have been served on (delivered to) the defendants correctly** by filing the ***Proof of Service*** form (POS-010) (completed by the person who did the service) with the court.

3. **Go to the case management conference on the date indicated on** The Notice of Case Management Conference.

4. **Consider using mediation, arbitration, or neutral case evaluation (ADR) to resolve the dispute.** All parties must answer questions about ADR on the *Case Management Statement* form. For more information, see the enclosed ADR information, visit www.cc-courts.org/adr, or email adrweb@contracosta.courts.ca.gov

5. **You may delay the first case management conference while you try to resolve the dispute in ADR.** If all parties agree to use ADR, complete and file the Stipulation and Order to Attend ADR and Continue First Case Management Conference 90 Days form to tell the court you want to use this option.

All civil actions (*except juvenile, probate, family, unlawful detainer, extraordinary writ, and asset forfeiture[1]*) and personal injury cases where a party is claiming damages[2] must meet the Civil Trial Delay Reduction time limits for filing documents and moving their cases forward. These time limits are listed in California Rule of Court 3.110 and Local Court Rules; Title Three. If parties miss these deadlines, a judge might issue an order (*Order to Show Cause*) for them to explain in court why they should not have to pay a fine or have their case dismissed.

## VIEW LOCAL COURT RULES AT: (WWW.CC-COURTS.ORG/RULES)

---

[1] *Health and Safety Code §11470 et seq.*
[2] *Including claims for emotional distress and/or wrongful death.*

**Superior Court of California, County of Contra Costa**

## NOTICE TO DEFENDANTS

In <u>Unlimited Jurisdiction</u> Civil Actions

<u>YOU ARE BEING SUED</u>.  The packet you have been served should contain:

a.    The Summons

b.    The Complaint

c.    The Notice of Case Management (shows hearing date and time)

d.    <u>Blank</u>: Case Management Statement (Judicial Council Form CM-110)

e.    <u>Blank</u>: Stipulation and Order to Attend ADR and Delay First Case Management Conference 90 Days (Local Court Form CV-655b)

f.    Alternative Dispute Resolution (ADR) Information  (Local Court Form CV-655c-INFO)

---

 ## WHAT DO I DO NOW? 

<u>You must:</u>

1.  **Prepare your response**    YOU COULD LOSE YOUR CASE—even before it is heard by a judge or before you can defend yourself, if you do not prepare and file a response on time. See the other side of this page for types of responses you can prepare.

2.  **Complete the *Case Management  Statement*** *(CM-110)*

3.  **File and serve your court papers on time**   Once your court forms are complete, you <u>must</u> file 1 original and 2 copies of the forms at court. An adult who is NOT involved in your case must serve one set of forms on the Plaintiff. If you were served in person you must file your response in 30 days. If the server left a copy of the papers with an adult living at your home or an adult in charge at your work or you received a copy by mail you must file your response in 40 days.

4.  **Prove you served your court papers on time**   by having your server complete a *Proof of Service, (Judicial Council form POS-040)*, that <u>must</u> be filed at the court within <u>60</u> days.

5.  **Go to court** on the date and time given in the *Notice of Case Management Conference.*

6.  **Consider trying to settle your case before trial**   If you and the other party to the case can agree to use mediation, arbitration or neutral case evaluation, the *<u>Stipulation and Order to Attend ADR and Delay First Case Management Conference 90 Days</u>* can be filed with your other papers.  For more information read the enclosed ADR information, visit www.cc-courts.org/adr, or email adrweb@contracosta.courts.ca.gov.

**IMPORTANT! The court recommends consulting an attorney for all or part of your case.  While you may represent yourself, lawsuits can be complicated, and the court cannot give you legal advice.**

---

<u>COURT FEES:</u>  You must pay court fees the first time you file your papers.  If you also file a motion, you must pay another fee.  If you cannot afford the fees, you may ask the court to waive (allow you not to pay) fees. Use Judicial Council forms FW-001-INFO [information sheet]; FW-001 [application]; and FW-003 [order].

<u>COURT FORMS:</u>  Buy forms at the Law Library (1020 Ward Street, Martinez, CA) or download them for free at: www.courtinfo.ca.gov/forms/

## WHAT KIND OF RESPONSES CAN I FILE?

1.  If you disagree with some or all of what the plaintiff says in the complaint because you believe, or know it is not true, you can file an <u>ANSWER</u>.
2.  If you have a claim in the same case against the plaintiff, you may file a <u>CROSS-COMPLAINT</u>.
3.  If you want to ask the court to do something on your behalf, you may file a <u>MOTION</u> (See *TYPES OF MOTIONS below*)

## HOW DO I PREPARE AN ANSWER?

There are two kinds of Answers you can use, depending on whether the Complaint was verified. You can tell if a Complaint is verified because it says "Verified Complaint" and/or has a signed oath on the last page.

**For complaints that are NOT verified:**

> Use Judicial Council form PLD-050 -- General Denial

**For complaints that ARE verified:**

  a.  For personal injury, property damage, and wrongful death claims, use Judicial Council PLD-PI-003 (do <u>not</u> check number 2).
  b.  For contract claims, use Judicial Council PLD-C-010 (do <u>not</u> check number 3a).
  c.  Be sure to deny <u>every</u> claim with which you disagree. For example, you might write: *"I believe, or know, that the information in paragraph #__ is untrue/incorrect."* Continue your list until you have addressed each paragraph in the Complaint.

**NOTE:** The Judicial Council Answer forms have spaces for your affirmative defenses. Be sure to include them or you may not be able to use them later. To find out what your affirmative defenses might be, go to the law library and ask the librarian to help you find the information you need.

**If you want to file a Cross-Complaint, you must do so at the same time you file the Answer.**

  a.  For a personal injury, property damage, and/or wrongful death Cross-Complaint, use Judicial Council form PLD-PI-002.
  b.  For a contract Cross-Complaint, use Judicial Council PLD-C-001.

## TYPES OF MOTIONS

Written motions are documents that ask the court to do something. You may have to file an *Answer* at the same time. At this point in the case, you can only make Motions from the following list:

1.  <u>Demurrer</u>  *(the facts stated in the complaint are wrong, or the deadline to file the lawsuit has passed);*
2.  <u>Motion to Strike</u> *(the complaint is unclear; does not follow the law, "doesn't matter", etc.);*
3.  <u>Motion to Transfer</u> *(the complaint is in the wrong court or there's a more appropriate court);*
4.  <u>Motion to Quash Service of Summons</u>  *(you were not legally served);*
5.  <u>Motion to Stay</u>  *(put the case on hold);* or
6.  <u>Motion to Dismiss</u> *(stops the case).*

**NOTE: Motions are very complicated and you may want to hire a lawyer to help you.**

## WHERE CAN I GET MORE HELP?

- **Lawyer Referral Service**:  (925) 825-5700
- **Bay Area Legal Aid:**   (800) 551-5554
- **Contra Costa County Law Library**    Martinez: (925) 646- 2783        Richmond:  (510) 374-3019
- **Ask the Law Librarian:**    www.247ref.org/portal/access_law3.cfm

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
# IN AND FOR THE COUNTY OF CONTRA COSTA

_____

_____
Plaintiff(s) / Cross Plaintiff(s)

vs.

_____

_____
Defendant(s) / Cross Defendant(s)

### *ADR Case Management Stipulation and Order*
### *(Unlimited Jurisdiction Civil Cases)*

CASE NO: _____

---

► ALL PARTIES STIPULATING TO ADR AND DELAYING THEIR CASE MANAGEMENT CONFERENCE 90 DAYS MUST **SUBMIT THE ORDER FOR THE JUDGE'S SIGNATURE AND FILE THIS FORM AT LEAST 15 DAYS BEFORE THEIR CASE MANAGEMENT CONFERENCE.** (NOT AVAILABLE IN COMPLEX LITIGATION CASES.)

► PARTIES MUST ALSO **SEND A COPY OF THIS FILED STIPULATION AND ORDER TO THE ADR OFFICE**: EMAIL adrweb@contracosta.courts.ca.gov  FAX: (925) 608-2109  MAIL: P.O. BOX 911, MARTINEZ, CA 94553

---

**Counsel and all parties agree to delay their case management conference 90 days to attend ADR and complete pre-ADR discovery as follows:**

1. Selection and scheduling for Alternative Dispute Resolution (ADR):
   a. The parties have agreed to ADR as follows:
      i. ❑ Mediation  (❑ Court-connected ❑ Private)
      ii. ❑ Arbitration  (❑ Judicial Arbitration (non-binding)  ❑ Private (non-binding)  ❑ Private (binding))
      iii. ❑ Neutral case evaluation
   b. The ADR neutral shall be selected by *(date):* _____ *(no more than 14 days after filing this form)*
   c. ADR shall be completed by *(date):* _____ *(no more than 90 days after filing this form)*
2. The parties will complete the following discovery plan:
   a. ❑ Written discovery:  (❑ Additional page(s) attached)
      i. ❑ Interrogatories to:
      ii. ❑ Request for Production of Documents to:
      iii. ❑ Request for Admissions to:
      iv. ❑ Independent Medical Evaluation of:
      v. ❑ Other:
   b. ❑ Deposition of the following parties or witnesses: (❑ Additional page(s) attached)
      i. _____
      ii. _____
      iii. _____
   c. ❑ No Pre-ADR discovery needed
3. The parties also agree: _____
_____
4. Counsel and self-represented parties represent they are familiar with and will fully comply with all local court rules related to ADR as provided in Title Three; Chapter 5, will pay the fees associated with these services, and understand that if they do not, without good cause, comply with this stipulation and all relevant local court rules, they may be subject to sanctions.

| Counsel for Plaintiff *(print)* | Fax | | Counsel for Defendant *(print)* | Fax |
|---|---|---|---|---|
| Signature | | | Signature | |
| Counsel for Plaintiff *(print)* | Fax | | Counsel for Defendant *(print)* | Fax |
| Signature | | | Signature | |

---

Pursuant to the Stipulation of the parties, and subject to the *Case Management Order* to be filed, **IT IS SO ORDERED** that the Case Management Conference set for _____ is vacated and rescheduled for _____ at (8:30 a.m. / _____ ) **Plaintiff / Plaintiff's counsel must notify all parties of the new case management conference.**

Dated: _____       _____
                                                                    **Judge of the Superior Court**

**CM-110**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | *FOR COURT USE ONLY* |
|---|---|
| TELEPHONE NO.:                          FAX NO. *(Optional):* <br> E-MAIL ADDRESS *(Optional):* <br> ATTORNEY FOR *(Name):* | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF |
|---|
| STREET ADDRESS: |
| MAILING ADDRESS: |
| CITY AND ZIP CODE: |
| BRANCH NAME: |

| PLAINTIFF/PETITIONER: |
|---|
| DEFENDANT/RESPONDENT: |

| CASE MANAGEMENT STATEMENT | CASE NUMBER: |
|---|---|
| *(Check one):*  ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000)  ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | |

| A **CASE MANAGEMENT CONFERENCE** is scheduled as follows: |
|---|
| Date:                          Time:                          Dept.:                          Div.:                          Room: |
| Address of court *(if different from the address above):* |
| ☐ **Notice of Intent to Appear by Telephone,  by** *(name):* |

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one):*
   a. ☐ This statement is submitted by party *(name):*
   b. ☐ This statement is submitted **jointly** by parties *(names):*

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date):*
   b. ☐ The cross-complaint, if any, was filed on *(date):*

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not):*
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names):*
      (3) ☐ have had a default entered against them *(specify names):*
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served):*

4. **Description of case**
   a. Type of case in  ☐ complaint  ☐ cross-complaint  *(Describe, including causes of action):*

Form Adopted for Mandatory Use <br> Judicial Council of California <br> CM-110 [Rev. July 1, 2011]

**CASE MANAGEMENT STATEMENT**

Cal. Rules of Court, <br> rules 3.720–3.730 <br> www.courts.ca.gov

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b. Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5. **Jury or nonjury trial**
   The party or parties request ☐ a jury trial ☐ a nonjury trial. *(If more than one party, provide the name of each party requesting a jury trial):*

6. **Trial date**
   a. ☐ The trial has been set for *(date):*
   b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

   c. Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7. **Estimated length of trial**
   The party or parties estimate that the trial will take *(check one):*
   a. ☐ days *(specify number):*
   b. ☐ hours (short causes) *(specify):*

8. **Trial representation** *(to be answered for each party)*
   The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
   a. Attorney:
   b. Firm:
   c. Address:
   d. Telephone number:                    f. Fax number:
   e. E-mail address:                       g. Party represented:
   ☐ Additional representation is described in Attachment 8.

9. **Preference**
   ☐ This case is entitled to preference *(specify code section):*

10. **Alternative dispute resolution (ADR)**
    a. **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.

    (1) For parties represented by counsel: Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

    (2) For self-represented parties: Party ☐ has ☐ has not reviewed the ADR information package identified in rule 3.221.

    b. **Referral to judicial arbitration or civil action mediation** (if available).

    (1) ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

    (2) ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

    (3) ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

**CASE MANAGEMENT STATEMENT**

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. c. Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information)*:

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply)*: | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation)*: |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for *(date):*<br>☐ Agreed to complete mediation by *(date):*<br>☐ Mediation completed on *(date):* |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for *(date):*<br>☐ Agreed to complete settlement conference by *(date):*<br>☐ Settlement conference completed on *(date):* |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for *(date):*<br>☐ Agreed to complete neutral evaluation by *(date):*<br>☐ Neutral evaluation completed on *(date):* |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for *(date):*<br>☐ Agreed to complete judicial arbitration by *(date):*<br>☐ Judicial arbitration completed on *(date):* |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for *(date):*<br>☐ Agreed to complete private arbitration by *(date):*<br>☐ Private arbitration completed on *(date):* |
| (6) Other *(specify)*: | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for *(date):*<br>☐ Agreed to complete ADR session by *(date):*<br>☐ ADR completed on *(date):* |

**CASE MANAGEMENT STATEMENT**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**11. Insurance**

a. ☐ Insurance carrier, if any, for party filing this statement *(name):*

b. Reservation of rights: ☐ Yes ☐ No

c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**12. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.

☐ Bankruptcy ☐ Other *(specify):*

Status:

**13. Related cases, consolidation, and coordination**

a. ☐ There are companion, underlying, or related cases.

(1) Name of case:

(2) Name of court:

(3) Case number:

(4) Status:

☐ Additional cases are described in Attachment 13a.

b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**14. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**15. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**16. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery):*

| Party | Description | Date |
|---|---|---|

c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify):*

**CASE MANAGEMENT STATEMENT**

CM-110

| | |
|---|---|
| PLAINTIFF/PETITIONER: | CASE NUMBER: |
| DEFENDANT/RESPONDENT: | |

**17. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**18. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**19. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**20. Total number of pages attached** *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.



## CONTRA COSTA COUNTY SUPERIOR COURT
## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

All judges in the Civil Trial Delay Reduction Program agree that parties should consider using Alternative Dispute Resolution (ADR) to settle their cases. To tell the court you will use ADR:

- Choose ADR on the *Case Management Form (*CM-110);
- File a *Stipulation and Order to Attend ADR and Continue First Case Management Conference 90-Days* (local court form); or
- Agree to ADR at your first court appearance.

*Questions?  Email adrweb@contracosta.courts.ca.gov or call (925) 608-2075*

## MEDIATION
Mediation is often faster and less expensive than going to trial. Mediators help people who have a dispute talk about ways they can settle their case. Parties email, fax or visit the ADR Programs office to get a list of mediators. After parties have agreed on a mediator, they must write a summary (5 pages or less) explaining the facts, legal arguments, and legal authority for their position. They must send this summary to the other parties and the mediator at least 5 court days before mediation starts.

ALL parties and attorneys must go to mediation. Mediation can be held whenever and wherever the parties and the mediator want, as long as they finish before the court deadline. In some kinds of court cases, parties have the chance to mediate in the courthouse on their trial day.

Most mediators begin by talking with the parties together, helping them focus on the important issues. The mediator may also meet with each party alone. Mediators often ask parties for their ideas about how to settle the case. Some mediators tell the parties how much money they think a case is worth, or tell them what they think might happen if the case went to trial. Other mediators help the parties decide these things for themselves. No matter what approach a mediator takes, decisions about settling a case can only be made when all the parties agree.

If the parties go through the court ADR program, mediators do not charge fees for the first half hour spent scheduling or preparing for mediation. They also do not charge fees for the first two hours of mediation. If parties need more time, they must pay the mediators regular fees. Some mediators ask for a deposit before mediation starts. Mediators who do this must give back whatever is left after counting the time he or she spent preparing for or doing the mediation. A party whose court fees have been waived (cancelled) may ask if their mediation fees or deposit can be waived.

If parties agree about how they will settle their case, they can choose to keep it private, write it up as a contract, or ask the judge to make it a court order. What parties say and agree to in mediation is confidential (private).

## PRIVATE MEDIATION
Private mediation works in the same way as judicial mediation, but the parties do not go through the ADR Programs office. Parties choose a mediator on their own, and pay the mediator's normal fees.

## JUDICIAL ARBITRATION (non-binding)

In judicial arbitration, an independent attorney (arbitrator) looks at the evidence, listens to the parties and their witnesses, and decides how the case will be settled. Judicial arbitration is less formal than court. Parties email, fax or visit the ADR Programs office to get a list of arbitrators. If they cannot agree on an arbitrator, the court will assign one. The judge can send cases to arbitration if there is less than $50,000 in dispute. The person who started the court case can make sure the case goes to arbitration if they agree to limit the amount they are asking for to $50,000. Parties can also agree they want to use judicial arbitration. The arbitrator must send their decision (award) to the court within 10 days of the last hearing. The award becomes a court judgment unless a party asks the court to review the case within 60 days. Parties must use the ADR-102 form to ask for a new court hearing (called a trial de novo.) Judicial arbitrators charge $150 per case or per day.

## PRIVATE ARBITRATION (non-binding and binding)

Private, non-binding arbitration is the same as judicial arbitration, except that the parties do not go through the ADR Programs office to choose an arbitrator, and the arbitrator's award will not become a judgment of the court unless all parties agree. Parties must pay the arbitrator's normal fees.

Binding arbitration is different from judicial or private non-binding arbitration because the arbitrator's decision is final. Parties give up their right to have a judge review their case later (except for reasons listed in California Code of Civil Procedure, Section 1286.2.) Binding arbitration rules are listed in California Code of Civil Procedure, Sections 1280-1288.8. Parties may also agree any time before the judge has made a decision that ends the case to switch to binding arbitration. Parties choose the arbitrator on their own, and must pay the arbitrator's normal (not $150) fees.

## SETTLEMENT MENTOR CONFERENCE

Settlement mentors are independent, experienced trial attorneys that a judge has assigned to help parties look for ways to settle their case. The conference is free and is held in the courthouse. It is often held on the morning of trial, but it can be scheduled anytime. These conferences usually last two or three hours. Parties do not present evidence and do not call witnesses. Parties can ask the settlement mentor to keep some information confidential (private) from the other party, but not from the judge. The settlement mentor can share any information with the judge, or involve the judge in settlement discussions. All principals, clients, and claims representatives must attend the settlement mentor conference.

## NEUTRAL CASE EVALUATION

In neutral case evaluation, an independent attorney (evaluator) reviews documents and listens to each party's side of the case. The evaluator then tells the parties what they think could happen if the case went to trial. Many people use the evaluator's opinion to reach an agreement on their own, or use this information later in mediation or arbitration to settle their case.

Parties email, fax or visit the ADR Programs office to get a list of evaluators. After parties have agreed on an evaluator, they must write a summary (5 pages or less) explaining the facts, legal arguments, and legal authority for their position. They must send this summary to the other parties and the evaluator at least 5 court days before evaluation starts. ALL parties and their attorneys must go to neutral case evaluation. The evaluation can be held whenever and wherever the parties and the evaluator want, as long as they finish before the court deadline. If the parties go through the court's ADR program, evaluators do not charge any fees for the first half hour spent scheduling or preparing for the evaluation conference. They also do not charge fees for the first two hours of the evaluation. If parties need more time, they must pay that evaluators regular fees. Some evaluators ask for a deposit before evaluation starts. Evaluators who do this must give back whatever is left after counting the time he or she spent preparing for or doing the evaluation. A party whose court fees have been waived (cancelled) may ask if their evaluation fees or deposit can be waived.

## TEMPORARY JUDGE

Some parties want a trial, but want to choose who will decide the case and when the trial will take place. Parties can agree on an attorney that they want the court to appoint as a temporary judge for their case. (See Article 6, Section 21 of the State Constitution and Rule 2.830 of the California Rules of Court.) Temporary judges have nearly the same authority as a superior court judge to conduct a trial and make decisions. As long as the parties meet the court deadline, they can schedule the trial at their own and the temporary judge's convenience.

Each of the temporary judges on the court's panel has agreed to serve at no charge for up to 5 court days. If the parties need more time, they must pay that person's regular fees. All parties and their lawyers must attend the trial, and provide a copy of all briefs or other court documents to the temporary judge at least two weeks before the trial. These trials are similar to other civil trials, but are usually held outside the court. The temporary judge's decision can be appealed to the superior court. There is no option for a jury trial. The parties must provide their own court reporter.

## SPECIAL MASTER

A special master is a private lawyer, retired judge, or other expert appointed by the court to help make day-to-day decisions in a court case. The special master's role can vary, but often includes making decisions that help the discovery (information exchange) process go more smoothly. He or she can make decisions about the facts in the case. Special masters can be especially helpful in complex cases. The trial judge defines what the special master can and cannot do in a court order.

Special masters often issue both interim recommendations and a final report to the parties and the court. If a party objects to what the special master decides or reports to the court, that party can ask the judge to review the matter. In general, the parties choose (by stipulation) whom they want the court to appoint as the special master, but there are times (see California Code of Civil Procedure Section 639), when the court may appoint a special master or referee without the parties' agreement. The parties are responsible to pay the special master's regular fees.

## COMMUNITY MEDIATION SERVICES

Mediation Services are available through non-profit community organizations. These low-cost services are provided by trained volunteer mediators. For more information about these programs contact the ADR Program at adrweb@contracosta.courts.ca.gov

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Victor M. Sher                                    SBN: 96197<br>SHER EDLING LLP<br>425 California St., Ste. 810, SAN FRANCISCO, CA 94104<br>TELEPHONE NO.: (628) 231-2500      FAX NO. *(Optional)*: (628) 231-2929<br>E-MAIL ADDRESS *(Optional)*: vic@sheredling.com<br>ATTORNEY FOR *(Name)*: City of Imperial Beach | *FILED*<br>2017 JUL 24   1:14<br>CLERK OF THE SUPERIOR COURT<br>CONTRA COSTA CA<br>K. VAQUERANO |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA
 STREET ADDRESS: 725 Court Street
 MAILING ADDRESS: 725 Court Street
 CITY AND ZIP CODE: Martinez, 94553
 BRANCH NAME: Wakefield Taylor Courthouse

PLAINTIFF/PETITIONER: City of Imperial Beach, et al.

DEFENDANT/RESPONDENT: Chevron Corp., et al.

| REQUEST FOR DISMISSAL | CASE NUMBER: C17-01227 |
|---|---|

**A conformed copy will not be returned by the clerk unless a method of return is provided with the document.**

**This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a class action. (Cal. Rules of Court, rules 3.760 and 3.770.)**

1. TO THE CLERK: Please dismiss this action as follows:
   a. (1) [ ] With prejudice   (2) [X] Without prejudice
   b. (1) [ ] Complaint   (2) [ ] Petition
      (3) [ ] Cross-complaint filed by *(name)*:                       on *(date)*:   **BY FAX**
      (4) [ ] Cross-complaint filed by *(name)*:                       on *(date)*:
      (5) [ ] Entire action of all parties and all causes of action
      (6) [X] Other *(specify)*:* Dismissal of Complaint without prejudice solely as to Defendant Statoil ASA

2. *(Complete in all cases except family law cases.)*
   The court [ ] did [ ] did not waive court fees and costs for a party in this case. *(This information may be obtained from the clerk. If court fees and costs were waived, the declaration on the back of this form must be completed).*
   Date:
   Victor M. Sher
   _____
   (TYPE OR PRINT NAME OF [X] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)
   ▶ _____ /s/ Victor Sher _____
                                          (SIGNATURE)
   *If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.
   Attorney or party without attorney for:
   [X] Plaintiff/Petitioner   [ ] Defendant/Respondent
   [ ] Cross-Complainant

3. TO THE CLERK: Consent to the above dismissal is hereby given.**
   Date: July 24, 2017      Victor M. Sher
   _____
   (TYPE OR PRINT NAME OF [X] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)
   ▶ _____ /s/ Victor Sher _____
                                          (SIGNATURE)
   ** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).
   Attorney or party without attorney for:
   [ ] Plaintiff/Petitioner   [ ] Defendant/Respondent
   [ ] Cross-Complainant

*(To be completed by clerk)*
4. [X] Dismissal entered as requested on *(date)*:   **JUL 24 2017**
5. [ ] Dismissal entered on *(date)*:                  as to only *(name)*:
6. [ ] Dismissal **not** entered as requested for the following reasons *(specify)*:

7. a. [ ] Attorney or party without attorney notified on *(date)*:
   b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
      [ ] a copy to be conformed   [ ] means to return conformed copy

Date: **JUL 24 2017**                  Clerk, by _____ K. VAQUERANO _____, Deputy

Form Adopted for Mandatory Use<br>Judicial Council of California<br>CIV-110 [Rev. Jan. 1, 2013]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.;<br>Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390<br>Westlaw Doc & Form Builder   www.courts.ca.gov